## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SUREFIRE DIVIDEND CAPTURE, LP, | : **Civil Action No.:** |
| | : |
| Plaintiff, | : **Complaint** |
| v. | : |
| | : |
| BRENDA SMITH, RENATO ESCOBAR IREGUI, | : **Jury Trial Demanded** |
| BRISTOL ADVISORS, LLC, CV BROKERAGE, | : |
| INC., CV INTERNATIONAL INVESTMENTS, | : |
| LTD., CV INVESTMENTS, LLC, INVESTMENT | : |
| CONSULTING LLC, WILLIAM THOMAS | : |
| MCCORMACK, ANTHONY SCOTT | : |
| KOPENHEFFER, SANVILLE & CO., and THE | : |
| NOTTINGHAM COMPANY. | : |
| | : |
| Defendants. | : |
| | : |

## COMPLAINT

Plaintiff Surefire Dividend Capture, LP ("Surefire") brings this action to recover

its $46,598,676.84 redeemed interest in Broad Reach Capital, LP ("BRC" or the "Fund"), an

allegedly liquid hedge fund controlled by Defendant Brenda Smith ("Ms. Smith") that purported

to invest solely in equities and options trading strategies.  As detailed herein, following the

missed redemption of its investment, Surefire has uncovered a massive securities fraud whereby

Ms. Smith and her Defendant compatriots induced Surefire and its predecessor to invest in the

Fund based on false and misleading representations, including the Fund's strategy, holdings, and

active oversight provided by the "independent" fund administrator, Defendant The Nottingham

Company ("Nottingham"), and independent auditing by Defendant Sanville & Co. ("Sanville").

Ms. Smith has since been arrested on federal charges for securities and wire fraud in connection

with BRC.  Additionally, the Securities and Exchange Commission has sued Ms. Smith, BRC

and several of other entities for securities fraud and frozen their assets and bank accounts.

Based on information uncovered to date, it is apparent that Defendants did not

invest Plaintiff's funds into publicly traded equities and options as represented, or in any

investment intended to benefit Plaintiff, but instead used the funds to pay earlier investors and

divert monies to entities controlled by Ms. Smith and other places yet known.  A centerpiece of

Defendants' scheme was to create and disseminate fictitious account statements of investment

holdings and returns.  But after three years of generating these false investment reports,

Defendants' scheme ultimately collapsed.  In an effort to cover tracks, Ms. Smith told Surefire a

string of fake excuses as to why its redemption had not been paid (*i.e.*, "I am waiting on one

banker acknowledgment…"), and then in June 2019, resorted to falsifying the Fund's holdings,

claiming that the Fund held an HSBC bond allegedly worth $129 million - - when public records

directly show that it does not - - and $20 million worth of "securitized crypto-currency"

evidenced by a "screen shot" of a crypto wallet - - when no such asset exists.  Unlike Ms. Smith,

the bank records do not lie.  Those records show Plaintiff's investments being immediately

transferred to earlier investors and other entities owned/controlled by Ms. Smith.

Surefire asserts claims for fraud, aiding and abetting fraud, aiding and abetting

breach of fiduciary duty, negligent misrepresentation, and conversion, as well as claims under §§

10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j

and 78t(a), and Rules 10b-5(a), (1), and (c), 17 C.F.R. § 240.10b5, promulgated thereunder by

the Securities and Exchange Commission ("SEC"), and 70 P.S. §§ 1-401, 1-501, and 1-503(a) of

the Pennsylvania Securities Act (the "Act").

## PARTIES

1.      Plaintiff Surefire is a limited partnership with a principal place of business at 8360 Rue Bougainville, Montreal, Quebec, Canada.  As described below, Surefire is both a direct investor in the Fund as well as the successor in interest to three related funds.

2.      Defendant Brenda A. Smith is an individual who has a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Upon information and belief, Ms. Smith resides at 222 West Rittenhouse Square, Philadelphia, PA 19103.

3.      Defendant Renato Escobar Iregui ("Mr. Iregui") is an individual who, upon information and belief, resides at 331 East Lytle Street, Murfreesboro, TN 37130.  Mr. Iregui is a director of Broad Reach Capital and Defendant CV International Investments, Ltd. He also is the sole member of a Tennessee entity called Investment Consultants, PLLC ("TN Investment Cons").

4.      Defendant William Thomas McCormack ("Mr. McCormack") is an individual who, at all relevant times, had a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Mr. McCormack is employed by CV Brokerage, Inc.  Upon information and belief, Mr. McCormack resides at 1521 E. Malaga Road, Williamstown, NJ 08094.

5.      Defendant Anthony Scott Koppenheffer ("Mr. Koppenheffer") is an individual who, at all relevant times, had a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Mr. Koppenheffer is employed by CV Brokerage, Inc.  Upon information and belief, Mr. Koppenheffer resides at 2 Twin Oaks Court, Sewell, NJ 08080.

6.      Defendant Bristol Advisors, LLC ("Bristol Advisors" or the "Investment Advisor") is a Delaware limited liability company with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  At all relevant times, Bristol Advisors acted as the investment manager to the Fund pursuant to an agreement between Bristol Advisors and BRC.  Bristol Advisors was owned and controlled by Ms. Smith.

7.      A "Firm Organization Chart" showing the structure of BRC and Bristol Advisors is attached as Exhibit 1.

8.      Defendant CV Investments, LLC ("CV Investments") is a Pennsylvania limited liability company with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  At all relevant times, CV Investments was owned and controlled by Ms. Smith.

9.      Defendant CV International Investments, Ltd. ("CV International") is a United Kingdom private limited company with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.   At all relevant times, CV International was owned and controlled by Ms. Smith.

10.      Defendant CV Brokerage, Inc. ("CV Brokerage") is a Financial Industry Regulatory Authority ("FINRA") registered broker dealer with a principal place of business at 200 Four Falls Corp. Center, Suite 211, Conshohocken, PA 19428.  Ms. Smith founded CV Brokerage.  At all relevant times, CV Brokerage was owned and controlled by Ms. Smith and Mr. McCormack.

11.      Defendant Investment Consulting LLC ("Investment Cons") is a Pennsylvania limited liability company with a principal place of business at 300 Conshohocken

State Road, Suite 200, West Conshohocken, PA 19428.  Upon information and belief,

Investment Cons was owned and controlled by Ms. Smith at all relevant times.

12.     Defendant Sanville & Co. ("Sanville" or the "Auditor") is a Pennsylvania

company with a principal place of business at 1514 Old York Road, Abington, PA 19001.  At all

relevant times, Sanville held itself out as the independent third-party auditor for BRC.

13.     Defendant The Nottingham Company ("Nottingham" or the

"Administrator") is a North Carolina corporation with a principal place of business at 116 South

Franklin Street, Rocky Mount, NC 27804.  At all relevant times, Nottingham held itself out as

the independent third-party administrator for BRC.

## JURISDICTION

14.     This Court has jurisdiction over the subject matter of this action pursuant

to § 27 of the Exchange Act, 15 U.S.C. § 78aa.  The claims asserted herein arise under and

pursuant to §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules

and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. 240.10b-5.

15.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1331.

16.     This Court has supplemental jurisdiction over the pendant state law claims

pursuant to 28 U.S.C. § 1367(a).

17.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15

U.S.C. § 78aa, and 28 U.S.C. §§ 1391 (b) and (c) in that many of the acts and transgressions

alleged herein occurred in substantial part in this District.

## FACTS

### Brenda Smith

18.     For decades, Ms. Smith had been recognized and respected in the

Philadelphia financial community.  She is a certified public accountant, internal auditor, and

international tax specialist with more than twenty-five (25) years of tax and financial

management experience at top firms, including Deloitte & Touche LLP.

19.     Ms. Smith also owned a FINRA registered broker/dealer - - CV Brokerage

- - and held FINRA Series 7, 24, 27, 53, 63, and 79 licenses.

20.     Ms. Smith also owned seats on both the New York Stock Exchange

(NYSE) and the Philadelphia Stock Exchange (PHLX).

### The Genesis and Creation of Broad Reach Capital Partners

21.     Upon information and belief, prior to the creation of BRC, Ms. Smith ran

an investment fund known as TA1, LLC ("TA1"), in which she utilized certain options strategies

that netted significant returns.

22.     Upon information and belief, the investors in TA1 were friends and family

of Ms. Smith.

23.     In early 2016, Ms. Smith determined to open a fund for qualified investors

- - named BRC - - ostensibly to replicate her successful TA1 strategies to a larger audience.

24.     In Spring 2016, Ms. Smith began pitching investors to place funds with

BRC; the central thesis being that she had gained access to the coveted "dividend capture" trade

and had been granted increased capacity to participate in that lucrative options business.  As

described herein, Defendants, through marketing materials, tear sheets, private placement

memorandums, and multiple due diligence calls, told a consistent and compelling story.

6

25.    Specifically, the dividend capture trade employs a combination of investing in options on both a long (*i.e.*, buying/call) and short (*i.e.*, selling/put) basis.  These options are timed to capture a stock's dividend.  The buy/sell options are also intended to offset each other, thus, allowing for liquidation of the position in the stock a few days after capturing the dividend.  Simply put, the strategy was intended to capture dividends with low risk and with high liquidity.

**The A Funds' Investment into BRC**

26.    Aalii Fund, LP and Alpha Capital Partners, LP, (collectively, the "A Funds") are investment vehicles.

27.    In multiple pre-investment discussions, both Ms. Smith and Mr. McCormack told the A Funds, through their authorized representative, that the "crown jewel" of BRC's investment strategy, which accounted for approximately thirty-five percent (35%) of the Fund's revenue, was the dividend capture trade.

28.    Ms. Smith and Mr. McCormack further explained that the dividend capture trade generally yielded exceptional returns and had an eighty-five percent (85%) "hit rate" (*i.e.*, approximately 85% of the dividend capture trades made money).

29.    Mr. McCormack further told the A Funds that the dividend capture trade was like an "old boys club," that "you can't participate unless you are invited," and that he and Ms. Smith "ran the club."

30.    This "old boys club" theme was echoed in BRC's promotional materials, including a Trading Strategies Summary (the "Trading Strategies Summary") that Mr. McCormack provided to the A Funds prior to their investment in BRC.  Specifically, the Trading Strategies Summary states that that there is a "material barrier to entry for the dividend trade."

31.     A true and accurate copy of the Trading Strategies Summary is attached hereto as Exhibit 2.

32.     Mr. McCormack also told the A Funds that the BRC investment was one-hundred percent (100%) attributed to publicly traded equities and equity options, and that Ms. Smith was personally invested in BRC, resulting in an alignment of interests.

33.     Likewise, Ms. Smith also told the A Funds that one-hundred percent (100%) of BRC's revenue came from the various equities and options trading strategies. Ms. Smith provided the A Funds with a written "attribution analysis" that broke down BRC's revenues by percentage (the "Attribution Analysis").

34.     The Attribution Analysis provided as follows:

Broad Reach:  Revenue Percentage Break Down as of September 30, 2016

| | | |
|---|---|---|
| - | Dividend trade | 35% |
| - | Volatility skew | 18% |
| - | Vix Spread | 32% |
| - | Intraday Traders | 6% |
| - | Opportunistic Trade | 9% |
| | | 100% |

35.     A true and accurate copy of the Attribution Analysis is attached hereto as Exhibit 3.

36.     As part of those discussions, Ms. Smith provided the A Funds with a slide deck (the "April 4, 2016 Slide Deck") that provided, in relevant part:

a.     BRC's "Distinctly Different Trading Strategies" for equities and equity options - - specifically, Dividend Trade, Volatility Skew Trade, Vix Options spreads, and Intra-day actively traded equities and options;

b.     "Liquidity:  Broad Reach Capital maintains a 90 day lock up for new dollars; with liquidity available after 30 days notice on the first of each month;"

      c.        "Independent third party administrator - Nottingham Investment Vehicle Solutions;"

      d.        "Independent third party accounting firm - Sanville & Co.," a "Top 19 Auditor[s] of Hedge Funds;"

      e.        "GIPS compliant data available;"

      f.        "Efficient execution and clearing costs for large volumes of equity and options trading – *CV Brokerage Inc. is an affiliated entity*;" (emphasis added) and,

      g.        BRC maintained a ninety (90) day lock up for new investments with liquidity available after thirty (30) days notice of the first of each month.

37.     A true and accurate copy of the April 4, 2016 Slide Deck is attached hereto as <u>Exhibit 4</u>.

38.     Ms. Smith, Bristol Advisors, and CV Brokerage also provided the A Funds with a Private Placement Memorandum (the "PPM").

39.     A true and accurate copy of the PPM is attached hereto as <u>Exhibit 5</u>.

40.     The PPM describes BRC's principal investment strategy as an "Option Dividend Strategy," (*i.e.*, the dividend capture trade) which employs a combination of "deep in the money" options on both a long (*i.e.*, buying/call) and short (*i.e.*, selling/put) basis. These options were purportedly timed to capture a stock's dividend, and intended to offset each other, allowing BRC to liquidate its position in the stock a few days after capturing the dividend.

41.     The PPM further represented that Nottingham served as the Fund's Administrator providing "certain administrative, accounting and investor services to the Fund."

42.     Specifically, the PPM stated that, "[p]ursuant to the terms of an Administration Agreement between the Fund and the Administrator, the Administrator [was] responsible, under the ultimate supervision of the General Partner, for providing all

administrative services required in connection with the Fund's operations, including: (a)
managing the purchase and redemption process; (b) computing the Net Asset Value of the Fund;
(c) maintaining the register of investors and entering on such all issues, transfers, and redemption
of Interests in the Fund; and (d) performing such additional administrative duties relating to the
administration of the Fund as may subsequently be agreed upon in writing between the Fund and
the Administrator."

43.     In addition to speaking with Ms. Smith and Mr. McCormack, the A Funds
requested from BRC contact information for its third-party service providers, including its
Administrator, as well as a personal reference for Ms. Smith.

44.     Ms. Smith provided contact information for Nottingham's CEO, Kip
Meadows ("Mr. Meadows").

45.     In or around Spring 2016, prior to investing in BRC, A Funds'
representatives spoke with Mr. Meadows about the Fund.

46.     During these discussions, Mr. Meadows told the A Funds that:

a.      He had known Ms. Smith for many years and had a "very high
        trust level;"

b.      Nottingham had full access to everything at BRC and logs in
        directly to the portal to the brokerage account to "run monthly
        numbers;"

c.      Nottingham confirmed total assets under management, calculated
        performance and the performance fees, verified and reconciled all
        accounts, and produced monthly investor statements; and,

d.      Nottingham verified all returns on a monthly basis and account
        statements were only produced after such verification.

47.     Ms. Smith, Bristol Advisors, CV Brokerage, and Mr. McCormack also
gave the A Funds PowerPoint presentations about BRC.

48.     A true and accurate copy of a 2016 PowerPoint presentation about BRC (the "2016 Investor Presentation"), which was provided to the A Funds, is attached hereto as Exhibit 6.

49.     The 2016 Investor Presentation contained many of the same representations that were in the April 4, 2016 Slide Deck.

50.     Ms. Smith, Bristol Advisors, CV Brokerage, and Mr. McCormack also gave the A Funds "tear sheets" about BRC.  These tear sheets were prepared and transmitted to the A Funds by CV Brokerage, Ms. Smith and Mr. McCormack and often bore the Bristol Advisors name and logo.

51.     Upon information and belief, these tear sheets were prepared by Mr. McCormack and Mr. Koppenheffer.

52.     The tear sheets contained the following information about BRC:

a.      Its proprietary strategies for trading in equities and equity options (*e.g.*, Dividend Trades, VIX Option Trades, Volatility Skew Trade);

b.      Its monthly liquidity;

c.      Performance data, historic returns, and assets under management; and,

d.      Its oversight by independent third-party Administrator, Nottingham, and independent third-party Auditor, Sanville.

53.     A true and accurate copy of a July 2016 tear sheet (the "2016 Tear Sheet") is attached hereto as Exhibit 7.

54.     The A Funds relied on these representations contained in the April 4, 2016 Slide Deck, the PPM, the 2016 Investor Presentation, and the 2016 Tear Sheet in making their investments in BRC.

55.     The A Funds also relied upon the representations described above from Ms. Smith, Mr. McCormack, CV Brokerage, Nottingham, and Mr. Meadows in making their investments in BRC.

56.     In or around September 2016, the A Funds made their first investment in BRC.

57.     On or about November 22, 2016, the A Funds arranged for their independent administrator, NAV Fund Administration Group ("NFA"), to wire funds to BRC for two additional investments in the Fund.

58.     The Compliance Team at NFA, however, refused to authorize the transfers until it independently verified various representations in the PPM and other offering documents.

59.     Specifically, NFA contacted Sanville to verify its role as BRC's Auditor, the dates of its engagement, its review of BRC's trading records, and its examination and verification that TA1 had complied with all composite construction requirements of the Global Investment Performance Standards ("GIPS") for the year ending December 31, 2015 (the "2015 TA1 GIPS Audit").

60.     On or about November 23, 2016, NFA spoke with Nick Matteo ("Mr. Matteo"), a senior audit manager with over twenty (20) years' experience in the investment management industry at Sanville.

61.     During that call, Mr. Matteo confirmed that Sanville (i) had been engaged to audit BRC's financial statements for the year ending December 31, 2016, (ii) had examined and verified that TA1 had complied with all GIPS requirements for the year ending December 31, 2015, and (iii) that Sanville had not yet reviewed BRC's actual trading records.

62.     In an email from Mr. Matteo to NFA sent later that same day, Mr. Matteo provided a copy of the 2015 TA1 GIPS Audit.  He further explained that Sanville had not yet reviewed BRC's actual trading records because it not yet executed the engagement letter to perform BRC's 2016 audit.

63.     Shortly thereafter, NFA authorized wire transfers from the A Funds to BRC based on Mr. Matteo's representations, including his representation that Sanville would have access to of BRC's actual trades and performance calculations once it had finalized and executed the engagement letter to audit BRC's financial statements.

64.     Between September 2016 and May 2018, the A Funds invested approximately $27 million in BRC.

65.     Shortly after its initial investment, the A Funds were given access to Nottingham's investor portal, which each month purported to calculate the net asset value ("NAV") and investment returns of the Fund based upon the administrator's direct access to BRC's brokerage accounts.  Nottingham each month verified and confirmed to investors, including the A Funds, that BRC was fully invested in publicly traded securities that had liquid market value.  These monthly statements demonstrated that BRC was a growing, successful fund, and gave confidence to the A Funds to stay invested and further invest monies into the Fund.

66.     The above representations, moreover, were repeated in additional investor presentations and tear sheets that were provided to the A Funds during 2017 and 2018.

67.     Additionally, on June 22, 2017, Ms. Smith provided the A Funds with a 2016 Independent Auditor's Report for BRC (the "2016 Independent Auditor's Report") prepared by Sanville.

68.     The 2016 Independent Auditor's Report reaffirmed the A Funds' understanding that BRC was investing in equities and options trading utilizing the dividend capture strategy.  It further reaffirmed the A Funds' understanding that BRC was subject to oversight by independent third-parties.

69.     Indeed, the 2016 Independent Auditor's Report states in relevant part: "we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement. . . . . We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.  In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Broad Reach Capital, LP as of December 31, 2016, and the results of its operation and changes in partners' capital for the year then ended in accordance with accounting principles generally accepted in the United States of America."

70.     The notes to the financial statements included in the 2016 Independent Auditor's Report state that "[t]he majority of the Fund's securities are traded on national and international securities exchanges and are stated at the last reported sales price on the day of valuation."  And that "[i]n the normal course of business, substantially all of the Fund's securities transactions, money balances, and security positions are transacted with the Fund's broker: Industrial and Commercial Bank of China, a major brokerage firm."

71.     A true and accurate copy of Ms. Smith's June 22, 2017 email attaching the 2016 Independent Auditor's Report is attached hereto as Exhibit 8.

72.     The A Funds relied upon the representations described in 2016 Independent Auditor's Report in making subsequent investments in BRC.

73.     In March 2018, BRC advised the A Funds that Sanville was conducting an audit for BRC's 2017 financial statements.

74.     BRC, however, never provided the A Funds with such audited financial statements.

75.     The A Funds also relied upon the representations described above in Paragraphs 26 to 74 from Ms. Smith, Mr. McCormack, Nottingham, Mr. Meadows, and Sanville in making its investments in BRC.

**Surefire Investigates the BRC Investment Opportunity**

76.     Surefire is a special purpose vehicle created specifically to hold investments utilizing the dividend capture strategies.

77.     Beginning in or around August 2018, Surefire conducted wide-ranging due diligence of BRC.

78.     On August 30, 2018, Ariel Shlien ("Mr. Shlien") of Surefire spoke with Ms. Smith to discuss a possible investment in BRC.

79.     During these discussions, Ms. Smith represented to Surefire that:

a.     BRC utilized three trading strategies, all of which involved equities and equity options;

b.     BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors;

c.     BRC was overseen by both a third-party independent Administrator, Nottingham, and third-party independent Auditor, Sanville;

d.     Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC; and,

e.     BRC maintained a ninety (90) day lock up for new investments with liquidity available after thirty (30) days' notice of the first of each month.

80.     The next day, August 31, 2018, George Medina ("Mr. Medina"), BRC's Senior Managing Director of Global Sales, emailed Mr. Shlien a July 2018 tear sheet for BRC, which included the following representations:

a.     "Our fund maintains a high level of liquidity with a rigor and focus on creating consistent positive returns;"

b.     "The current portfolio of strategies include Dividend Capture, VIX Convergence, Volatility Skew, S&P Premium Capture, Opportunistic and Intraday Trading;"

c.     The funds offers "Monthly" liquidity;

d.     The Fund Administrator is Nottingham; and,

e.     The Fund Auditor is Sanville.

81.     A true and accurate copy of Mr. Medina's August 31, 2018 email attaching the July 2018 tear sheet is attached hereto as Exhibit 9.

82.     On September 13, 2018, Surefire had telephone call with Ms. Smith and Mr. Medina to further discuss a possible investment in BRC.  During this call, Ms. Smith and Mr. Medina represented that:

a.     Ms. Smith's personal investments represented approximately fifteen percent (15%) of BRC's assets;

b.     BRC trades about $150 million to $200 million each day;

c.     BRC's independent fund Administrator is Nottingham; and,

d.     BRC's tear sheets show its net returns.

83.     Mr. Medina and Ms. Smith later sent additional tear sheets to Surefire as part of its pre-investment due diligence (the "2018 BRC Tear Sheets").

84.     True and accurate copies of the 2018 BRC Tear Sheets are attached hereto as Exhibit 10.

16

85.     On October 9, 2018, Mr. Shlien and Jason Green ("Mr. Green"), a Surefire analyst, met with Ms. Smith, Mr. Medina, and two BRC traders, Mr. Koppenheffer and Jason Ferrari ("Mr. Ferrari"), at BRC's New York Office located at 1633 Broadway, 28th Floor, New York, NY 10019 to further discuss Surefire's possible investment in BRC.

86.     During the meeting, the BRC team represented that:

a.     BRC employed three core trading strategies: (1) dividend capture; (2) intra day/opportunistic; and (3) VIX Calls;

b.     Every trade has a tight stop loss;

c.     Every trade is hedged; and,

d.     Ninety percent (90%) of the trades are exited the same day.

87.     On October 11, 2018, Mr. Medina emailed Surefire BRC's 2018 investor PowerPoint presentation (the "2018 Investor Presentation"), which contained the following representations:

a.     "Since inception, 57.07% annualized return to investors, net of all fees and expenses;"

b.     "Alignment of Interests – [Ms.] Smith, 100% owner of the General Partner and Investment Manager of the Fund [BRC], with her Advisory Board and key employees constitute over 15% of the Fund;"

c.     BRC's Portfolio Construction consists of three strategies, "Dividend Capture," "Short-Term Opportunistic Trading," and "VIX Convergence;"

d.     BRC's "Reporting" is monitored by "Independent third party administrator: Nottingham Investment Vehicle Solutions" and "Independent third party audit firm: Sanville & Co;" and,

e.     BRC's "Offering Terms" include "Liquidity – Monthly with 30 days' notice with no lock-up."

88.     A true and accurate copy of Mr. Medina's email and the 2018 Investor Presentation is attached hereto as Exhibit 11.

89.     On October 22, 2018, Mr. Green spoke with Mr. Medina, Mr. Koppenheffer, and Mr. Ferrari to review the Dividend Capture Trading Strategy.  During that discussion, the BRC team represented that:

     a.     Dividend Capture trading comprises ~ 1/3 of the underlying fund's profits on average;

     b.     The traders average ten to twenty (10-20) trades per day for this strategy; and,

     c.     Ninety percent (90%) of the trades are closed within one day.

**Surefire is Provided 2016 Independent Auditor Report for BRC**

90.     On November 6, 2018, Ms. Smith sent to Surefire a copy of the 2016 Independent Auditor's Report, which was prepared by Sanville.

**Nottingham Confirms Its Role as the Fund's Gatekeeper**

91.     On November 21, 2018, Mr. Green at Surefire spoke to Mr. Meadows at Nottingham as part of Surefire's due diligence before investing in BRC.  During that call, Mr. Meadows told Mr. Green that:

     a.     Nottingham had known and worked with Ms. Smith for six to seven (6-7) years;

     b.     Nottingham calculated the monthly NAV of the fund;

     c.     Nottingham verified monthly performance through online portal to the brokerage account;

     d.     Nottingham generated and sent monthly statements to investors;

     e.     Nottingham reviewed the fund balance monthly, reconciled statements and calculated performance fees; and,

     f.     Nottingham had online access to all the brokerage accounts.

92. On December 13, 2018, Mr. Medina emailed Surefire a copy of BRC's PPM.

93. The PPM represents that Nottingham served as the Fund's independent third-party Administrator and provided certain administrative, accounting and investor services to the Fund.

94. Specifically, the PPM states that "[p]ursuant to the terms of an Administration Agreement between the Fund and the Administrator, the Administrator [was] responsible, under the ultimate supervision of the General Partner, for providing all administrative services required in connection with the Fund's operations, including: (a) managing the purchase and redemption process; (b) computing the Net Asset Value of the Fund; (c) maintaining the register of investors and entering on such all issues, transfers, and redemption of Interests in the Fund; and (d) performing such additional administrative duties relating to the administration of the Fund as may subsequently be agreed upon in writing between the Fund and the Administrator."

95. A true and accurate copy of Mr. Medina's December 13, 2018 email is attached hereto as Exhibit 12.

**Ms. Smith Confirms Her Alleged Investment Into the Fund**

96. In December 2018, Surefire asked Ms. Smith for a copy of her BRC account statement so that it could verify her representation that she was personally invested in BRC and, thus, her interests were aligned with those of the fund.

97. Shortly thereafter, Ms. Smith provided Surefire with the November 2018 BRC account statement (the "Nov. 2018 Smith BRC Account Statement").

98.     A true and accurate copy of the Nov. 2018 Smith BRC Account Statement is attached as Exhibit 13.

**Mr. Iregui Poses as a BRC Investor and Vouches for Ms. Smith**

99.     As part of its due diligence, Surefire asked to speak with current BRC investors about their experiences with BRC and Ms. Smith.

100.    In response, Ms. Smith provided contact information for several persons, including Mr. Iregui.

101.    On October 2, 2018, representatives from Surefire spoke with Mr. Iregui on the telephone.  During the call, Mr. Iregui told Surefire, among other things, that: (a) he was a professional investor; (b) he had been invested in BRC for approximately two years; and (b) no one but Ms. Smith could replicate the dividend capture trade because it requires special infrastructure and being "grandfathered in."

102.    Upon information and belief, each of these statements was false and intended to bolster Ms. Smith's credibility and solicit Surefire's investment.  As described further below, it now appears that Mr. Iregui was in cahoots with Ms. Smith and was himself siphoning money from the Fund.

**Surefire's Investment in BRC**

103.    Between January and March 2019, Surefire invested approximately $4.5 million in BRC.

104.    Surefire relied on the representations contained in the PPM, the 2016 Independent Auditor's Report, the 2018 Investor Presentation, and the 2018 Tear Sheets in making its investments in BRC.

105.     Surefire also relied upon the representations described above in
Paragraphs 76 to 104 from Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Nottingham, Mr.
Meadows and Sanville in making its investments in BRC.

**The A Funds Transfers Their BRC Investments to Surefire**

106.     On or about February 27, 2019, the A Funds transferred their investments
in BRC to Surefire (the "Transfer") and, thereafter, became an investor in Surefire.  The Transfer
was approved in writing by BRC.

107.     Following the Transfer, Surefire's total investment in BRC was
approximately $46.6 million.

108.     The Transfer was recorded on BRC's books and records as a redemption
by the A Funds and a simultaneous investment of $41,580,190.90 by Surefire.

**Surefire Redeems its Limited Partnership Interests in BRC**

109.     In a March 18, 2019 letter from BRC's counsel, Blank Rome LLP ("Blank
Rome"), to Surefire, BRC threatened to involuntarily redeem Surefire's investment.  In the letter,
BRC accused Surefire of "improperly solicit[ing]" other BRC limited partners to transfer their
interests to Surefire.

110.     In light of BRC's odd behavior, baseless accusations and threats, Surefire
decided to fully redeem its investments in BRC as of March 31, 2019.

111.     Pursuant to § 7.1 of the LPA, Surefire submitted its Request for
Redemption.  Specifically, the request was attached to a response letter from Surefire's attorney,
Ulmer and Berne, LLP ("Ulmer"), to Blank Rome.

112.     A true and accurate copy of Ulmer's March 22, 2019 letter submitting
Surefire's Request for Redemption is attached hereto as Exhibit 14.

**BRC Accepts the Redemption and Promises to Return the Investment by May 15, 2019**

113.    Three days later, BRC accepted Surefire's redemption.

114.    In a March 25, 2019 letter from Blank Rome, BRC advised Surefire that the "Redemption request will be processed pursuant to the standard terms of Section 7.1 of the LPA."

115.    A true and accurate copy of Blank Rome's March 25, 2019 letter is attached hereto as Exhibit 15.

116.    In follow up emails, BRC confirmed: "The effective redemption date would be April 30, 2019.  The wire would go out on May 15, 2019."

117.    A true and accurate copy of the March 27-28, 2019 email chain between Blank Rome and Ulmer is attached hereto as Exhibit 16.

118.    Pursuant to the redemption request, on April 30, 2019, BRC closed Surefire's capital account.  Indeed, Surefire's BRC account statement shows that $46,598,676.84 was withdrawn in April 2019, and that the account had a $0 balance as of April 30, 2019.

119.    A true and accurate copy of Surefire's BRC account statement for April 2019 is attached hereto as Exhibit 17.

120.    Similarly, records from Nottingham showed that Surefire's capital account balance was $0 as of April 2019.

121.    A true and accurate copy of a print-out from Nottingham's web portal page is attached hereto as Exhibit 18.

122.    On May 3, 2019, Surefire emailed Ms. Smith asking for an update on the May 15, 2019 wire transfer.

123.     On May 6, 2019, Ms. Smith responded that she would provide confirmation closer to May 15, but "So far, we are on track."

124.     A true and accurate copy of the May 3-6, 2019 email exchange between Surefire and Ms. Smith is attached hereto as Exhibit 19.

125.     In short, BRC agreed to redeem Surefire's investment and wire $46,598,676.84 to Surefire on or before May 15, 2019 (the "Redemption Agreement").

**BRC Fails to Pay the Redemption and Lulls Surefire with Fraudulent Account Statements**

126.     BRC failed to wire the funds to Surefire on May 15, 2019 as promised.

127.     On May 17, 2019, Surefire emailed Ms. Smith, asking about the status of the wire transfer.

128.     Ms. Smith responded, stating: "I will know more exact wire date on Tuesday morning.  Thank you for your patience."

129.     On May 22, 2019, Surefire followed up with another email to Ms. Smith about the status of the wire.

130.     Ms. Smith responded: "I am waiting on one banker acknowledgment by close of business today."

131.     The next day, on May 23, 2019, Surefire again emailed Ms. Smith looking for a status on the wire.

132.     On May 30, 2019, Surefire emailed Ms. Smith, stating:

Brenda,

Both Christel and I have been trying to reach you without success. The wire is now 2 weeks late and each small delay you advise us of, passes without any notification or update from you.  Our investors are now calling us daily and the pressure for us is rising. This situation is simply not acceptable.  You are forcing us to

23

escalate this and I truly wish you would not put us in this position. Our relationship does not need to end like this.

PLEASE ISSUE THE REDEMPTION WIRE TODAY AND SEND US CONFIRMATION. If you are unable to do so, I need to understand why and have a person who can speak with to confirm the funds are available and delayed for whatever reason.

I am not sure how much more clear I can be.

Ariel

133.    Ms. Smith responded stating: "I will provide proof of funds or wire confirmation by the end of this week."

134.    The following morning, on May 31, 2019, Surefire emailed Ms. Smith, stating:

Brenda,

Today's the day!! We need the wire confirmation by 3 pm EST so the bank can make any wire cutoff time they may have. Please be advised I have shared with my investors your commitment to get the wire out today and have been given until the end of day today to get a confirmation to everyone. Failing which, I have been told that at least 2 will proceed to file complaints with SEC and FINRA against Broad Reach and perhaps Nottingham as well.

Please understand I am not threatening. I am just relaying the message I have received from my investors stemming from their deep frustration. You have had months to prepare for a May 15 wire date that you and your attorney have confirmed. The wire is now 2 weeks late and you have missed each of the 3 delay deadlines you have offered. I cannot contain this anymore. End of day today or this is out of my control . . .
Please get wire out today and email us written wire confirmation.

Ariel

135.    At 10:22 a.m. Ms. Smith responded: "Received and understood."

136.    A true and accurate copy of the May 17-31, 2019 email exchange is attached hereto as Exhibit 20.

137.   Later that same afternoon, Ms. Smith offered an excuse for why Surefire had not been paid.  Specifically, Ms. Smith claimed that BRC had invested in "long dated" option contracts and that liquidating those options to fund the redemption would "require her to take a haircut."  To avoid that purported "haircut," Ms. Smith stated that she or CV International - - a foreign investment fund managed by her - - would purchase Surefire's position in BRC.

138.   Ms. Smith told Surefire that she would provide "proof of funds" showing that Surefire's investment in BRC was intact.

139.   In a May 31, 2019 letter to Surefire, BRC wrote:

Dear Limited Partner:

This serves as notice that I am in receipt of your redemption request.  There has been a slight delay in receiving funds based on the attached resolution.  As such, **I wanted to provide this *proof of funds* so that your underlying investors know that their capital is intact.**

I do anticipate being able to transmit the funds during the month of June and will continue to work on increasing liquidity of this asset. I will keep you informed accordingly.

Sincerely,

Brenda A. Smith

(emphasis added).

140.   Ms. Smith's letter attached - - as purported proof of funds - - a document entitled "CV International Investments Limited - Action By Written Consent of the Directors." The document further states: "**RESOLVED**, the Company is the owner of medium term notes issued by HSBC Holdings PLC with the ISIN No. US404280AH22 and has transferred $100 Million of such notes to Broad Reach Capital LP effective as of December 31, 2017 and such transfer is hereby ratified, approved, adopted and confirmed . . . ." (emphasis added).

25

141.    The consent of directors was signed by both Ms. Smith and Mr. Iregui, as directors of CV International.

142.    A true and accurate copy of BRC's May 31, 2019 letter (which was emailed to Surefire at 4:10 p.m.) is attached hereto as Exhibit 21.

143.    As further "proof of funds," Ms. Smith emailed Surefire later that same evening an HSBC "bank statement" purporting to show CV International's ownership of a $2.5 billion bond (the "HSBC Bond").

144.    On June 14, 2019, Ms. Smith emailed Surefire stating that she was traveling to London the following week to monetize the HSBC bond.  She further asked Surefire not to tell anyone that she owned the HSBC Bond:

> Ariel –
>
> Please use this email address for me as this is offshore business.  I am going to London early next week to monetize the financial instrument.  The ISIN was in your letter and is US404280AH22. **For my safety, I would appreciate you keeping this information confidential (that I am the owner).**  If you can wait until next week, I should be able to have liquidity once in London bank.  I currently have the instrument at HSBC Hong Kong and the time zone difference is causing issues with certain transactions.  I do not expect to hear anything more from my HK banker until early next week as it is 11:30 p.m. on Friday night.  Hope this helps **and please do not forward this to anyone.**  Brenda

(emphasis added).

145.    A few hours later, Surefire responded to Ms. Smith's email, asking: "Why does Bloomberg show a completely different list of owners for this specific bond?  See attached Bloomberg analysis."

146.    Confronted with this email, Ms. Smith changed her story - - and claimed that she in fact represented very wealthy families who in turn owned the HSBC Bond, and that

she was brokering the sale of a $500 million portion of the HSBC bond to Metlife.  She further

claimed that the sale would close in June, and that she would use her commission on the sale to

purchase Surefire's $46.6 million interests in BRC.

147.    Over the next several days, Surefire pressed Ms. Smith for additional

information.  Ms. Smith responded with cryptic messages and repeated assurances that Surefire

would have its money soon.

148.    Defendants' representations concerning the "proof of funds" were false

when made and was intended to lull Surefire into a false sense of security so that it would delay

taking legal actions and expose the fraudulent scheme.

149.    Likewise, Defendants' claims regarding the imminent sale of some or all

of the HSBC Bond were false when made to induce Surefire to delay further action that would

expose the fraudulent scheme.

**BRC Refuses to Allow Surefire to Examine its Books and Records**

150.    Section 9.1 of the Limited Partnership Agreement ("LPA") provides

Surefire with the right to inspect and copy BRC's books and records within two business days of

any request.  Specifically, § 9.1 provides:

> The General Partner shall cause the Partnership to maintain true
> and accurate books, records, reports, and accounts in which shall
> be entered all transactions of the Partnership.  The General Partner
> shall also maintain all schedules and exhibits to this Agreement
> and shall update such schedules and exhibits promptly upon receipt
> of new information relating thereto.  **Copies of such books,
> records, reports, accounts and schedules shall be located at the
> principal office of the General Partner and *shall be available to
> any Partner for inspection and copying* upon at least two
> Business Days notice, during reasonable business hours . . . .**
>
> (emphasis added).

151.    On June 17, 2019, Surefire emailed Ms. Smith requesting detailed account statements that identified BRC's holdings.

152.    On June 18, 2019, Surefire again emailed Ms. Smith asking for an update on payment and stating "I need a copy of Broad Reach's books and records along with Broad Reach account statements.  This request will not go away … can you advise me who on your team or at Nottingham can assist me?"

153.    Ms. Smith ignored Surefire's request to inspect BRC's books and records. Instead, she repeatedly assured Surefire that it would receive its money soon.

154.    On June 25, 2019, counsel for Surefire sent a letter to BRC and Blank Rome demanding to inspect BRC books and records, pursuant to § 9.1 of the LPA.

155.    On June 27, 2019, Blank Rome acknowledged receipt of the request but stated that BRC needed "additional time to gather the materials" and review them for privilege.

156.    A true and accurate copy of Blank Rome's June 27, 2019 letter is attached hereto as Exhibit 22.

**The JAMS Arbitration to Enforce the Redemption**

157.    On July 1, 2019, Surefire filed a demand for arbitration to recover the proceeds from its redemption.[1]

158.    At the same time, Surefire filed an Emergency Motion for Preliminary Injunction.

159.    On July 3, 2019, the Arbitrator entered a Stipulated Temporary Order: (1) requiring BRC to immediately produce a listing of its assets with current valuations; (2)

---

[1] Pursuant to § 10.4 of the LPA, the arbitration was filed with JAMS in Pennsylvania.

compelling BRC to produce its books and records; and (3) freezing BRC's assets up to the amount of the unpaid redemption (*e.g.*, $46,598,676.84).

**BRC and Ms. Smith Flout the Arbitrator's Orders**

160.    On July 3, 2019, BRC supplied a one-page "listing of assets," which claimed that BRC held $129,560,000 in HSBC bonds, a "Securitized cryptocurrency" valued at $20,250,000, and $12 million in unidentified "Notes." The listing of assets further stated that BRC had approximately $2.6 million in its prime brokerage account and $750,000 in its bank accounts.

161.    When pressed to provide evidence that BRC actually owned these assets (*i.e.*, purchase documents and holder information), Defendants went radio silent and it is apparent that the asset list is completely fictitious.

162.    These alleged assets, moreover, are ***not*** consistent with the investment strategies described by BRC to investors in the PPM, Investor Presentations, attribution analysis, and tear sheets. They also are not consistent with Defendants' numerous representations to the A Funds and Surefire prior to their investing in BRC.

163.    A true and accurate copy of the July 3, 2019 listing of assets is attached hereto as Exhibit 23.

164.    Instead of producing its books and records, as required by the Stipulated Temporary Order, BRC produced sixty-two (62) pages of incomplete, misleading, and falsified documents.

165.    Because BRC failed to comply with the Stipulated Temporary Order, Surefire asked the Arbitrator to issue third-party document subpoenas to BRC's banks, administrator, auditors, and custodian.

166.    Despite stipulating to the subpoenas, upon information and belief, Ms. Smith contacted certain of the third-parties and interfered with their document production - - in some instances, directing them not to comply with the subpoenas.

**Documents Obtained by Surefire Expose the Securities Fraud**

167.    Documents that Surefire has obtained through the Arbitration demonstrate that Defendants' representations to induce the A Funds and Surefire to invest in BRC were false when made.

168.    Contrary to Defendants' representations, BRC was ***not*** invested 100% in equities and equity options.  Instead, the account statement produced by BRC's custodian, Industrial and Commercial Bank of China ("ICBC"), and BRC's Listing of Assets show that only a tiny fraction of the Funds' assets were actually used to trade equities and equity options.

169.    Contrary to Defendants' representations, moreover, Nottingham did not act as an independent third-party administrator for the Fund.  Nottingham was supposed to: (a) manage the purchase and redemption process; (b) compute the Net Asset Value of the Fund; and, (c) maintain the register of investors and enter on such all issues, transfers, and redemption of Interests in the Fund.

170.    Instead, Nottingham's emails show that it acted at the direction of Ms. Smith - - creating phony account statements from the information that Ms. Smith provided.

171.    In a February 22, 2017 internal Nottingham email, the CEO of Nottingham, Kip Meadows, wrote, in relevant part: "I just talked to her [Brenda Smith], she said she will send those % tonight. ***We can take her fund valuation data and create shareholder accounts. With a partnership the liability for the data is on the GP, not us. She recognizes that and is completely comfortable with the numbers she has provided.***" (emphasis added).

172.     In a June 6, 2018 internal email, Nottingham internally discussed its

potential liability for its involvement in BRC.  Specifically, Nottingham's EVP of Client

Development, Kate Honey wrote to its Mr. Meadows:

> *I have concern that 1) contract state's we're valuing, 2) we have*
> *documentation I think saying we need this info in order to be able to*
> *value, but never received it,* it might still be hard to prove.  Based on the
> latest communication, she's [Brenda Smith] had back/forth with him
> [another BRC investor] on calculations and could be throwing Nottingham
> under the bus.  We do not know b/c we are cut out!  I fear she could use
> Nottingham as scapegoat!

(emphasis added).

173.     Mr. Meadows replied:

> Understand.  I can find that out with a call to him.  I'll also reach back out
> to her.
>
> *The good thing is that a non registered fund isn't under purview of*
> *either SEC or FINRA and our role certainly isn't* but just like with any
> lawsuit, it doesn't necessarily matter whether it will succeed, it's the
> hassle expense factor during.

(emphasis added).

174.     A true and accurate copy of Nottingham's internal June 6, 2018 email

chain is attached as Exhibit 24.

175.     In August 2018, Nottingham again discussed its potential liability for its

involvement in BRC.  Specifically, an investor (Spouting Rock Asset Management) questioned

Nottingham about certain fees that Ms. Smith had charged BRC.  In responding to the inquiry,

Nottingham admitted:

> We do not receive a detail breakdown of the changes in the fund.  What
> we see from Brenda's report is the total earnings.  Brenda would be the
> person to provide the details as to the fee schedule.

176.    In his reply email, the investor wrote: "Are you not the administrator of the fund?  As such, is it not your responsibility to be doing the accounting and administration on the fund?"

177.    Nottingham discussed the situation internally, writing:

*I was worried about this.*  I raised the question when this started if Spouting Rock was aware of our limited role and responsibilities for the Broadreach relationship. *This is a sensitive account/relationship . . . .*

(emphasis added).

178.    Mr. Meadows then wrote to Ms. Smith:

You know I love you, but if we don't get this all straight and figured out within the next few weeks we're resigning.  I can't be put in a position where we are not doing our job because we don't have information and *we both look really bad and have tons of liability.*

(emphasis added).

179.    A true and accurate copy of the August 15, 2018 email chain concerning Spouting Rock is attached as Exhibit 25.

180.    Contrary to Ms. Smith's representations to Surefire, she was not personally invested in BRC.

181.    Indeed, the Nov. 2018 Smith BRC Account Statement was fabricated by Nottingham at Ms. Smith's request and direction.

182.    In a December 7, 2018 email to Nottingham, Ms. Smith wrote:

Surefire wants to see a statement for me.  Could you possibly prepare one for me?  I came into 2018 with 3,138,568 and have earned 12,345,000 incentive allocation thru Nov. 30 with draws of 2,000,000.

This is supposed to be the last item they need and I would really appreciate it.  Could you please email to me as I am on a river cruise for my sister's birthday.

183.    Nottingham responded:

Hey Brenda,

We will need the data broken down per month in order to generate a statement. Once we have received the information, we can generate the statement. Let me know if you have any questions.

184.    Ms. Smith replied: "Just divide evenly please as we only email him November."

185.    When pressed for more information by Nottingham, Ms. Smith wrote:

Can we please divide evenly? I am out of the country & can give all specifics as soon as back. **This is only for one prospect & will not go anywhere else.**

(emphasis added).

186.    Mr. Meadows then replied: "We'll come up with a ballpark based on other shareholders. We'll take care of it from here."

187.    A true and accurate copy of the December 7-11, 2018 email chain is attached as Exhibit 26.

188.    Nottingham then created the phony account statement and gave it to Ms. Smith so that she could provide it to Surefire and land its investment.

**The PNC Bank Statements Show that BRC Transferred Plaintiff's Investment to Earlier Investors and Other Entities Controlled By Ms. Smith**

189.    Bank account statements for BRC show that virtually none of Plaintiff's funds actually went to purchasing any legitimate fund assets.

190.    Instead, the account statements show that Ms. Smith quickly transferred Plaintiff's investments out of BRC to either earlier investors, one of her other entities (including but not limited to Investment Cons), or places not yet known.

33

191.    Upon information and belief, Ms. Smith transferred millions of dollars of

BRC's assets to Mr. Iregui either directly or through on of his entities, including but not limited

to TN Investment Cons.

**FINRA Investigates Ms. Smith and Bars Her from the Securities Industry**

192.    FINRA recently investigated Ms. Smith in connection with CV Brokerage.

193.    FINRA documents dated May 23, 2019 describe the investigation as

follows:

> Non-compliance with FINRA Rules 8210 and 2010 in that Ms.
> Smith failed to provide documents and information requested in
> connection with a FINRA investigation into potential
> misstatements about the financial performance of an investment
> fund that were made during the course of private securities
> transactions in which Ms. Smith participated.

194.    A true and accurate copy of Ms. Smith's FINRA Broker Check is attached

as Exhibit 27.

195.    Ms. Smith's Broker Check further states that she resigned from CV

Brokerage, Inc. on June 14, 2019 after allegations were made against her.

196.    On July 2, 2019, FINRA barred Ms. Smith from the securities industry.

**Ms. Smith Is Arrested and Charged with Securities Fraud.**

197.    On August 27, 2019, Ms. Smith was arrested by the Federal Bureau of

Investigation and charged with four counts of wire fraud and one count of securities fraud.

198.    According to the August 27, 2019 press release issued by United States

Attorney for the District of New Jersey (who is handling the criminal prosecution):

> Smith orchestrated a scheme using her investment fund,
> Broad Reach Capital, in which she lied to investors about
> the assets and performance of the fund and falsely stated
> that she would invest their funds in particular trading
> strategies.   Smith collected more than $100 million in

investments.   Instead of investing the money as she promised, she diverted millions of dollars of investor funds out of Broad Reach Capital for other purposes, including paying other investors.

199.   Ms. Smith is currently being detained pending her criminal trial.

**The Securities and Exchange Commission Sue Ms. Smith and Her Entities for Securities Fraud and Freeze Her Assets and the Bank Accounts of Her Various Entities.**

200.   On August 27, 2019, the Securities Exchange Commission ("SEC") filed a civil complaint for securities fraud against Ms. Smith, BRC, Broad Reach Partners, LLC, and Bristol Advisors.

201.   A true and accurate copy of the SEC Complaint is attached hereto as Exhibit 28.

202.   The SEC Complaint alleges that:

a.   "To solicit and retain investors, Defendants represented that the Fund employed several profitable, sophisticated trading strategies involving highly liquid securities, including those that it was uniquely positioned to pursue because of its access to the Philadelphia Stock Exchange trading floor ('Trading Strategies'). In reality, only a small fraction of investor money was actually used for these strategies." (SEC Complaint ¶4).

b.   "The vast majority of the funds were moved through the bank accounts of entities Smith controls and ultimately used to, among other things, make her own personal investments and to repay other investors. To lull existing investors and solicit additional investments, Defendants provided monthly account statements reflecting high returns and 'tear sheets' touting the Fund's overall claimed 30%+ yearly return and that the Fund had never had a losing month. These and other performance statements were false." (SEC Complaint ¶5).

c.   "since the Fund's inception, Smith used over $2 million of the Fund's assets (filtered through three of her entities) to pay American Express bills. None of this capital was engaged in the claimed profitable Trading Strategies." (SEC Complaint ¶25).

d.   "although investors contributed approximately $105 million to the Fund, the high point of all brokerage and bank accounts in the name of the Fund

and its purported affiliates was no more than $31.8 million in December 2016." (SEC Complaint ¶26).

**The Defendants Acted with Scienter**

203.     Defendants knew that the statements that they made to the A Funds and Surefire to induce their investments in BRC were false.

204.     Defendants knew, among other things, that:

a.     BRC was not investing the monies received from A Funds and Surefire in the enunciated trade strategies - - *e.g.,* "Dividend Capture," "Short-Term Opportunistic Trading," and "VIX Convergence;"

b.     BRC was not investing in highly liquid equities and equity options;

c.     the historical financial performance data provided to the A Funds and Surefire was false;

d.     BRC's 2016 audited financial statement, the tear sheets, and the PowerPoint presentations all were false;

e.     Ms. Smith was not personally invested in BRC and her interests were not aligned with the interests of the Fund;

f.     BRC had no independent third-party oversight from either Nottingham or Sanville; and,

g.     Funds were being siphoned out of BRC.

**No Safe Harbor**

205.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified specifically as "forward-looking statements" when made, and at most included a general, non-specific disclaimer in other portions of the same document. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false purportedly forward-looking statements because at the time each of those purportedly forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by BRC's executives, Ms. Smith and/or Mr. McCormack, who knew that those statements were false when made.

## CAUSES OF ACTION

### COUNT I
**(Violations of Section 10 (b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder Against Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer)**

206.     Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

207.     As detailed above, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer falsely represented to the A Funds and Surefire in connection with its purchase of limited partnership securities in BRC that, among other things: (i) BRC utilized three trading strategies, all of which involved equities and equity options; (ii) BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors; (iii) by using this strategy, BRC historically had consistent profitable returns since inception; (iv) BRC was overseen by both a third-party independent Administrator, Nottingham, and third-party independent Auditor, Sanville; and (v) Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC.

208.     These statements were materially false and misleading when issued because, among other things: (i) BRC was not investing in the equity and option strategies that it

represented to Plaintiff; (ii) BRC was not following any of the claimed procedures, including use of an independent third-party Administrator, to assure the Fund's investments were supported by real assets and transactions; (iii) liquidity was not available after thirty (30) days' notice of the first of each month; and (iv) Ms. Smith and her team were not investors in BRC and had no "alignment of interests."

209.    At all pertinent times, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer acted with the requisite scienter when issuing these false and misleading statements because: (i) they knew that they never intended to follow the investment objectives, strategies and methods that they claimed to be following; (ii) they knew that they were not following the investment objectives, strategies and methods that they claimed to be following; (iii) they knew or should have known that the bulk of BRC's assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; and, (iv) they knew that they had not taken any procedures, including use of an independent third-party Administrator to assure that the BRC's investments were supported by real assets and transactions.

210.    Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer knew or recklessly disregarded that their materially false and misleading statements were the principal means by which Surefire was induced to invest, make additional investments, and maintain its investments in BRC.

211.    Surefire would not have purchased the securities of BRC if it had known that the statements were materially false and misleading and/or omitted to state material facts necessary in order to make the statements made - - in light of the circumstances under which they were made - - not misleading, as detailed above.

212.     By virtue of the foregoing, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer individually and in concert with one another, violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they, directly and indirectly, by use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct whereby they knowingly and/or recklessly made material misrepresentations and failed to correct misrepresentations which were materially false and misleading in light of the circumstances in which they were made, employed devices, schemes and artifices to defraud, and engaged in acts and practices and a course of business that operated as a fraud and deceit upon Surefire in connection with its purchases of limited partnership interests in BRC.

213.     The misrepresentations were made in connection with the purchase and sale to investors, including Surefire, of limited partnership securities in BRC, and to induce it to purchase such limited partnership interests.

214.     As a direct and proximate result, Surefire has suffered damages in an amount to be proven at trial.

**COUNT II**
**(Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder Against Nottingham)**

215.     Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein

216.     As detailed above, and as specifically set forth in Paragraphs 169 through 179, Nottingham knowingly and/or recklessly, in disregard of red flags that should have alerted it to Ms. Smith's fraud and explicit warnings that such fraud was occurring, made materially false and misleading statements and issued false reports to Surefire.

217. Specifically, and as set forth in Paragraphs 43 through 45 and 91, Mr. Meadows told the A Funds and Surefire that Nottingham, as BRC's independent third-party Administrator: (i) had full access to everything at BRC and logs in directly to the portal to the brokerage account to "run monthly numbers;" (ii) confirmed total assets under management, calculated performance and the performance fees, verified and reconciled all accounts, and produced investor statements; (iii) verified all returns on a monthly basis and account statements are only produced after such verification; (iv) calculated the monthly NAV of the Fund; (v) verified monthly performance through online portal to the brokerage account; (vi) generated monthly statements and sends to investors; and, (vii) reviewed the Fund balance monthly, reconcile statements and calculates performance fees.

218. These statements were materially false and misleading when issued because Nottingham: (i) did not have access to *any* underlying information at BRC; (ii) did not confirm BRC's total AUM or verify and reconcile any investor accounts; (iii) did not verify any returns on a monthly basis before producing monthly statements; (iv) did not calculate the monthly NAV of the Fund; (v) did not verify monthly performance; and (vi) issued phony account statements based on the numbers Ms. Smith provided.

219. Nottingham knew or recklessly disregarded that its statements to the A Funds and Surefire, as well as the monthly investor statements issued by it, were the principal means by which the A Funds and Surefire were induced to invest and make additional investments in BRC, in that there was no other purportedly independently-verified information available to investors and limited partners upon which they could rely. Nottingham was under an affirmative duty to obtain competent evidential material verifying the assets held by BRC, yet it failed to do so.

220.     Surefire would not have purchased the securities of BRC if it had known that the statements Nottingham made were materially false and misleading and/or omitted to state material facts necessary in order to make the statements made - - in light of the circumstances under which they were made - - not misleading, as detailed above.

221.     By virtue of the foregoing, Nottingham individually and in concert with Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Mr. McCormack, violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that it, directly and indirectly, by use of means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct whereby it knowingly and/or recklessly made material misrepresentations and failed to correct misrepresentations which were materially false and misleading in light of the circumstances in which they were made, employed devices, schemes and artifices to defraud, and engaged in acts and practices and a course of business that operated as a fraud and deceit upon Surefire in connection with its purchases of limited partnership interests in BRC.

222.     The misrepresentations were made in connection with the purchase and sale to investors, including Surefire, of limited partnership interests in BRC, and to induce it to purchase such limited partnership interests.

223.     As a direct and proximate result, Surefire has suffered damages in an amount to be proven at trial.

## COUNT III
**(Violations of Section 20(a) of the Exchange Act Against Ms. Smith and Mr. McCormack)**

224.     Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

225.    Ms. Smith and Mr. McCormack are control persons of BRC, Bristol
Advisors, CV Investments, CV International, and CV Brokerage within the meaning of Section
20(a) of the Exchange Act, as alleged herein.

226.    At all times relevant herein, and as specifically alleged in Paragraphs 2
through 11, Ms. Smith and Mr. McCormack acted as control persons of BRC, Bristol Advisors,
CV Investments, CV International, and CV Brokerage within the meaning of Section 20(a) of the
Exchange Act.  Specifically, by virtue of their high-level positions, participation in and/or
awareness of BRC's, Bristol Advisors', CV Investments', CV International's, and CV
Brokerage's operations, direct involvement in the day-to-day operations, intimate knowledge of
the actual performance, and their power to control public statements about BRC, Ms. Smith and
Mr. McCormack had the power and ability to control the actions of BRC, Bristol Advisors, CV
Investments, CV International, CV Brokerage and its agents and employees, and did in fact
exercise such control and participation in the primary violation of Section 10(b) and Rule 10b-5
alleged herein.

227.    Ms. Smith and Mr. McCormack are liable for the wrongful conduct
alleged herein and are liable to Surefire for damages suffered thereby in amounts to be
determined at trial.

## COUNT IV
**(Violations of 70 P.S. §§ 1-401 and 1-501 of the Pennsylvania Securities Act Against Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer)**

228.    Surefire repeats, realleges, and incorporates the allegations set forth in the
Paragraphs above as if restated in full herein.

229.    At all times relevant herein, and as specifically alleged in Paragraphs 24
through 191, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage,

Mr. McCormack, and Mr. Koppenheffer made, approved, and disseminated untrue statements of material fact or omitted to state material facts necessary in order to make the statements made not misleading, in connection with the sale and purchase of limited partnership interests in BRC to Surefire in Pennsylvania.

230.    Specifically, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer falsely represented to Surefire in connection with its purchase of limited partnership interests in BRC that: (i) BRC utilized three trading strategies, all of which involved equities and equity options; (ii) BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors; (iii) by using this strategy, BRC historically had consistent profitable returns since inception; (iv) BRC was overseen by both a third-party independent Administrator, Nottingham, and third-party independent Auditor, Sanville; and (v) Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC.

231.    These statements were materially false and misleading when issued because Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer: (i) knew that they never intended to follow the investment objectives, strategies and methods that they claimed to be following; (ii) knew that they were not following the investment objectives, strategies and methods that they claimed to be following; (iii) knew or should have known that the bulk of BRC's assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; (iv) knew that they had not taken any procedures, including use of an independent third-party Administrator to assure that the BRC's investments were supported by real assets and transactions; (v) knew that the Fund did not offer monthly liquidity to investors; and (vi) knew

that Ms. Smith and her team were not investors in BRC and, therefore, had no alignment of interests.

232. In purchasing and holding BRC securities in Pennsylvania, Surefire relied directly on the false and misleading statements and omissions made by Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer. Surefire acquired BRC shares without knowledge that Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormick, Mr. Koppenheffer had misstated or omitted material facts.

233. Surefire would not have purchased BRC shares in the quantities it purchased, at the prices they paid, or at all, if it had been aware that the market prices had been artificially and falsely inflated by Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack, and Mr. Koppenheffer's misleading statements.

234. As a direct and proximate result of Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack, and Mr. Koppenheffer's conduct, Surefire has suffered damages in an amount to be proven at trial, plus pre-judgment and post-judgment interest, punitive damages, costs and such other relief as the Court determines to be necessary.

## COUNT V
### (Violations of 70 P.S. §§ 1-501 and 1-503 of the Pennsylvania Securities Act Against Nottingham)

235. Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

236.   Nottingham, individually and in concert with Ms. Smith, indirectly participated in a course of conduct employing devices, schemes and artifices to defraud in connection with the sale of limited partnership interests in BRC to Surefire.  Specifically, Nottingham, acting individually and in concert with others, materially aided in acts or transactions constituted by making material misrepresentations and/or omissions as specifically set forth in Paragraphs 169  through 188.

237.   As a direct and proximate result of Nottingham's conduct, Surefire has suffered damages in an amount to be proven at trial, plus pre-judgment and post-judgment interest, punitive damages, costs and such other relief as the Court determines to be necessary.

### COUNT VI
**(Fraud Against Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer)**

238.   Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

239.   As set forth more fully above, Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage knowingly or recklessly made numerous false and misleading statements of material fact and omitted to state material facts regarding BRC's operations, investment strategy, and liquidity.

240.   Specifically, Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage materially misrepresented, among other things: (i) BRC utilized three trading strategies, all of which involved equities and equity options; (ii) BRC's strategy of investing in liquid instruments (equities and equity options) provided monthly liquidity to its investors; (iii) by using this strategy, BRC historically had consistent profitable returns since inception; (iv) BRC was overseen by both a third-party

independent Administrator, Nottingham, and third-party independent Auditor, Sanville; and (v) Ms. Smith and her team had an "alignment of interests" because they also were investors in BRC.

241.    Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage made these misrepresentations in, among other places, the April 4, 2016 Slide Deck, the PPM, the 2016 Investor Presentation, the 2016 Tear Sheets, the 2018 Investor Presentation, and the 2018 Tear Sheets, written and oral presentations, and emails to Surefire and the A Funds as alleged in detail above.

242.    When they made their false statements and committed their omissions, Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage knew facts or had access to information suggesting that their public statements were not accurate or failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.

243.    Ms. Smith, Mr. McCormack, Mr. Koppenheffer, Bristol Advisors, CV Investments, CV International, and CV Brokerage made the false representations knowing of their falsity and with the intent to induce Surefire to rely upon the false representations in deciding to invest in the Fund.

244.    Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. Koppenheffer, and Mr. McCormack knew these representations were false when made and that Surefire would rely on these representations in deciding to invest in BRC.

245.    Surefire reasonably relied on these representations in making their initial investment in BRC, and could not, through the exercise of reasonable diligence, discover that these representations were false.

46

246.    As a direct and proximate result, Surefire has suffered damages in an amount to be proven at trial.

## COUNT VII
### (Aiding and Abetting Fraud Against Nottingham and Sanville)

247.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

248.    As detailed above, and as specifically set forth in Paragraphs 21 through 204, Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer perpetrated a massive fraud that included, among other things, making material misrepresentations about BRC in order to induce the A Funds and Surefire, to invest, make additional investments, or remain invested in BRC.

249.    Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack's, and Mr. Koppenheffer's representations about BRC were material to the A Funds' and Surefire's decision to invest in BRC, maintain their investments in BRC, and make additional investments in BRC.

250.    Nottingham and Sanville knew, or were reckless in not knowing, that Ms. Smith, Bristol Advisors, CV Investments, CV International, CV Brokerage, Mr. McCormack, and Mr. Koppenheffer were perpetrating a fraud.  Specifically, Nottingham and Sanville knew - - based on their independent review of BRC's underlying financial records, including actual trading records and account statements - - Nottingham and Sanville knew that (i) BRC was not following the investment objectives, strategies and methods represented to the A Funds and Surefire; (ii) the bulk of BRC's assets were moved to other accounts and/or treated inconsistently with the disclosed investment objectives, strategies and methods; (iii) BRC was not utilizing a third-parties to assure that BRC's investments were supported by real assets and transactions;

47

(iv) that BRC did not offer monthly liquidity to investors; and (v) knew that Ms. Smith and her team were not investors in BRC.

251.    Nottingham and Sanville knowingly substantially assisted Ms. Smith's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's, Mr. McCormack's, and Mr. Koppenheffer's fraud.

252.    Nottingham made direct material misrepresentations to the A Funds and Surefire that: it had access to underlying information at BRC; it confirmed BRC's total AUM and/or verified and reconciled investor accounts; verified returns on a monthly basis before producing monthly statements; calculated the monthly NAV of the Fund; and verified Fund performance.  Nottingham also created phony account statements which it disseminated to Surefire and the A Funds based on the numbers Ms. Smith provided.

253.    Sanville issued a clean audit report for BRC that it knew was materially false and misleading for the year ending December 31, 2016.

254.    Both Nottingham and Sanville knew that the A Funds and Surefire would rely upon such reports and statements and would rely upon their professional expertise in deciding to invest in BRC, maintain their investments in BRC, and make additional investments in BRC.  Specifically, Nottingham and Sanville knew that the reports issued by it were the principal means by which investors were induced to purchase shares of the Fund, and not to redeem their shares, in that there was no other purportedly independently-verified information available to investors upon which they could rely.

255.    As alleged herein, Nottingham's and Sanville's reckless statements and representations aided and abetted Ms. Smith's fraud.  Nottingham recklessly disregarded numerous red flags, as previously described, and engaged in acts and omissions constituting a

gross departure from professional standards of care for an independent administrator. Nottingham's and Sanville's breaches of these standards of care, and its grossly negligent and reckless disregard for its professional standards and obligations, gave substantial assistance to Ms. Smith's accomplishment of the fraud.

256.     As a direct and proximate result of Nottingham's and Sanville's acts in furtherance of Ms. Smith's fraud, Surefire has suffered damages in an amount to be proven at trial.

257.     The conduct of Nottingham and Sanville, in substantially assisting and aiding and abetting Ms. Smith's fraud, as set forth above, was malicious, willful, wanton, and oppressive, and in reckless disregard of the rights of Surefire, thereby warranting the imposition of punitive damages against Nottingham in addition to the compensatory damages in accordance with the proof at trial.

## COUNT VIII
### (Negligent Misrepresentation Against Nottingham and Sanville)

258.     Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

259.     Nottingham issued false statements containing inflated NAV calculations and account balance information on a monthly basis.

260.     In issuing these statements, Nottingham acted negligently because it knew or had access to information indicating that its statements were not accurate. Nottingham acted negligently by failing to check or verify the information received from Ms. Smith despite a duty to scrutinize and verify independently the information relating to the NAV and account balances. Nottingham's failure to check or verify the information was also negligent because it was aware

of the red flags surrounding BRC, including the consolidation of the roles of BRC, Bristol Advisors, and CV International, and Ms. Smith.

261.    Sanville issued the 2016 Independent Auditor's Report, which is addressed "To the Partners of Broad Reach Capital, LP." The 2016 Independent Auditor's Report contained material misstatements of fact, including among other things that: (i) BRC's financial statements as of December 31, 2016 were prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"); (ii) Sanville conducted its audit in accordance with auditing standards generally accepted in the United States of America ("GAAS") (ii) BRC held certain positions in equities and options; and (iv) substantially all of BRC's security transactions, money balances, and securities positions are transacted with ICBC.

262.    In issuing these statements, Sanville acted negligently because it knew or had access to information indicating that its statements were not accurate. Sanville acted negligently by failing to check or verify the information received from Ms. Smith, BRC, and CV Brokerage despite a duty to scrutinize and verify independently the information relating to the financial statements, as required by GAAS.

263.    Surefire justifiably relied on the information contained in Nottingham's statements. Further, Nottingham was paid substantial fees for performing administrative services.

264.    As a direct and proximate result of Nottingham's and Sanville's conduct, Surefire has suffered damages in connection with its purchases of shares in BRC in an amount to be proven at trial.

## COUNT IX
### (Conversion Against Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, and CV Brokerage, and Investment Cons)

265.    Surefire repeats, realleges, and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

266.    Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Investment Cons intentionally and unlawfully converted property of Surefire to their own use and benefit, to the harm and detriment of Surefire, as alleged herein.

267.    Specifically, as described in Paragraphs 109 to 121, records from both BRC and Nottingham show that $46,598,676.84 was withdrawn from Surefire's capital account as part of the redemption.

268.    The $46,598,676.84 is the property of Surefire.

269.    Surefire has demanded that Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Investment Cons return its $46,598,676.84.

270.    Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, and CV Brokerage, however, have failed to wire those funds to Surefire or account for their whereabouts.

271.    Ms. Smith, Mr. Iregui, Bristol Advisors, CV Investments, CV International, CV Brokerage, and Investment Cons have wrongfully exerted dominion over Surefire's property (*i.e.*, the $46,598,676.84 in missing funds) in denial of and/or inconsistent with Surefire's rights.

272.     As a direct and proximate result of Ms. Smith's, Mr. Iregui's, Bristol Advisors', CV Investments', CV International's, CV Brokerage's and Investment Cons' malfeasance, Surefire has suffered damages in an amount to be proven at trial.

## COUNT X
**(Aiding and Abetting Breach of Fiduciary Duty Against Bristol Advisors, Ms. Smith and Mr. Iregui)**

273.     Surefire repeats, realleges and incorporates the allegations set forth in the Paragraphs above as if restated in full herein.

274.     In acting or purporting to act as General Partner, Broad Reach Partners LLC owed fiduciary duties to Surefire by virtue of the PPM.  In addition, Surefire entrusted its investments to the General Partner who had substantial discretion and control over BRC's investment activities and assets and Surefire's investments. This discretion and control gave rise to a fiduciary duty and duty of care on the part of the General Partner to Surefire as evidenced by the following:

a.     The General Partner occupied a superior position over Surefire with respect to its management and control over their investments in the Fund and had superior access to confidential information about BRC's investments and assets; and,

b.     The General Partner's superior position necessitated that Surefire repose their trust and confidence in the General Partner to fulfill its duties, particularly with respect to BRC's investment activities and asset management, and Surefire did so by investing in the Fund.

275.     Bristol Advisors, Ms. Smith, and Mr. Iregui were aware of the fiduciary duties owed by the General Partner to Surefire as alleged above and that the General Partner was breaching its fiduciary duty to Surefire.

276.     By their conduct, Bristol Advisors, Ms. Smith, and Mr. Iregui knowingly participated, substantially assisted, and encouraged the General Partner to breach its fiduciary duties to Surefire as described above.

277.   As a direct and proximate result of (i) the General Partner's breaches of fiduciary duties; and, (ii) Bristol Advisors', Ms. Smith's, and Mr. Iregui's aiding and abetting those breaches, Surefire has suffered damages in an amount to be proven at trial.

## JURY DEMAND

Surefire demands trial by jury on all counts for which a jury trial is permitted.

## REQUEST FOR RELIEF

WHEREFORE, Surefire respectfully requests that the Court:

A.   Preliminarily enjoin Defendants from conveying, transferring, alienating, selling, hypothecating, encumbering, disposing or paying any accounts, payables or other sums, amounts, income or funds up to the amount of $46,598,676.84;

B.   Order a general attachment on all assets of Defendants in the amount of $46,598,676.84;

C.   Award Surefire damages in the amount of $46,598,676.84;

D.   Award Surefire prejudgment and post judgment interest;

E.   Award Surefire its reasonable attorney's fees and costs; and,

F.   Award such other relief as the Court deems just and proper.

_____
David Smith (atty. I.D. 21480)
Ira Neil Richards (atty. I.D. 50879)
Daniel P. Lawn (atty. I.D. 326114)
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 751-2503
Irichards@schnader.com

ATTORNEYS FOR PLAINTIFF

*Pro hac vice* pending:
William C. Nystrom
Dana A. Zakarian
Nina S. Hirsch
NYSTROM BECKMAN & PARIS LLP
One Marina Park Drive, 15th Floor
Boston, MA 02210
Telephone: (617) 778-9100
wnystrom@nbparis.com
dzakarian@nbparis.com
nhirsch@nbparis.com

Dated: September 6, 2019