# **Exhibit 12**

**Attachments:**     Broad Reach Capital_SubscriptionDoc_2016-3.pdf; Broad Reach Capital LP - LPA - 082016-3.pdf; Broad Reach Capital L P  - PPM 2016-3.pdf

From: **George Medina** <gmedina@bristoladv.com>
Date: Thu, Dec 13, 2018 at 10:11 AM
Subject: Onboarding Documents
To: Christel Leighton <christel@surefirecapital.com>, Ariel Shlien <ariel@surefirecapital.com>, Jason Green <jason@surefirecapital.com>

Hi Christel,

Please find Subscription, PPM, and LPA documents attached. Please let me know if you have any questions.

Best Regards,

George B. Medina

Senior Managing Director

Global Sales

1633 Broadway 28th Floor

New York, NY 10019

gmedina@bristoladv.com

Desk  610-671-2342

office  610-862-0880 ext 245

Cel  917-213-5010



**CONFIDENTIALITY NOTE:** This message is for the named person's use only. It may contain confidential, proprietary or legally privileged material. No confidentiality or privilege is waived by any accidental or unintentional transmission. If you receive this message in error, please immediately delete it and all copies of it from your system, destroy any hard copies and notify the sender. You must not, directly or indirectly, use, disclose, distribute, print or copy any part of this message if you are not the intended recipient. Bristol Advisors monitors all email and electronic communication. Bristol Advisors cannot guarantee the confidentiality of the material transmitted; therefore, information of a sensitive or confidential nature should not be transmitted. You should also be aware that Bristol Advisors will not accept orders for the purchase or sale of a security or other product via an e-mail transmission.  This email has been scanned for viruses, malware, and has been automatically archived by Mimecast Ltd.

# BROAD REACH CAPITAL, LP

## SUBSCRIPTION DOCUMENTS

# INVESTMENT PROCEDURES

Prospective investors should read the Confidential Memorandum for Broad Reach Capital, LP (the "Partnership"), the Limited Partnership Agreement of the Partnership as well as this booklet and the Anti-Money Laundering Supplement prior to subscribing to the Partnership.

If you are interested in purchasing an Interest (as defined herein), please complete all applicable pages as indicated below and promptly return this booklet and the Anti-Money Laundering Supplement to the General Partner to reserve an Interest in the Partnership.  Please retain a copy of all documents for your files.

☐      Investor Profile Form (page 11)

☐      General Eligibility Representations (pages 13)

☐      Form W-9 (page 21)

☐      Signature Pages (pages 26)

☐      Anti-Money Laundering Supplement (page S-1)

If you decide not to subscribe, please return the Confidential Memorandum for the Partnership, this booklet and the Anti-Money Laundering Supplement to the General Partner.

## WIRING INSTRUCTIONS

PNC Bank
ABA:  031000053
Account Name: BROAD REACH CAPITAL, LP
Account Number: 8611920902

**IMPORTANT**

1.      Please have your bank identify your name on the wire transfer.

2.      We recommend that your bank charge its wiring fees separately so that the amount you have elected to invest may be invested.

**CLEARED FUNDS MUST BE IN THE PARTNERSHIP'S ACCOUNT ONE BUSINESS DAY PRIOR TO THE DATE ON WHICH THE INVESTOR IS ADMITTED TO THE PARTNERSHIP.**

# SUBSCRIPTION AGREEMENT

Broad Reach Capital, LP
c/o Broad Reach Partners, LLC
200 Four Falls, Suite 211
1001 Conshohocken State Road
West Conshohocken, PA  19428

**Re:    Broad Reach Capital, LP—Issuance of Limited Partnership Interests**

The undersigned (the "Investor") wishes to become a limited partner of Broad Reach Capital, LP, a Delaware limited partnership (the "Partnership"), and to purchase a limited partnership interest (an "Interest") in the Partnership upon the terms and conditions set forth herein, in the Confidential Private Placement Memorandum of the Partnership, as the same may be updated or modified from time to time (the "Memorandum"), and in the Limited Partnership Agreement of the Partnership, as the same may be amended from time to time (the "Partnership Agreement").   Capitalized terms used herein but not defined herein shall have the meanings assigned to them in the Partnership Agreement.

Accordingly, the Investor agrees as follows:

## I.    SUBSCRIPTION FOR AN INTEREST

**(A)**    The Investor agrees to become a limited partner of the Partnership (a "Limited Partner") and, in connection therewith, subscribes for and agrees to purchase an Interest in and to make a capital contribution (a "Capital Contribution") to the Partnership.  Payment in cleared funds for an Interest must be received prior to the closing date established by the Partnership for the subscription (the "Closing Date").   Subject to any legal or regulatory restrictions before the Closing Date, the Investor's payment (the "Payment") will be held by the Partnership in a non-interest bearing account.  The minimum initial subscription is $1,000,000, subject to the discretion of Broad Reach Partners, LLC (the "General Partner") to accept a lower amount.

**(B)**    The Investor understands and agrees that the Partnership reserves the right to reject this subscription for an Interest for any reason or no reason, in whole or in part, and at any time prior to its acceptance.  If the subscription is rejected, the Payment will be returned, without interest, promptly to the Investor and this subscription agreement (the "Subscription Agreement") shall have no force or effect.  Upon acceptance of this subscription by the Partnership, the Investor shall become a Limited Partner.

## II.    REPRESENTATIONS AND COVENANTS OF THE INVESTOR

**(A)**    The Investor will not sell or otherwise transfer the Interest without registration under the Securities Act of 1933, as amended (the "Securities Act"), or an exemption therefrom.  The Investor understands and agrees that it must bear the economic risk of its investment for an indefinite period of time (subject to limited rights of redemption as provided in the Partnership Agreement) because, among other reasons, the Interest has not been registered under the Securities Act or under the securities laws of certain states and, therefore, cannot be sold, pledged, assigned or otherwise disposed of unless it is so registered or an exemption from registration is available.  The Investor understands that the Partnership is under no obligation to register the Interest on its behalf or to assist it in complying with any exemption from

registration under the Securities Act.  Furthermore, the Interest can only be transferred with the prior authorization of the General Partner, which may be withheld in the General Partner's sole discretion. The Investor understands and acknowledges that the General Partner in its sole discretion may cause a compulsory redemption of all or any portion of the Investor's Interest in accordance with the Partnership Agreement.

**(B)**     The Investor has received, carefully read and understands the Partnership Agreement and the Memorandum outlining, among other things, the organization and investment objectives and policies of, and the risks and expenses of an investment in, the Partnership.  The Investor acknowledges that it has made an independent decision to invest in the Partnership and that, in making its decision to subscribe for an Interest, the Investor has relied solely upon the Memorandum, the Partnership Agreement and independent investigations made by the Investor.  The Investor is not relying on the Partnership, the General Partner, Bristol Advisors LLC, a Delaware limited liability company (the "Investment Manager"), or any other person or entity with respect to the legal, tax and other economic considerations involved in this investment other than the Investor's own advisers.  The Investor's investment in the Interest is consistent with the investment purposes, objectives and cash flow requirements of the Investor and will not adversely affect the Investor's overall need for diversification and liquidity.

The Investor acknowledges that it is not subscribing pursuant hereto for an Interest as a result of or pursuant to:  (i) any advertisement, article, notice or other communications published in any newspaper, magazine or similar media (including any internet site whose information about the Partnership is not password protected) or broadcast over television or radio; or (ii) any seminar or meeting whose attendees, including the Investor, had been invited as a result of, or pursuant to, any of the foregoing.

The Investor has been provided an opportunity to obtain any additional information concerning the offering, the Partnership and all other information to the extent the Partnership or the General Partner possesses such information or can acquire it without unreasonable effort or expense, and has been given the opportunity to ask questions of, and receive answers from, the General Partner concerning the terms and conditions of the offering and other matters pertaining to this investment.

**(C)**     The Investor has not reproduced, duplicated or delivered the Memorandum, the Partnership Agreement or this Subscription Agreement to any other person, except professional advisers to the Investor or as instructed by the General Partner.  Notwithstanding anything to the contrary herein or in the Partnership Agreement, the Investor (and all each employee, representative or other agent of the Investor) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of (i) the Partnership and (ii) any of the Partnership's transactions, and all materials of any kind (including opinions or other tax analyses) that are provided to the Investor relating to such tax treatment and tax structure.

**(D)**     The Investor has such knowledge and experience in financial and business matters that the Investor is capable of evaluating the merits and risks of the Investor's investment in the Partnership and is able to bear such risks, and has obtained, in the Investor's judgment, sufficient information from the General Partner to evaluate the merits and risks of such investment.  The Investor has evaluated the risks of investing in the Partnership, understands there are substantial risks of loss incidental to the purchase of an Interest and has determined that the Interest is a suitable investment for the Investor.

**(E)**   The Investor is aware of the limited provisions for transferability and redemption from the Partnership and has read the sections of the Memorandum entitled "Redemptions" and "Restrictions of Transferability."  The Investor has no need for liquidity in this investment, can afford a complete loss of the investment in the Interest and can afford to hold the investment for an indefinite period of time.  The Investor acknowledges that distributions, including, without limitation, the proceeds of redemptions, may be paid in cash or in kind.

**(F)**   The Investor is acquiring the Interest for its own account, for investment purposes only and not with a view toward distributing or reselling the Interest in whole or in part.

**(G)**   The Investor understands that:

    (i)   No federal or state agency has passed upon the Interests or made any findings or determination as to the fairness of this investment; and

    (ii)   The representations, warranties, agreements, undertakings and acknowledgments made by the Investor in this Subscription Agreement will be relied upon by the Partnership and the General Partner in determining the Investor's suitability as a purchaser of an Interest and the Partnership's compliance with federal and state securities laws, and shall survive the Investor's admission as a Limited Partner.

**(H)**   The Investor has all requisite power, authority and capacity to acquire and hold the Interest and to execute, deliver and comply with the terms of each of the instruments required to be executed and delivered by the Investor in connection with the Investor's subscription for the Interest, including this Subscription Agreement, and such execution, delivery and compliance does not conflict with, or constitute a default under, any instruments governing the Investor, or violate any law, regulation or order, or any agreement to which the Investor is a party or by which the Investor may be bound.  If the Investor is an entity, the person executing and delivering each of such instruments on behalf of the Investor has all requisite power, authority and capacity to execute and deliver such instruments, and, upon request by the Partnership or the General Partner, will furnish to the Partnership true and correct copies of any instruments governing the Investor, including all amendments thereto.

**(I)**   All information which the Investor has provided to the Partnership or the General Partner concerning the Investor, the Investor's status, financial position and knowledge and experience of financial, tax and business matters, or, in the case of an Investor that is an entity, the knowledge and experience of financial, tax and business matters of the person making the investment decision on behalf of such entity, is correct and complete as of the date set forth herein.

**(J)**   The Investor understands that the value of a Limited Partner's capital account and redemptions therefrom under the Partnership Agreement, and the performance of the Partnership, may be based on unaudited and in some cases, estimated valuations of the Partnership's investments and that valuations provided in an Investor's account statement may be an unaudited, estimated value.

**(K)**   The Investor understands that the Partnership will not register as an investment company under the Investment Company Act of 1940, as amended (the "Company Act"), nor will it make a public offering of its securities within the United States.  The Investor understands that the Partnership relies on an exclusion from the definition of an investment company provided in section 3(c)(7) of the Company Act.  Consequently, each Limited Partner must be a "qualified purchaser" and "accredited investor," as

defined in Regulation D promulgated under the Securities Act. If the Investor is an entity, the Investor represents that (i) it was not formed for the purpose of investing in the Partnership, (ii) it does not invest more than 40% of its total assets in the Partnership, (iii) each of its beneficial owners participates in investments made by the Investor *pro rata* in accordance with its interest in the Investor and, accordingly, its beneficial owners cannot opt in or out of investments made by the Investor, and (iv) its beneficial owners did not and will not contribute additional capital (other than previously committed capital) for the purpose of purchasing the Interests.

**(L)**   If the Investor is a plan, as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and/or Section 4975(e)(1) of the Internal Revenue Code of 1986, as amended (the "Code"), or an entity whose underlying assets constitute "plan assets" under the U.S. Department of Labor's plan asset regulation at 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA, (a "Plan"), the person executing this Subscription Agreement on behalf of the Plan (the "Fiduciary") represents and warrants to the partnership that:

i.   such person is a "fiduciary" of such Plan and trust and/or custodial account within the meaning of Section 3(21) of ERISA, Section 4975(e)(3) of the Code, or other similar laws, policies, ordinances, or regulations applicable to the Investor, and such person is authorized to execute the Subscription Agreement;

ii.   unless otherwise indicated in writing to the Partnership, the Plan is not a participant-directed defined contribution plan (such as a 401(k) plan) or a partnership or other investment vehicle (a) in which its partners or participants have or will have any discretion to determine whether or how much of the Investor's assets are invested in any investment made or to be made by the Investor or (b) that is otherwise an entity managed to facilitate the individual decisions of its beneficial owners to invest in the Partnership;

iii.   the Fiduciary has considered a number of factors with respect to the Plan's investment in the Interest and has determined that, in view of such considerations, the purchase of an Interest is consistent with the Fiduciary's responsibilities under ERISA or other similar laws, policies, ordinances, or regulations applicable to the Investor. Such factors include, but are not limited to:

(a)   the role such investment or investment course of action plays in that portion of the Plan's portfolio that the Fiduciary manages;

(b)   whether the investment or investment course of action is reasonably designed as part of that portion of the portfolio managed by the Fiduciary to further the purposes of the Plan, taking into account both the risk of loss and the opportunity for gain that could result therefrom;

(c)   the composition of that portion of the portfolio that the Fiduciary manages with regard to diversification;

(d)   the liquidity and current rate of return of that portion of the portfolio managed by the Fiduciary relative to the anticipated cash flow requirements of the Plan;

(e)   the projected return of that portion of the portfolio managed by the Fiduciary relative to the funding objectives of the Plan; and

(f)    the risks associated with an investment in the Partnership and the fact that the Investor has only limited redemption rights.

iv.    the investment in the Partnership has been duly authorized under, and conforms in all respects to, the documents governing the Plan and the Fiduciary;

v.    the Fiduciary is: (a) responsible for the decision to invest in the Partnership; (b) independent of the Partnership; and (c) qualified to make such investment decision;

vi.    (a) neither the General Partner nor any of its employees or affiliates: (i) is a "fiduciary" (within the meaning of Section 3(21) of ERISA and/or Section 4975(e)(3) of the Code) of the Investor in connection with the Plan's investment in the Interest; (ii) manages any part of the Investor's investment portfolio on a discretionary basis; (iii) regularly gives investment advice with respect to the assets of the Investor; (iv) has an agreement or understanding, written or unwritten, with the Investor under which the latter receives information, recommendations or advice concerning investments which are used as a primary basis for the Investor's investment decisions; or (v) has an agreement or understanding, written or unwritten, with the Investor under which the latter receives individualized investment advice concerning the Investor's assets;

OR

(b) (i) the Fiduciary, who is independent of the General Partner, has studied the Memorandum and has made an independent decision to purchase Interests solely on the basis of such Memorandum and without reliance on any other information or statements as to the appropriateness of this investment for the Investor; and (ii) the Investor represents and warrants that neither the General Partner nor any of its employees or affiliates: (A) has exercised any investment discretion or control with respect to the Investor's purchase of Interests; (B) has authority, responsibility to give, or has given individualized investment advice with respect to the Investor's purchase of the Interests; or (C) is the employer maintaining or contributing to such Plan.

**(M)**    If applicable, the Investor has identified its status as a Benefit Plan Investor (as defined below) to the Partnership on pages 12.  If the Investor has identified to the Partnership on page 12 that it is not currently a Benefit Plan Investor, but becomes a Benefit Plan Investor, the Investor shall forthwith disclose to the General Partner promptly in writing such fact and also the percentage of such Investor's equity interests held by Benefit Plan Investors.  For these purposes, a "Benefit Plan Investor," as defined under the Department of Labor Regulation Section 2510.3-101(f), as modified by Section 3(42) of ERISA, includes, but is not limited to, retirement and other employee benefit plans subject to ERISA and/or Section 4975 of the Code as well as entities whose underlying assets include plan assets by reason of investment by plans in such entities.

**(N)**    If the Investor is a Benefit Plan Investor, governmental pension plan, or foreign pension plan,  then: (a) the purchase, holding and disposition of the Interest by the Investor will not result in a prohibited transaction under Section 406 of ERISA, Section 4975 of the Code, or other similar laws, policies, ordinances, or regulations applicable to the Investor for which an exemption is not available; (b) it has not solicited and has not received from the General Partner nor any of its employees or affiliates any evaluation or other investment advice on any basis in respect of the advisability of a subscription for an

7

Interest in light of the plan's assets, cash needs, investment policies or strategy, overall portfolio composition or plan for diversification of assets and it is not relying and has not relied on the General Partner nor any of its employees or affiliates for any such advice.

**(O)**   If the Investor is an insurance company and is investing the assets of its general account in the Partnership, it has identified on page 12 whether the assets underlying the general account constitute plan assets within the meaning of ERISA.  The Investor agrees to promptly notify the General Partner if there is a change in the percentage of the general account's assets that constitute plan assets within the meaning of ERISA and shall disclose such new percentage ownership.

**(P)**   The Investor acknowledges, understands and agrees that the General Partner has authority to allocate transaction costs to obtain research and brokerage services, as set forth in the Memorandum.  By signing this Subscription Agreement, the Investor expressly consents to any arrangement pursuant to which the General Partner obtains such products and services.

**(Q)**   The Investor acknowledges, or, if the Investor is acting as agent, representative or nominee for a subscriber (a "Beneficial Owner"), the Investor has advised the Beneficial Owner, that the Investment Manager may enter into agreements with placement agents providing for either: (i) a payment from the Investor to the particular placement agent; or (ii) a payment from the Investment Manager of a one–time or ongoing fee based upon the amount of the Capital Contribution of any Investor introduced to the Partnership by the agent.

**(R)**   The Investor understands that Andrew E. Hurni, Esq. acts as counsel to the Partnership, the General Partner, the Investment Manager and their affiliates.  The Investor also understands that, in connection with this offering of Interests and subsequent advice to the Partnership, the General Partner, the Investment Manager and their affiliates, Mr. Hurni will not be representing investors in the Partnership, including the Investor, and no independent counsel has been retained to represent investors in the Partnership.

**(S)**   If the Investor is a "charitable remainder trust" within the meaning of Section 664 of the Internal Revenue Code of 1986, as amended (the "Code"), the Investor has advised the General Partner in writing of such fact and the Investor acknowledges that it understands the risks, including specifically the tax risks, if any, associated with its investment in the Partnership.

**(T)**   The Investor understands and agrees that, although the Partnership, the General Partner and the Investment Manager will use its reasonable efforts to keep the information provided in the answers to this Subscription Agreement strictly confidential, the Partnership, the General Partner and the Investment Manager may present this Subscription Agreement and the information provided in answers to it to such parties (*e.g.*, affiliates, attorneys, auditors, administrators, brokers and regulators) as it deems necessary or advisable to facilitate the acceptance and management of the Investor's Capital Contributions including, but not limited to, in connection with anti-money laundering and similar laws, if called upon to establish the availability under any applicable law of an exemption from registration of the Interests, the compliance with applicable law and any relevant exemptions thereto by the Partnership, the General Partner, the Investment Manager or its affiliates, or if the contents thereof are relevant to any issue in any action, suit or proceeding to which the Partnership, the General Partner, the Investment Manager or its affiliates are a party or by which they are or may be bound.  The Partnership

8

may also release information about the Investor if directed to do so by the Investor, if compelled to do so by law or in connection with any government or self-regulatory organization request or investigation.

## III.   TAX INFORMATION

The Investor certifies under penalties of perjury that (A)(i) the Investor's name, taxpayer identification or social security number and address provided in the Investor Questionnaire are correct and (ii) the Investor will complete and return with this Subscription Agreement IRS Form W-9, Payer's Request for Taxpayer Identification Number and Certification, and (B)(i) the Investor is not a non-resident alien individual, foreign corporation, foreign partnership, foreign trust or foreign estate (as defined in the Code) and (ii) the Investor will notify the Partnership within 60 days of any change in such status. The Investor agrees to execute properly and provide to the Partnership in a timely manner any tax documentation that may be reasonably required by the General Partner in connection with the Partnership.

## IV.   GENERAL

(A)   The Investor agrees to indemnify and hold harmless the Partnership, its General Partner, the Investment Manager, each of their respective affiliates, and each other person, if any, who controls, is controlled by, or is under common control with, any of the foregoing, within the meaning of Section 15 of the Securities Act, against any and all loss, liability, claim, damage and expense whatsoever (including all expenses reasonably incurred in investigating, preparing or defending against any claim whatsoever) arising out of or based upon (i) any false representation or warranty made by the Investor, or breach or failure by the Investor to comply with any covenant or agreement made by the Investor, in this Subscription Agreement or in any other document furnished by the Investor to any of the foregoing in connection with this transaction or (ii) any action for securities law violations instituted by the Investor which is finally resolved by judgment against the Investor. The Investor also agrees to indemnify the Partnership, the General Partner, the Investment Manager and their respective affiliates and agents for any and all costs, fees and expenses (including legal fees and disbursements) in connection with any damages resulting from the Investor's assertion of lack of proper authorization from the Beneficial Owner to enter into this Subscription Agreement or perform the obligations hereof.

(B)   If any provision of this Subscription Agreement is invalid or unenforceable under any applicable law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such applicable law. Any provision hereof which may be held invalid or unenforceable under any applicable law shall not affect the validity or enforceability of any other provisions hereof, and to this extent the provisions hereof shall be severable.

(C)   If any answers provided or background documentation required under this Subscription Agreement is found to be false, forged or misleading, the Investor understands that the General Partner may terminate the interest of any Limited Partner from the Partnership as permitted under the Partnership Agreement.

## V.   TRUSTEE AGENT, REPRESENTATIVE OR NOMINEE

(A)   If the Investor is acting as trustee, agent, representative or nominee for a Beneficial Owner, the Investor understands and acknowledges that the representations, warranties and agreements made herein are made by the Investor:  (i) with respect to the Investor; *and* (ii) with respect to the Beneficial Owner.

The Investor represents and warrants that it has all requisite power and authority from said Beneficial Owner to execute and perform the obligations under this Subscription Agreement.

**(B)**    If the Investor will enter into a swap, structured note or other derivative instrument, the return from which is based in whole or in part on the return of the Partnership (the "Swap"), with a third party (a "Third Party"), the Investor represents and warrants that with respect to a Third Party entering into a Swap:   (i) the Third Party is authorized under its constitutional documents (*e.g.*, certificate of incorporation, by-laws, partnership agreement or trust agreement) and applicable law (including U.S. and non-U.S. anti-money laundering laws and regulations) to enter into the Swap and would also be so authorized to invest directly into the Partnership; (ii) the Third Party has received and reviewed a copy of the Memorandum, the Partnership Agreement, and this Subscription Agreement; (iii) the Third Party acknowledges that the Partnership and its affiliates are not responsible for the legality, suitability or tax consequences of the Swap and that the Investor is not an agent of the Partnership; and (iv) the Third Party is an "eligible contract participant" under the Commodity Futures Trading Commission (the "CFTC") rules and an "accredited investor" under Regulation D promulgated under the Securities Act. Nothing herein constitutes an agreement or statement by the Partnership as to the legality of a Swap or the suitability of a Swap for the Third Party.

## VI.    <u>ADDITIONAL INFORMATION AND SUBSEQUENT CHANGES IN THE FOREGOING REPRESENTATIONS; LEGENDS</u>

**(A)**    The Partnership may request from the Investor such additional information as it may deem necessary to evaluate the eligibility of the Investor to acquire an Interest, and may request from time to time such information as it may deem necessary to determine the eligibility of the Investor to hold an Interest or to enable the General Partner to determine the Partnership's or the General Partner's compliance with applicable regulatory requirements or the Partnership's tax status, and the Investor agrees to provide such information as may reasonably be requested.

**(B)**    The Investor agrees to notify the General Partner promptly in writing if there is any change with respect to any of the information or representations made herein and to provide the General Partner with such further information as the General Partner may reasonably require.

**(C)**    This Subscription Agreement may be executed through the use of separate signature pages or in any number of counterparts.  The counterparts shall, for all purposes, constitute one agreement binding on all the parties, notwithstanding that all parties do not execute the same counterpart.

# INVESTOR PROFILE FORM

## ALL INVESTORS MUST COMPLETE THIS PAGE.

_____

Name of Investor (*Please Print or Type*)

$_____

Amount of Subscription

_____

Social Security Number/Tax I.D. Number

Type of Investor—***Please check one***:

□ Individual       □ Registered Investment Company      □ Foundation
□ Partnership     □ Joint Tenants (with Rights of           □ Endowment
                     Survivorship
□ Corporation    □ Tenants in Common               □ Employee Benefit Plan
□ Trust          □ Individual Retirement Plan        □ Keogh Plan
□ Limited Liability Company    □ Charitable Remainder Trust

Full Mailing Address (***Exactly as it should appear on labels***):

□ Mr.        □ Mrs.       □ Ms.       □ Miss      □ Dr.       □ Other_____

_____
_____
_____
_____

_____      _____

Telephone Number                      Fax Number

Residence (if an individual) or Principal Place of Business (if an entity) Address (*No P.O. Boxes Please, if any*):

_____
_____
_____
_____

_____      _____

Telephone Number                      Fax Number

Address of Authorized Representative/Agent (*No. P.O. Box Please, if any*):

_____
_____
_____
_____

_____      _____

Telephone Number                      Fax Number

Attention:_____
E-Mail Address:_____
Agent E-Mail Address:_____

# INVESTOR PROFILE FORM

**COMMUNICATIONS TO INVESTOR**

Please send all communications to (***Please initial one***):

_____           Mailing Address
*Initial*

_____           Residence or Principal Place of Business Address
*Initial*

_____           Authorized Representative/Agent
*Initial*

_____           Investor Email Address:_____
*Initial*

_____           Agent Email Address:_____
*Initial*


By executing this Subscription Agreement the Investor hereby consents to electronic delivery of all Partnership materials, including but not limited to, monthly NAV calculations, correspondence, annual reports and periodic updates to offering materials.

# GENERAL ELIGIBILITY REPRESENTATIONS

**PLEASE COMPLETE ALL APPROPRIATE ITEMS.**

## I.   <u>INVESTOR INFORMATION</u>

**(A)**      Formation date of entity, if applicable:_____

**(B)**      If an entity, the Investor is organized under the laws of:_____

**(C)**

Was the Investor referred to the Partnership by a placement agent?  Yes ☐  No ☐

If yes, please provide name of placement agent:_____

**(D)**      The Investor hereby warrants and represents that:

*(Please initial one and complete blanks)*

_____      1.      If the Investor is an employee benefit plan, an endowment, a
*Initial*              foundation, a corporation, a partnership, a limited liability
                    company, a trust or other legal entity, it is:

                    organized under the laws of:_____
                    and has its principal place of business in :_____

_____      2.      If beneficial ownership of the Investor is held by an individual
*Initial*              (or an Individual Retirement Account, Keogh Plan, or other
                    self-directed defined contribution plan), such individual is of
                    legal age and is a resident of:

                    _____

**(E)**      The Investor _____ (is) _____ (is not) *(please initial one)* a "Benefit
Plan Investor" (as defined in Section II(N) of this Subscription Agreement).

(ii)  The Investor ____ (is) ____ (is not) *(please initial one)* subject to any rules or
regulations similar to the fiduciary responsibility provisions of ERISA, and/or the
prohibited transactions provisions of Section 4975 of the Code.

# GENERAL ELIGIBILITY REPRESENTATIONS

**(F)**      If the Investor is an entity, the Investor hereby certifies to either 1 or 2 below:

*(Please initial one)*

13

## GENERAL ELIGIBILITY REPRESENTATIONS

_____
*Initial*

1.  If the Investor is a corporation, partnership, limited liability company, trust or other entity, less than 25% of the value of each class of equity interests in the Investor is held by Benefit Plan Investors (as defined in Section II(N) of this Subscription Agreement).

_____
*Initial*

2.  Twenty-five percent (25%) or more of the value of any class of equity interests in the Investor is held by Benefit Plan Investors and no more than ____% of its value of any class of equity interests constitute or during the investment will constitute plan assets within the meaning of ERISA;

and

the Investor, _____ (is) _____ (is not) (***please initial one***) subject to the fiduciary responsibility provisions of ERISA and/or the prohibited transaction provisions of Section 4975 of the Code.

**(G)**   If the Investor is an insurance company, the Investor hereby certifies to either 1 or 2 below:

_____
*Initial*

1.  The Investor is an insurance company investing the assets of its general account in the Partnership but none of the underlying assets of the Investor's general account constitutes plan assets within the meaning of ERISA.

_____
*Initial*

2.  The Investor is an insurance company investing in the Partnership with the general account assets and a portion of the underlying assets of the Investor's general account constitutes plan assets within the meaning of ERISA; and no more than ____% of its general account constitute or during the investment will constitute plan assets within the meaning of ERISA; and

**(H)**   If the Investor is a governmental or foreign pension plan, the Investor certifies:

_____
*Initial*

That the Plan is not, as of the date hereof, subject to a law, policy, ordinance, or regulation that could cause the underlying assets of the Partnership to be subject to laws that are similar to the fiduciary standards of care under ERISA and/or the prohibited transactions rules under Section 406 of ERISA or Section 4975 of the Code; and the Investor agrees to promptly notify the General Partner if there is a change in the Investor's law with regard to this representation; and

**(I)**   If the investor is exempt from U.S. federal income tax, please indicate the basis for the exemption:_.

14

# GENERAL ELIGIBILITY REPRESENTATIONS

## II.   ACCREDITED INVESTOR STATUS

The Investor certifies that the Investor is an "accredited investor" as defined in Regulation D promulgated under the Securities Act because:

*(Please initial as appropriate)*

**(A)   Individuals**

_____
*Initial*
1.   The Investor has an individual net worth, or joint net worth with his or her spouse, in excess Initial of $1,000,000.  As used herein, "net worth" means the excess of total assets at fair market value, including home,[*] home furnishings and automobiles, over total liabilities; or

_____
*Initial*
2.   The Investor had individual income (exclusive of any income attributable to his or her spouse) of more than $200,000 in each of the past two years, or joint income with his or her spouse of more than $300,000 in each of those years, and reasonably expects to reach the same income level in the current year.[**]

**(B)   Corporations, Foundations, Endowments, Partnerships or Limited Liability Companies**

_____
*Initial*
1.   The Investor has total assets in excess of $5,000,000 and was not formed for the specific purpose of acquiring the Interests offered; or

---

[*]   Notwithstanding anything to the contrary herein, for purposes of determining "net worth," the principal residence owned by an individual shall be valued either at (A) cost, including the cost of improvements, net of current encumbrances upon the property, or (B) the appraised value of the property as determined upon written appraisal used by an institutional lender making a loan to the individual secured by the property, including the cost of subsequent improvements, net of current encumbrances upon the property. "Institutional lender" means a bank, savings and loan company, industrial loan company, credit union or personal property broker or a company whose principal business is as a lender secured by real property and which has such loans receivable in the amount of $2,000,000 or more.

[**]   For purposes of this Subscription Agreement, individual income means adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest income under Section 103 of the United States Internal Revenue Code of 1986, as amended (the "Code"), received; (ii) the amount of losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040; (iii) any deduction claimed for depletion under Section 611 *et seq.* of the Code; (iv) amounts contributed to an Individual Retirement Account (as defined in the Code) or Keogh retirement plan; (v) alimony paid; and (vi) any elective contributions to a cash or deferred arrangement under Section 401(k) of the Code.

_____
*Initial*
2.   Each of the Investor's equity owners is an accredited investor for either of the following Initial reasons:

## GENERAL ELIGIBILITY REPRESENTATIONS

(a)      the equity owner of the Investor has an individual net worth, or joint net worth with his or her spouse, in excess of $1,000,000.  As used herein, "net worth" means the excess of total assets at fair market value, including home, [*] home furnishings and automobiles, over total liabilities, or

(b)      the equity owner of the Investor has individual income (exclusive of any income attributable to his or her spouse) of more than $200,000 in each of the past two years, or joint income with his or her spouse of more than $300,000 in each of those years, and reasonably expects to reach the same income level in the current year.[**]   *The General Partner, in its sole discretion, may request information regarding the basis on which such equity owners are accredited.*

**(C)**       **Employee Benefit Plans**

_____       1.   The Investor is an employee benefit plan within the meaning of ERISA, and
*Initial*             the decision to invest in the Partnership was made by a plan fiduciary (as defined in Section 3(21) of ERISA), which is either a bank, savings and loan association, insurance company or registered investment adviser.  The name of such plan fiduciary is: _____.

_____       2.   The Investor is an employee benefit plan within the meaning of ERISA and
*Initial*             has total assets Initial  in excess of $5,000,000; or

_____       3.   The Investor is a plan established and maintained by a state, its political
*Initial*             subdivisions, or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, and has total assets in excess of $5,000,000.

---

[*]    Notwithstanding anything to the contrary herein, for purposes of determining "net worth," the principal residence owned by an individual shall be valued either at: (i) cost, including the cost of improvements, net of current encumbrances upon the property; or (ii) the appraised value of the property as determined upon written appraisal used by an institutional lender making a loan to the individual secured by the property, including the cost of subsequent improvements, net of current encumbrances upon the property.  "Institutional lender" means a bank, savings and loan company, industrial loan company, credit union or personal property broker or a company whose principal business is as a lender secured by real property and which has such loans receivable in the amount of $2,000,000 or more.

[**]   For purposes of this Subscription Agreement, individual income means adjusted gross income, as reported for federal income tax purposes, less any income attributable to a spouse or to property owned by a spouse, increased by the following amounts (but not including any amounts attributable to a spouse or to property owned by a spouse): (i) the amount of any tax-exempt interest income under Section 103 of the Code, received; (ii) the amount of losses claimed as a limited partner in a limited partnership as reported on Schedule E of Form 1040; (iii) any deduction claimed for depletion under Section 611 et seq. of the Code; (iv) amounts contributed to an Individual Retirement Account (as defined in the Code) or Keogh retirement plan; (v) alimony paid; and (vi) any elective contributions to a cash or deferred arrangement under Section 401(k) of the Code.

**(D)**           **Individual  Retirement  Accounts,  Keogh  Plans  and  Other  Self-Directed**

## GENERAL ELIGIBILITY REPRESENTATIONS

**Defined Contribution Plans**

_____
*Initial*

The Investor is an individual retirement account, Keogh Plan or other self-directed defined contribution plan in which a participant may exercise control over the investment of assets credited to his or her account and the investing participant is an accredited investor because such participant has a net worth of at least $1,000,000 or has had an individual income of at least $200,000 (or a joint income with spouse of at least $300,000) in each of the last two years and reasonably expects to reach the same income level in the current year.  *The General Partner, in its sole discretion, may request information regarding the basis on which such participants are accredited.*

**(E)**        **Section 501(c)(3) Organizations**

_____
*Initial*

The Investor is an organization described in Section 501(c)(3) of the Code of 1986, was not formed for the specific purpose of acquiring the Interests offered and has total assets in excess of $5,000,000.

**(F)**        **Trusts**

_____
*Initial*

1.        The Investor has total assets in excess of $5,000,000, was not formed for the specific purpose of acquiring the Interests offered and its purchase is directed by a sophisticated person.  *As used in the foregoing sentence, a "sophisticated person" is one who has such knowledge and experience in financial and business matters that it is capable of evaluating the merits and risks of the prospective investment*; *or*

_____
*Initial*

2.        The Investor is:  (a) a bank as defined in Section 3(a)(2) of the Securities Act, a savings and loan association, or other institution as defined in Section 3(a)(5)(A) of the Securities Act; (b) acting in a fiduciary capacity; and (c) subscribing for the purchase of the interests being offered on behalf of a trust account or accounts; or

_____
*Initial*

3.        The Investor is a revocable trust which may be amended or revoked at any time by the grantors thereof and all of the grantors are accredited investors as described herein.  *The General Partner, in its sole discretion, may request information regarding the basis on which such equity owners are accredited.*

**(G)**        **Banks, Savings and Loans and Similar Institutions**

_____
*Initial*

The Investor is a bank as defined in Section 3(a)(2) of the Securities Act or a savings and loan association, or other institution as defined in Section 3(a)(5)(A) of the Securities Act acting in its individual capacity.

## GENERAL ELIGIBILITY REPRESENTATIONS

**(H)**        **Insurance Companies**

_____
*Initial*              The Investor is an insurance company as defined in Section 2(13) of the Securities Act.

**(I)**        **Other**

_____
*Initial*              The Investor is an executive officer or director of the General Partner or an IRA for their benefit.


## III.    SUPPLEMENTAL DATA FOR ENTITIES

If the Investor is not a natural person, furnish the following supplemental data (natural persons may skip this Section of the Investor Questionnaire):

| | | |
|---|---|---|
| _____<br>Initial | 1. | ***Legal form of entity (trust, corporation, partnership, limited liability company, benefit plan, etc.):***<br>_____<br>_____.<br><br>Jurisdiction of organization: _____ |
| _____<br>*Initial* | 2. | ***Was the Investor organized for the specific purpose of acquiring interests?***<br><br>☐ Yes    ☐ No |
| _____<br>*Initial* | 3a. | ***Is the Investor a grantor trust, a partnership or an S-Corporation for U.S. federal income tax purposes?***<br><br>☐ Yes    ☐ No |
| _____<br>*Initial* | 3b. | ***If "Yes" to question 3a above, please indicate whether or not:***<br><br>***(i) more than 50 % of the value of the ownership interest of any beneficial owner in the Investor is (or may at any time during the term of the Partnership be) attributable to the Investor's (direct or indirect) interest in the Partnership; or***<br><br>☐ Yes    ☐ No<br><br>***(ii) it is a principal purpose of the Investor's participation in the Partnership to permit the Partnership to satisfy the 100 partner limitation contained in U.S. Treasury Regulation Section 1.7704-1(h)(3).*** |

18

## GENERAL ELIGIBILITY REPRESENTATIONS

| | | |
|---|---|---|
| | | ☐ Yes    ☐ No |
| _____<br>*Initial* | 4. | *Are shareholders, partners or other holders of equity or beneficial interests in the Investor able to decide individually whether or participate, or the extent of their participation, in the Investor's investment in the Partnership (i.e., can shareholders, partners or other holders of equity or beneficial interests in the Investor determine whether their capital will form part of the capital invested by the Investor in the Partnership)?*<br><br>☐ Yes    ☐ No |
| _____<br>*Initial* | 5. | *If the Investor's tax year ends on a date other than December 31, please indicate such date below:*<br><br>_____ |
| _____<br>*Initial* | 6. | *What percentage of the Investor is owned by non-United States persons or entities?* _____% |
| _____<br>*Initial* | 7. | *Is the Investor (a) a trust any portion of which is treated (under subpart E of part I of subchapter J of chapter 1 of subtitle A of the Code) as owned by a natural person (e.g., a grantor trust), (b) an entity disregarded for U.S. federal income tax purposes and owned (or treated as owned) by a natural person or a trust described in clause (a) of this sentence (e.g., a limited liability company with a single member), (c) an organization described in Section 401(a), Section 501(c)(17) or Section 509(a) of the Code, or (d) a trust permanently set aside or to be used for a charitable purpose?*<br><br>☐ Yes    ☐ No |

| Form **W-9**<br>(Rev. October 2007)<br><br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer<br>Identification Number and Certification** | **Give form to the requester. Do not send to the IRS** |

**Print or type**
**See Specific Instructions on page 2.**

Name (as shown on your income tax return)

Business name, if different from above

Check appropriate box: ☐ Individual/ Sole proprietor   ☐ Corporation   ☐ Partnership

☐ Limited liability company. Enter the tax classification (D=disregarded entity, C=corporation, P=partnership) ▶ ------

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)

Requester's name and address (optional)

City, state, and ZIP code

List account number(s) here (optional)

## Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a *TIN* on page 3.

**Note.** If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

**or**

Employer identification number

## Part II    Certification

Under penalties of perjury, I certify that:

1.    The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2.    I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3.    I am a U.S. citizen or other U.S. person (defined below).

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. See the instructions on page 4.

| **Sign Here** | Signature<br>U.S. person ▶ | Date ▶ | of |

Form W-9 (Rev. 10-2007

# General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1.   Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2.   Certify that you are not subject to backup withholding, or

3.   Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

**Note.** If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

**Definition of a U.S. person.** For federal tax purposes, you are considered a U.S. person if you are:

* An individual who is a U.S. citizen or U.S. resident alien,

* A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

* An estate (other than a foreign estate), or

* A domestic trust (as defined in Regulations section 301.7701-7).

**Special rules for partnerships.** Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

The person who gives Form W-9 to the partnership for purposes of establishing its U.S. status and avoiding withholding on its allocable share of net income from the partnership conducting a trade or business in the United States is in the following cases:

* The U.S. owner of a disregarded entity and not the entity,

* The U.S. grantor or other owner of a grantor trust and not the trust, and

* The U.S. trust (other than a grantor trust) and not the beneficiaries of the trust.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the payee has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1.   The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2.   The treaty article addressing the income.

3.   The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

4.   The type and amount of income that qualifies for the exemption from tax.

5. Sufficient facts to justify the exemption from tax under the terms of the treaty article.

*Example.* Article 20 of the U.S.-China income tax treaty allows an exemption from tax for scholarship income received by a Chinese student temporarily present in the United States. Under U.S. law, this student will become a resident alien for tax purposes if his or her stay in the United States exceeds 5 calendar years. However, paragraph 2 of the first Protocol to the U.S.-China treaty (dated April 30, 1984) allows the provisions of Article 20 to continue to apply even after the Chinese student becomes a resident alien of the United States. A Chinese student who qualifies for this exception (under paragraph 2 of the first protocol) and is relying on this exception to claim an exemption from tax on his or her scholarship or fellowship income would attach to Form W-9 a statement that includes the information described above to support that exemption.

If you are a nonresident alien or a foreign entity not subject to backup withholding, give the requester the appropriate completed Form W-8.

**What is backup withholding?** Persons making certain payments to you must under certain conditions withhold and pay to the IRS 28% of such payments. This is called "backup withholding." Payments that may be subject to backup withholding include interest, tax-exempt interest, dividends, broker and barter exchange transactions, rents, royalties, nonemployee pay, and certain payments from fishing boat operators. Real estate transactions are not subject to backup withholding.

You will not be subject to backup withholding on payments you receive if you give the requester your correct TIN, make the proper certifications, and report all your taxable interest and dividends on your tax return.

**Payments you receive will be subject to backup withholding if:**

1.   You do not furnish your TIN to the requester,

2.   You do not certify your TIN when required (see the Part II instructions on page 3 for details),

3. The IRS tells the requester that you furnished an incorrect TIN,

4.   The IRS tells you that you are subject to backup withholding because you did not report all your interest and dividends on your tax return (for reportable interest and dividends only), or

5.   You do not certify to the requester that you are not subject to backup withholding under 4 above (for reportable interest and dividend accounts opened after 1983 only).

Certain payees and payments are exempt from backup withholding. See the instructions below and the separate Instructions for the Requester of Form W-9.

Also see *Special rules for partnerships* on page 1.

## Penalties

**Failure to furnish TIN.** If you fail to furnish your correct TIN to a requester, you are subject to a penalty of $50 for each such failure unless your failure is due to reasonable cause and not to willful neglect.

**Civil penalty for false information with respect to withholding.** If you make a false statement with no reasonable basis that results in no backup withholding, you are subject to a $500 penalty.

**Criminal penalty for falsifying information.** Willfully falsifying certifications or affirmations may subject you to criminal penalties including fines and/or imprisonment.

**Misuse of TINs.** If the requester discloses or uses TINs in violation of federal law, the requester may be subject to civil and criminal penalties.

## Specific Instructions

## Name

If you are an individual, you must generally enter the name shown on your income tax return. However, if you have changed your last name, for instance, due to marriage without informing the Social Security Administration of the

name change, enter your first name, the last name shown on your social security card, and your new last name.

If the account is in joint names, list first, and then circle, the name of the person or entity whose number you entered in Part I of the form.

**Sole proprietor.** Enter your individual name as shown on your income tax return on the "Name" line. You may enter your business, trade, or "doing business as (DBA)" name on the "Business name" line.

**Limited liability company (LLC).** Check the "Limited liability company" box only and enter the appropriate code for the tax classification ("D" for disregarded entity, "C" for corporation, "P" for partnership) in the space provided.

For a single-member LLC (including a foreign LLC with a domestic owner) that is disregarded as an entity separate from its owner under Regulations section 301.7701-3, enter the owner's name on the "Name" line. Enter the LLC's name on the "Business name" line.

For an LLC classified as a partnership or a corporation, enter the LLC's name on the "Name" line and any business, trade, or DBA name on the "Business name" line.

**Other entities.** Enter your business name as shown on required federal tax documents on the "Name" line. This name should match the name shown on the charter or other legal document creating the entity. You may enter any business, trade, or DBA name on the "Business name" line.

**Note.** You are requested to check the appropriate box for your status (individual/sole proprietor, corporation, etc.).

## Exempt Payee

If you are exempt from backup withholding, enter your name as described above and check the appropriate box for your status, then check the "Exempt payee" box in the line following the business name, sign and date the form.

Generally, individuals (including sole proprietors) are not exempt from backup withholding. Corporations are exempt from backup withholding for certain payments, such as interest and dividends.

**Note.** If you are exempt from backup withholding, you should still complete this form to avoid possible erroneous backup withholding.

The following payees are exempt from backup withholding:

1.  An organization exempt from tax under section 501(a), any IRA, or a custodial account under section 403(b)(7) if the account satisfies the requirements of section 401(f)(2),

2.  The United States or any of its agencies or instrumentalities,

3.  A state, the District of Columbia, a possession of the United States, or any of their political subdivisions or instrumentalities,

4.  A foreign government or any of its political subdivisions, agencies, or instrumentalities, or

5.  An international organization or any of its agencies or instrumentalities.

Other payees that may be exempt from backup withholding include:

6.  A corporation,

7.  A foreign central bank of issue,

8.  A dealer in securities or commodities required to register in the United States, the District of Columbia, or a possession of the United States,

9.  A futures commission merchant registered with the Commodity Futures Trading Commission,

10.  A real estate investment trust,

11.  An entity registered at all times during the tax year under the Investment Company Act of 1940,

12.  A common trust fund operated by a bank under section 584(a),

13.  A financial institution,

14.  A middleman known in the investment community as a nominee or custodian, or

15. A trust exempt from tax under section 664 or described in section 4947.

The chart below shows types of payments that may be exempt from backup withholding. The chart applies to the exempt payees listed above, 1 through 15.

| IF the payment is for . . . | THEN the payment is exempt for . . . |
|---|---|
| Interest and dividend payments | All exempt payees except for 9 |
| Broker transactions | Exempt payees 1 through 13. Also, a person registered under the Investment Advisers Act of 1940 who regularly acts as a broker |
| Barter exchange transactions and patronage dividends | Exempt payees 1 through 5 |
| Payments over $600 required to be reported and direct sales over $5,000[1] | Generally, exempt payees 1 through 7[2] |

[1] See Form 1099-MISC, Miscellaneous Income, and its instructions.

[2] However, the following payments made to a corporation (including gross proceeds paid to an attorney under section 6045(f, even if the attorney is a corporation) and reportable on Form 1099-MISC are not exempt from backup withholding: medical and health care payments, attorneys' fees, and payments for services paid by a federal executive agency.

# Part I. Taxpayer Identification Number (TIN)

**Enter your TIN in the appropriate box.** If you are a resident alien and you do not have and are not eligible to get an SSN, your TIN is your IRS individual taxpayer identification number (ITIN). Enter it in the social security number box. If you do not have an ITIN, see *How* to get a TIN below.

If you are a sole proprietor and you have an EIN, you may enter either your SSN or EIN. However, the IRS prefers that you use your SSN.

If you are a single-member LLC that is disregarded as an entity separate from its owner (see *Limited liability company (LLC)* on page 2), enter the owner's SSN (or EIN, if the owner has one). Do not enter the disregarded entity's EIN. If the LLC is classified as a corporation or partnership, enter the entity's EIN.

**Note.** See the chart on page 4 for further clarification of name and TIN combinations.

**How to get a TIN.** If you do not have a TIN, apply for one immediately. To apply for an SSN, get Form SS-5, Application for a Social Security Card, from your local Social Security Administration office or get this form online at www.ssa.gov. You may also get this form by calling 1-800-772-1213. Use Form W-7, Application for IRS Individual Taxpayer Identification Number, to apply for an ITIN, or Form SS-4, Application for Employer Identification Number, to apply for an EIN. You can apply for an EIN online by accessing the IRS website at www.irs.gov/businesses and clicking on Employer Identification Number (EIN) under Starting a Business. You can get Forms W-7 and SS-4 from the IRS by visiting www.irs.gov or by calling 1-800-TAX-FORM (1-800-829-3676).

If you are asked to complete Form W-9 but do not have a TIN, write "Applied For" in the space for the TIN, sign and date the form, and give it to the requester. For interest and dividend payments, and certain payments made with respect to readily tradable instruments, generally you will have 60 days to get a TIN and give it to the requester before you are subject to backup withholding on payments. The 60-day rule does not apply to other types of payments. You will be subject to backup withholding on all such payments until you provide your TIN to the requester.

**Note.** Entering "Applied For" means that you have already applied for a TIN or that you intend to apply for one soon.

**Caution:** A disregarded domestic entity that has a foreign owner must use the appropriate Form W-8.

Part II. Certification

To establish to the withholding agent that you are a U.S. person, or resident alien, sign Form W-9. You may be requested to sign by the withholding agent even if items 1, 4, and 5 below indicate otherwise.

For a joint account, only the person whose TIN is shown in Part I should sign (when required). Exempt payees, see Exempt Payee on page 2.

**Signature requirements.** Complete the certification as indicated in 1 through 5 below.

    **1.   Interest, dividend, and barter exchange accounts opened before 1984 and broker accounts considered active during 1983.** You must give your correct TIN, but you do not have to sign the certification.

    **2.   Interest, dividend, broker, and barter exchange accounts opened after 1983 and broker accounts considered inactive during 1983.** You must sign the certification or backup withholding will apply. If you are subject to backup withholding and you are merely providing your correct TIN to the requester, you must cross out item 2 in the certification before signing the form.

    **3.   Real estate transactions.** You must sign the certification. You may cross out item 2 of the certification.

    **4.   Other payments.** You must give your correct TIN, but you do not have to sign the certification unless you have been notified that you have previously given an incorrect TIN. "Other payments" include payments made in the course of the requester's trade or business for rents, royalties, goods (other than bills for merchandise), medical and health care services (including payments to corporations), payments to a nonemployee for services, payments to certain fishing boat crew members and fishermen, and gross proceeds paid to attorneys (including payments to corporations).

    **5.   Mortgage interest paid by you, acquisition or abandonment of secured property, cancellation of debt, qualified tuition program payments (under section 529), IRA, Coverdell ESA, Archer MSA or HSA contributions or distributions, and pension distributions.** You must give your correct TIN, but you do not have to sign the certification.

## What Name and Number To Give the Requester

| For this type of account: | Give name and SSN of: |
|---|---|
| 1. Individual | The individual |
| 2. Two or more individuals (joint account) | The actual owner of the account or, if combined funds, the first individual on the account[1] |
| 3. Custodian account of a minor (Uniform Gift to Minors Act) | The minor[2] |
| 4. a. The usual revocable savings trust (grantor is also trustee) | The grantor-trustee[1] |
| b. So-called trust account that is not a legal or valid trust under state law | The actual owner[1] |
| 5. Sole proprietorship or disregarded entity owned by an individual | The owner[3] |

| For this type of account: | Give name and EIN of: |
|---|---|
| 6. Disregarded entity not owned by an individual | The owner |
| 7. A valid trust, estate, or pension trust | Legal entity[4] |
| 8. Corporate or LLC electing corporate status on Form 8832 | The Corporation |
| 9. Association, club, religious, charitable, educational, or other tax-exempt organization | The organization |
| 10. Partnership or multi-member LLC | The partnership |
| 11. A broker or registered nominee | The broker or nominee |
| 12. Account with the Department of Agriculture in the name of a public entity (such as a state or local government, school district, or prison) that receives agricultural program payments | The public entity |

[1] List first and circle the name of the person whose number you furnish. If only one person on a joint account has an SSN, that person's number must be furnished.

[2] Circle the minor's name and furnish the minor's SSN.

[3] You must show your individual name and you may also enter your business or "DBA" name on the second name line. You may use either your SSN or EIN (if you have one), but the IRS encourages you to use your SSN.

[4] List first and circle the name of the trust, estate, or pension trust. (Do not furnish the TIN of the personal representative or trustee unless the legal entity

itself is not designated in the account title.) Also see Special Ivies for partnerships on page 1.

**Note.** If no name is circled when more than one name is listed, the number will be considered to be that of the first name listed.

## Secure Your Tax Records from Identity Theft

Identity theft occurs when someone uses your personal information such as your name, social security number (SSN), or other identifying information, without your permission, to commit fraud or other crimes. An identity thief may use your SSN to get a job or may file a tax return using your SSN to receive a refund.

To reduce your risk:

- Protect your SSN,
- Ensure your employer is protecting your SSN, and
- Be careful when choosing a tax preparer.

    Call the IRS at 1-800-829-1040 if you think your identity has been used inappropriately for tax purposes.

    Victims of identity theft who are experiencing economic harm or a system problem, or are seeking help in resolving tax problems that have not been resolved through normal channels, may be eligible for Taxpayer Advocate Service (TAS) assistance. You can reach TAS by calling the TAS toll-free case intake line at 1-877-777-4778 or TTY/TDD 1-800-829-4059.

**Protect yourself from suspicious emails or phishing schemes.** Phishing is the creation and use of email and websites designed to mimic legitimate business emails and websites. The most common act is sending an email to a user falsely claiming to be an established legitimate enterprise in an attempt to scam the user into surrendering private information that will be used for identity theft.

    The IRS does not initiate contacts with taxpayers via emails. Also, the IRS does not request personal detailed information through email or ask taxpayers for the PIN numbers, passwords, or similar secret access information for their credit card, bank, or other financial accounts.

    If you receive an unsolicited email claiming to be from the IRS, forward this message to phishing@irs.gov. You may also report misuse of the IRS name, logo, or other IRS personal property to the Treasury Inspector General for Tax Administration at 1-800-366-4484. You can forward suspicious emails to the Federal Trade Commission at: spam@uce.gov or contact them at www.consumergovfidtheft or 1-877-IDTHEFT(438-4338).

    Visit the IRS website at www.irs.gov to learn more about identity theft and how to reduce your risk.

## Privacy Act Notice

Section 6109 of the Internal Revenue Code requires you to provide your correct TIN to persons who must file information returns with the IRS to report interest, dividends, and certain other income paid to you, mortgage interest you paid, the acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA, or Archer MSA or HSA. The IRS uses the numbers for identification purposes and to help verify the accuracy of your tax return. The IRS may also provide this information to the Department of Justice for civil and criminal litigation, and to cities, states, the District of Columbia, and U.S. possessions to carry out their tax laws. We may also disclose this information to other countries under a tax treaty, to federal and state agencies to enforce federal nontax criminal laws, or to federal law enforcement and intelligence agencies to combat terrorism.

You must provide your TIN whether or not you are required to file a tax return. Payers must generally withhold 28% of taxable interest, dividend, and certain other payments to a payee who does not give a TIN to a payer. Certain penalties may also apply

# SIGNATURE PAGES

**ALL INVESTORS MUST COMPLETE THIS SECTION.**

The undersigned hereby represents that:

1.  the undersigned has carefully read and is familiar with this Subscription Agreement and the Partnership Documents;

2.  the information contained herein is complete and accurate and may be relied upon; and

3.  the undersigned agrees that the execution of this signature page constitutes the execution and receipt of this Subscription Agreement.

IN WITNESS WHEREOF, the undersigned has executed this Subscription Agreement this _____ day of _____, 20__.

INDIVIDUALS                                              ENTITIES


_____                         _____
Signature                                               Print Name of Entity


_____                         By: _____
Print Name                                                  Authorized Signature


_____                         _____
Additional Investor Signature                           Print Name and Title


_____
Print Name

### *Name of Trustees or Other Fiduciaries Exercising Investment Discretion with Respect to Benefit Plan or Trust*

| *Signature* | *Printed Name* | *Title* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## SIGNATURE PAGES

### Agreement of Custodian of Individual Retirement Account

The undersigned, being the custodian of the above named individual retirement account, hereby accepts and agrees to this subscription.

By:_____        _____
    Signature of Authorized Signatory                    Name of Custodian *(Please Type or Print)*


_____
Name of Authorized Signatory *(Please Type or Print)*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**FOR INTERNAL USE ONLY**
**To be completed by Broad Reach Capital, LP**


_____
SUBSCRIPTION ACCEPTED
AS TO $_____

**BROAD REACH CAPITAL, LP**
By:  Broad Reach Partners, LLC

By:_____

Date: _____, 20___

26

# Additional Subscription Form

Broad Reach Capital, LP
c/o Broad Reach Partners, LLC
200 Four Falls, Suite 211
1001 Conshohocken State Road
West Conshohocken, PA  19428

Dear Sir/Madam:

The undersigned hereby wishes to make an additional capital contribution to Broad Reach Capital, LP (the "Partnership").  The amount to be contributed ("Additional Capital Contribution") is:  $_____.

The undersigned acknowledges and agrees:  (i) that the undersigned is making the Additional Capital Contribution on the terms and conditions contained in the subscription agreement, dated _____, 20__, previously executed by the undersigned and accepted by the General Partner (the "Subscription Agreement"); (ii) that the representations and covenants of the undersigned contained in the Subscription Agreement and the anti-money laundering supplement thereto are true and correct in all material respects as of the date set forth below; (iii) the information provided on the Investor Profile Form in the Subscription Agreement is correct as of the date set forth below; and (iv) the background information provided to the General Partner is true and correct in all material respects as of the date set forth below.

**THE UNDERSIGNED AGREES TO NOTIFY THE GENERAL PARTNER PROMPTLY IN WRITING SHOULD THERE BE ANY CHANGE IN ANY OF THE FOREGOING INFORMATION.**

Dated: _____, 20__

INDIVIDUALS                                           ENTITIES


_____          _____
Signature                                              Print Name of Entity


_____          By:_____
Print Name                                                  Authorized Signature


_____          _____
Additional Investor Signature                 Print Name and Title


_____
Print Name

-----------------------------------------------------------

**FOR INTERNAL USE ONLY**
**To be completed by the General Partner**

ADDITIONAL CAPITAL CONTRIBUTION ACCEPTED
AS TO $_____

**Broad Reach Capital, LP**
By:  Broad Reach Partners, LLC

By:_____

Date: _____, 20___

**EXHIBIT B**

**REQUEST FOR REDEMPTION OF LIMITED PARTNERSHIP INTEREST**

Broad Reach Capital, LP
c/o Broad Reach Partners, LLC
200 Four Falls, Suite 211
1001 Conshohocken State Road
West Conshohocken, PA  19428

Dear Sir/Madam:

The undersigned limited partner (the "Limited Partner") of Broad Reach Capital, LP (the "Partnership") hereby requests that the Partnership redeem from the Limited Partner's capital account in the Partnership (the "Capital Account") that was established pursuant to the capital contribution made on _____ ___, 20___ and pay the following amount to the Limited Partner as directed below:

> (check one)

> _____    The entire balance of the Limited Partner's Capital Account established for the Limited Partner as of _____

> _____    The entire balance of the Limited Partner's Capital Accounts in the Partnership

> _____    $_____ from the Limited Partner's Capital Account established for the Limited Partner as of _____

> on the next available Redemption Date (the "Redemption Date") following receipt of this letter.*

The cash proceeds of such Capital Account should be paid and forwarded to the Limited Partner as follows:

_____
Name

_____
Address

---

\*      This request for redemption must be received not less than 30 days prior to a Redemption Date.  **Requests for redemption must be unconditional.  Notices of redemption are irrevocable by the Investor.**

If desired, set forth instructions for the account to which the cash proceeds of the redemption may be sent by wire transfer:

_____
Name of Bank

_____
Address of Bank

_____
ABA Number

_____
Account Number

_____
Name Under Which Account Is Held

**Note:  Redemption proceeds shall be paid to the same account from which the Limited Partner's investment in the Partnership was originally remitted, unless the General Partner, in its sole discretion, agrees otherwise.**

Very truly yours,

Signature(s) Guaranteed by:

_____
Signature of Limited Partner

_____
Print name

_____
Mailing Address

_____

_____

_____

## BROAD REACH CAPITAL, LP

### CLIENT PRIVACY NOTICE

Your privacy is very important to us.  This Privacy Notice sets forth the policies of Broad Reach Capital, LP (the "Partnership") with respect to non-public personal information of its investors, prospective investors and former investors.  These policies apply to individuals and Individual Retirement Accounts only and may be changed at any time, provided a notice of such change is given to you.

You provide us with personal information, such as your address, social security number, assets and/or income information:  (i) in the Subscription Agreement and related documents; (ii) in correspondence and conversations with the Partnership's representatives; and (iii) through transactions in the Partnership.

We do not disclose any of this personal information about our investors, prospective investors or former investors to anyone, other than to our affiliates, such as the Investment Manager of the Partnership, and except as permitted by law, such as to our attorneys, auditors, brokers, regulators and certain service providers, in such case, only as necessary to facilitate the acceptance and management of your investment.  Thus, it may be necessary, under anti-money laundering and similar laws, to disclose information about the Partnership's investors in order to accept subscriptions from them.  We will also release information about you if you direct us to do so, if compelled to do so by law, or in connection with any government or self-regulatory organization request or investigation.

## BROAD REACH CAPITAL, LP (THE "PARTNERSHIP")

### Anti-Money Laundering Supplement

**You (the "Investor") must complete this supplement (the "Anti-Money Laundering Supplement") in order to become a limited partner in the Partnership. Your subscription agreement will not be deemed complete, and you will not be deemed a limited partner of the Partnership, regardless of whether you have already wired funds, until all of the required documentation listed below is received by the General Partner. For additional information, please contact Brenda Smith at (610) 671-2346.**

## IV.   PAYMENT INFORMATION

(a)   Name of Investor: _____

(b)   Name of the bank from which your payment to the Partnership is being wired (the "Wiring Bank"):_____

|  |  | YES | NO |
|---|---|---|---|
| (c) | Is the Wiring Bank located in a FATF Country[*]? | ☐ | ☐ |

If yes, please answer question (d) below.

If no, please provide the information described in Item II below.

|  |  | | |
|---|---|---|---|
| (d) | Are you a customer of the Wiring Bank? | ☐ | ☐ |

If yes, you may skip Item II below.

If no, please provide the information described in Item II below.

**You must wire the payment from an account in your name. If the General Partner is unable to verify your answers above through confirmation from Wiring Bank or SWIFT message, you will be required to provide the information described in Item II below.**

---

[*]   As of the date hereof, countries that are members of the Financial Action Task Force on Money Laundering (each, a "FATF Country") are: Argentina, Australia, Austria, Belgium, Brazil, Canada, China, Denmark, European Commission, Finland, France, Germany, Greece, Gulf Co-operation Council, Hong Kong, Iceland, Ireland, Italy, Japan, Kingdom of the Netherlands, Luxembourg, Mexico, New Zealand, Norway, Portugal, Russian Federation, Singapore, South Africa, Spain, Sweden, Switzerland, Turkey, United Kingdom and the United States.

V.      **ADDITIONAL INFORMATION**

*Note: This section applies only to investors who responded "No" to question I(c) or I(d) above.*

**The following materials must be provided to the General Partner:**

**For Individuals**

☐      A certified or notarized copy of a government issued form of picture identification (*e.g.*, passport).

☐      Certified proof of current address (*e.g.*, copy of a current residential utility bill).

**For Fund of Funds**

☐      A certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (*e.g.*, certificate of good standing).

☐      An incumbency certificate attesting to the title of the individual executing the Anti-Money Laundering Supplement on behalf of the prospective investor (a sample Incumbency Certificate is attached hereto as Exhibit A).

☐      A completed copy of Exhibit B certifying that the entity has adequate anti-money laundering policies and procedures in place that are consistent with all applicable anti-money laundering laws and regulations, including, to the extent applicable, the USA PATRIOT Act and OFAC (as defined below).

☐      A letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in a FATF Country certifying that the prospective investor maintains an account at such bank/brokerage firm and containing a statement affirming the prospective investor's integrity (a sample Letter of Reference is attached hereto as Exhibit C).

☐      If the prospective investor is a publicly traded company, the information described above in "For Individuals" must be provided for the lesser of (i) two or (ii) all of, the directors of the company.

☐      Certified copy of Certificate of Incorporation, Certificate of Formation, Certificate of Registration, Memorandum and Articles of Association, signed LLC Agreement, signed Operating Agreement and signed Limited Partnership Agreement, as applicable.

☐      Identification required for individuals must be provided for at least two directors, partners or members, as applicable.

**For All Entity Investors**

☐ A certified certificate of due formation and organization and continued authorization to conduct business in the jurisdiction of its organization (*e.g.*, certificate of good standing).

☐ An incumbency certificate attesting to the title of the individual executing the Anti-Money Laundering Supplement on behalf of the prospective investor (a sample Incumbency Certificate is attached hereto as <u>Exhibit A</u>).

☐ A letter of reference from a local office of a reputable bank or brokerage firm which is incorporated, or has its principal place of business located, in a FATF Country certifying that the prospective investor maintains as account at such bank/brokerage firm for a length of time and containing a statement affirming the prospective investor's integrity (a sample Letter of Reference is attached hereto as <u>Exhibit C</u>).

☐ If the prospective investor is a privately-held entity, a completed copy of <u>Exhibit D</u> listing the name of each person who directly, or indirectly through intermediaries, is the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the prospective investor.

☐ If the prospective investor is a trust, a completed copy of <u>Exhibit E</u> listing the current beneficiaries of the trust that have, directly or indirectly, 25% or more of any interest in the trust, the settlor of the trust and the trustees.

☐ If the prospective investor is a publicly traded company, the information described above in "For Individuals" must be provided for the lesser of (i) two or (ii) all of, the directors of the company.

☐ Certified copy of Certificate of Incorporation, Certificate of Formation, Certificate of Registration, Memorandum and Articles of Association, signed LLC Agreement, signed Operating Agreement and signed Limited Partnership Agreement, as applicable.

☐ Identification required for individuals must be provided for at least two directors, partners or members, as applicable.

## VI.   REPRESENTATIONS AND COVENANTS OF THE INVESTOR

**You should check the website of the U.S. Treasury Departments Office of Foreign Assets Control ("OFAC") at <http://www.treas.gov/ofac> before making the following representations.**

**(A)**   The Investor represents that the amounts contributed by it to the Partnership were not directly or indirectly derived from activities that may contravene federal, state or international laws and regulations, including anti-money laundering laws and regulations.

Federal regulations and executive orders administered by U.S. Treasury Department's Office of Foreign Assets Control ("OFAC") prohibit among other things, the engagement in transactions with, and the provisions of services to, certain foreign countries, territories, entities and individuals.[**]   The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <http://www.treas.gov/ofac>.   In addition, the programs administered by OFAC ("OFAC Programs" prohibit dealing with individuals or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

The Investor represents and warrants that, to the best of its knowledge, none of:

(1)   the Investor;

(2)   any person controlling or controlled by the Investor;

(3)   if the Investor is a privately held entity, any person having a beneficial interest in the Investor; or

(4)   any person for whom the Investor is acting as agent or nominee in connection with this investment

is a country, territory, individual or entity named on an OFAC list, nor is a person or entity prohibited under the OFAC Programs.

Please be advised that the Partnership may not accept any amount from a prospective investor if it cannot make the representation set forth in the preceding paragraph.   If an existing Investor can no longer make these representations, the Partnership may require the redemption of such Investor's interests in the Partnership.

**(B)**   The Investor agrees to notify the Partnership promptly in writing should the Investor become aware of any change in the information set forth in these representations.   The Investor is advised that, by law, the Partnership may be obligated to "freeze the account" of such Investor, either by prohibiting additional investments from the Investor, declining any redemption requests and/or segregating the assets in the account in compliance with

---

[**]   These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

governmental regulations, and the Partnership may also be required to report such action and to disclose the Investor's identity to OFAC or other applicable governmental and/or regulatory authorities.  The Investor further acknowledges that the Broad Reach Partners, LLC (the "General Partner") may, by written notice to the Investor, suspend the payment of redemption proceeds payable to such Investor if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Partnership, the Investment Manager or any of the Partnership's other service providers.

**(C)**     The Investor represents and warrants that, to the best of its knowledge, none of:

(1)     the Investor;

(2)     any person controlling or controlled by the Investor;

(3)     if the Investor is a privately held entity, any person having a beneficial interest in the Investor;

(4)     any person for whom the Investor is acting as agent or nominee in connection with this investment

is a senior foreign political figure,[***]or any immediate family member[****]or close associate[*****] of a senior foreign political figure as such terms are defined in the footnotes below.

**(D)**     The Investor understands and agrees that any redemption proceeds paid to it will be paid to the same account from which the Investor's investment in the Partnership was originally remitted, unless the General Partner, in its sole discretion, agrees otherwise.

**(E)**     The Investor agrees that, upon the request of the Partnership or the General Partner, it will provide such information as the Partnership or the General Partner require to satisfy applicable anti-money laundering laws and regulations, including, without limitation, the Investor's anti-money laundering policies and procedures, background documentation relating to its directors, trustees, settlors and beneficial owners, and audited financial statements, if any.

---

[***]     A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a senior official of a major non-U.S. political party, or a senior executive of a non-U.S. government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[****]     "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[*****]     A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial U.S. and non-U.S. financial transactions on behalf of the senior foreign political figure.

# SIGNATURE PAGES

**ALL INVESTORS MUST COMPLETE THIS SECTION.**

The undersigned hereby represents that:  (i) the information contained herein is complete and accurate and may be relied upon; and (ii) the anti-money laundering/OFAC representations contained herein are true and correct.

IN WITNESS WHEREOF, the undersigned has executed this Anti-Money Laundering Supplement this _____ day of _____, 20___.

INDIVIDUALS                                    ENTITIES

_____       _____
Signature                                      Print Name of Entity

_____       By: _____
Print Name                                          Authorized Signature

_____       _____
Additional Investor Signature               Print Name and Title

_____
Print Name

*Name of Trustees or Other Fiduciaries Exercising Investment*
*Discretion with Respect to Benefit Plan or Trust*

| *Signature* | *Printed Name* | *Title* |
|---|---|---|
| _____ | _____ | _____ |
| _____ | _____ | _____ |
| _____ | _____ | _____ |

## AGREEMENT OF CUSTODIAN OF INDIVIDUAL RETIREMENT ACCOUNT

The undersigned, being the custodian of the above named individual retirement account, hereby accepts and agrees to this Anti-Money Laundering Supplement.

By:_____       _____
        Signature of Authorized Signatory                     Name of Custodian ( Please Type or Print)

_____
Name of Authorized Signatory (Please Type or Print)

## FORM OF INCUMBENCY CERTIFICATE

The undersigned, being the _____ of _____,
<div align="center">*Insert Title*                    *Insert Name of Entity*</div>

a _____ organized under the laws of _____
<div align="center">*Insert Type of Entity*                    *Insert Jurisdiction of Organization*</div>

(the "Company"), does hereby certify on behalf of the Company that the persons named below are directors and/or officers of the Company and that the signature at the right of said name, respectively, is the genuine signature of said person and that the persons listed below are each an authorized signatory for the Company.

<div align="center">

<u>Name</u>                    <u>Title</u>                    <u>Signature</u>

_____    _____    _____

_____    _____    _____

_____    _____    _____

</div>

IN WITNESS WHEREOF, the undersigned has hereunto set his hand as of the ___ day of _____, 20__.

By:   _____
<div align="right">*Signature of Signatory #1*          </div>
Name:
Title:

THE UNDERSIGNED, _____, a duly authorized _____
<div align="center">*Insert Name of Signatory #2*                    *Insert Title*</div>

of the Company, does hereby certify that _____ is a duly authorized
<div align="center">*Insert Name of Signatory #1*</div>

officer of _____ and that the signature set forth above is [his][her] true and
<div align="center">*Insert Name of Company*</div>

correct signature.

IN WITNESS WHEREOF, the undersigned has executed this certificate as of the ___ day of _____, 20__.

By:   _____
<div align="right">*Signature of Signatory #2*          </div>
Name:
Title:

# AML CERTIFICATION FORM FOR FUND OF FUNDS OR ENTITIES THAT INVEST ON BEHALF OF THIRD PARTIES THAT ARE NOT LOCATED IN A FATF COUNTRY

The undersigned, being the _____ of _____,
*Insert Title*             *Insert Name of Entity*

a _____ organized under the laws of _____
*Insert Type of Entity*             *Insert Jurisdiction of Organization*

(the "Company"), does hereby certify on behalf of the Company that it is aware of applicable anti-money laundering laws and regulations, including the requirements of the USA PATRIOT Act of 2001 and the regulations administered by the U.S. Department of Treasury's Office of Foreign Assets Control (collectively, the "anti-money laundering/OFAC laws").  The Company has anti-money laundering policies and procedures in place reasonably designed to verify the identity of its [beneficial holders] [underlying investors] and their sources of funds.  Such policies and procedures are properly enforced and are consistent with the anti-money laundering/OFAC laws such that Broad Reach Capital, LP (the "Partnership") may rely on this Certification.

The Company hereby represents to the Partnership that, to the best of its knowledge, the Company's [beneficial holders] [underlying investors] are not individuals, entities or countries that may subject the Partnership to criminal or civil violations of any anti-money laundering/OFAC laws.  The Company has read the section entitled "Representations and Covenants of the Investor" in the Partnership's Anti-Money Laundering Supplement.  The Company has taken all reasonable steps to ensure that its [beneficial holders] [underlying investors] are able to certify to such representations.  The Company agrees to promptly notify the Partnership in writing should the Company have any questions relating to any of the investors or become aware of any changes in the representations set forth in this Certification.

Date: _____, 20__      By: _____

                                     Name:

                                     Title:

**EXHIBIT C**

# FORM LETTER OF REFERENCE

[LETTERHEAD OF LOCAL OFFICE OF FATF MEMBER BANKING INSTITUTION OR BROKERAGE FIRM]

Date: _____, 20__

Broad Reach Capital, LP
c/o Broad Reach Partners, LLC
200 Four Falls, Suite 211
1001 Conshohocken State Road
West Conshohocken, PA  19428

To whom it may concern:

I, _____, the _____of _____, do hereby
        *Name*        *Title*    *Name of Institution*

certify that _____ has maintained an account at our institution for
       *Name of Investor*

_____ years and, during this period, nothing has occurred that would give our institution
*Insert Period*

cause to be concerned regarding the integrity of _____.
       *Name of Investor*

Do not hesitate to contact me at _____ if you have any further
      *Insert Telephone No.*

questions.

Very truly yours,

_____
Name:
Title:

## BENEFICIAL OWNERSHIP INFORMATION

### TO BE COMPLETED BY ENTITY INVESTORS THAT ARE PRIVATELY HELD ENTITIES

**Instructions:  Please complete and return this __Exhibit D__ and provide the name of every person who is directly, or indirectly through intermediaries, the beneficial owner of 25% or more of any voting or non-voting class of equity interests of the Investor.  If the intermediary's shareholders or partners are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.  If there are no 25% beneficial owners, please write None.**

| Full Name | If Shareholder is an Individual, Insert Name and Address of Principal Employer and Position | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# TRUST OWNERSHIP INFORMATION

### TO BE COMPLETED BY ENTITY INVESTORS THAT ARE TRUSTS

**Instructions:  Please complete and return this Exhibit E and provide the name of:  (i) every current beneficiary that has, directly or indirectly, an interest of 25% or more in the trust; (ii) every person who contributed assets to the trust (settlors or grantors); and (iii) every trustee.  If there are intermediaries that are not individuals, continue up the chain of ownership listing their 25% or more equity interest holders until individuals are listed.**

| Full Name and Address | Status (Beneficiary/Settlor/ Trustee) | Citizenship (for Individuals) or Principal Place of Business (for Entities) |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

**LIMITED PARTNERSHIP AGREEMENT**

**OF**

**BROAD REACH CAPITAL, LP**

**A DELAWARE LIMITED PARTNERSHIP**

**February 15, 2016**

ARTICLE I        GENERAL PROVISIONS ............................................................................... 1

ARTICLE II       MANAGEMENT OF THE PARTNERSHIP ...................................................... 8

ARTICLE III      CAPITAL ACCOUNTS OF PARTNERS AND OPERATION
                 THEREOF ...................................................................................................... 15

ARTICLE IV       ADMISSION OF PARTNERS ..................................................................... 21

ARTICLE V        RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS ...................... 22

ARTICLE VI       REDEMPTION AND DISTRIBUTIONS OF CAPITAL .............................. 23

ARTICLE VII      REDEMPTION, WITHDRAWAL, DEATH OR DISABILITY OF
                 A PARTNER ................................................................................................. 24

ARTICLE XIII     DURATION AND TERMINATION OF THE PARTNERSHIP ................. 27

ARTICLE IX       BOOKS; REPORTS TO PARTNERS; TAX ELECTIONS ........................ 28

ARTICLE X        MISCELLANEOUS ...................................................................................... 30

**LIMITED PARTNERSHIP AGREEMENT**
**OF**
**BROAD REACH CAPITAL, LP**

THIS LIMITED PARTNERSHIP AGREEMENT (the "Agreement") is entered into as of February 15, 2016 by and among BROAD REACH PARTNERS, LLC, a Delaware limited liability company (the "General Partner"), and the undersigned Persons who have as "Limited Partners" executed this Agreement or counterparts of this Agreement, personally or by attorney-in-fact (each, a "Limited Partner" and, collectively, the "Limited Partners") for the purpose of admitting each such Person as a Limited Partner to Broad Reach Capital, LP, a limited partnership organized under the laws of the State of Delaware (the "Partnership").

ARTICLE I

GENERAL PROVISIONS

Section 1.1  Formation.  The General Partner has formed a limited partnership under the provisions of the Delaware Revised Uniform Limited Partnership Act (6 Del. C. §17-101 *et seq.*) (the "Act") by executing and filing a Certificate of Limited Partnership in accordance with the provisions of the Act. The General Partner may execute, file, record and publish as appropriate such amendments thereto and other documents and certificates as are or become necessary or advisable as determined by the General Partner.

Section 1.2  Partnership Name and Registered Office Address.  The Partnership shall conduct business under the name of "Broad Reach Capital, LP" or such other name or names as the General Partner may, in its discretion, from time to time select, and its business shall be carried on in such name with such variations and changes as the General Partner deems necessary to comply with requirements of the jurisdictions in which the Partnership's operations are conducted. The registered office address of the Partnership is: Registered Office Service Company, 203 NE Front Street, Suite 101, Milford, Kent County, Delaware 19963. The General Partner may, by subsequent written notice to all Limited Partners, change the name and registered office address of the Partnership.

Section 1.3  Purpose of the Partnership.  The purpose and business of the Partnership generally is, in accordance with investment objectives and policies established by the General Partner, to acquire, purchase, invest in, hold for investment, own, exchange, assign, sell or otherwise dispose of, trade in, on margin or otherwise, sell short, lend, lease, mortgage, pledge or otherwise deal in securities, and other intangible investment instruments and vehicles of every kind and nature, including, without limitation, stocks, notes, bills, bonds, fixed income securities, debentures, options, futures, forward contracts, commodities contracts, currencies, swaps, derivatives, rights, convertible securities, warrants, mutual partnerships, unit investment trusts, index shares, derivatives, trust receipts, repurchase agreements, reverse repurchase agreements, depository receipts, equipment trust certificates, interests in partnerships, participation notes, certificates of interest or participation in any profit-sharing agreement, collateral trust certificates, bankruptcy claims, investment contracts, any "eligible security" (as such term is defined in Rule 2a-7 under the 1940 Act, as such Rule may be amended from time to time) and evidences of indebtedness, all of which are herein called "Investments," to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Investments held or owned by the Partnership, and to engage in any activity incidental to the foregoing, including,

1

without limitation, borrowing and lending Investments and funds and otherwise entering into credit arrangements in connection therewith, and to engage in any and all types of investment and business activity as the General Partner shall determine from time to time is related to the foregoing. Unless otherwise determined by the General Partner, the General Partner shall seek to conduct the Partnership's operations, to the extent possible, in such a manner so as not to require: (i) the registration of the Partnership under the 1940 Act; or (ii) the registration of the Interests of the Partnership under the 1933 Act.

Section 1.4 <u>Title to Partnership Property</u>. All property owned by the Partnership, whether tangible or intangible shall be deemed to be owned by the Partnership, and no Partner, individually, shall have any interest in such property. Title to all such property shall be held in the name of the Partnership or, at the discretion of the General Partner, may be held in the name of the General Partner, or any entity approved by the General Partner, as nominee for the Partnership.

Section 1.5 <u>Partition</u>. No Partner, nor any successor-in-interest to any Partner, shall have the right, while this Agreement remains in effect, to have the property of the Partnership partitioned, or to file a complaint or institute any proceeding at law or in equity to have the property of the Partnership partitioned, and each Partner, on behalf of itself and its successors, representatives and assigns, hereby waives any such right. It is the intention of the Partners that, during the term of this Agreement, the rights of the Partners and their successors-in-interest, as among themselves, shall be governed by the terms of this Agreement, and that the right of any Partner or successor-in-interest to assign, transfer, sell or otherwise dispose of any interest in the Partnership shall be subject to the limitations and restrictions of this Agreement.

Section 1.6 <u>Taxable Year</u>. The taxable year of the Partnership shall be a year ending December 31 or such other date as the General Partner may determine and as may be either approved by the Internal Revenue Service or otherwise available for federal income tax purposes; except that the first taxable year of the Partnership shall begin on the date of formation of the Partnership. The General Partner shall give all other Partners notice of any change of the date on which the taxable year of the Partnership shall end.

Section 1.7 <u>Minimum Investments</u>. The General Partner has the right to establish from time to time minimum initial or additional Capital Contribution (as defined herein) requirements with respect to a Limited Partner's purchase of Interests. The General Partner shall provide notice of such requirements to the Limited Partners. The General Partner reserves the right, in its sole discretion, to make exceptions with respect to its established minimum initial and additional Capital Contribution requirements.

Section 1.8. <u>Liability of the General Partner Generally</u>. Except as provided in the Act, the General Partner shall have the liabilities of a partner in a partnership without limited partners (i) to any Person other than the Partnership and the Limited Partners and (ii) to the Partnership and each Limited Partner, in each instance, except as otherwise provided in this Agreement.

Section 1.9 <u>Certain Definitions</u>. Unless the context otherwise requires, the following terms shall have the meanings indicated below:

(a)      "1933 Act" means the Securities Act of 1933, as amended.

(b)      "1940 Act" means the Investment Company Act of 1940, as amended.

2

(c)      "Accounting Period" means the period of time that begins immediately after the end of the prior Accounting Period and ends at the earliest of the following: (i) the close of business on the day immediately preceding the day in which a Limited Partner is admitted to or redeems from the Partnership; (ii) the close of business on the day immediately preceding the day in which a Limited Partner makes a contribution to the Partnership or receives a distribution from the Partnership; or (iii) the close of business on the last day of a month (or, in the case of the last Accounting Period, on the Partnership's date of dissolution).

(d)      "Act" has the meaning set forth in the preamble.

(e)      "Adjusted Capital Account Deficit" means, with respect to any Partner, the deficit balance, if any, in such Partner's Capital Account (as defined below) as of the end of the relevant Fiscal Year, after giving effect to the following adjustments: (A) credit to such Capital Account any amounts which such Partner is obligated to restore or is deemed to be obligated to restore pursuant to the penultimate sentence of Treas. Reg. §1.704-2(g)(1) and §1.704-2(i)(5); and (B) debit to such Capital Account the items described in Treas. Reg. §1.704-1(b)(2)(ii)(d)(4), (5) and (6). This definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treas. Reg. §1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

(f)      "Advisers Act" means the Investment Advisers Act of 1940, as amended.

(g)      "Affiliate" means any Person that directly or indirectly controls, is controlled by, or is under common control with, the Person in question.

(h)      "Asset Value" means, with respect to the Partnership, the value of one or all, where relevant, of the assets of the Partnership, as determined in accordance with the provisions of the Agreement, as of the date on which such determination is made.

(i)      "Book Value" means for the purpose of the Capital Account maintenance and allocation provisions of this Agreement and as necessary to apply the relevant tax principles to the Partnership, all Partnership assets, including Investments, shall be valued at the adjusted basis of such assets for federal income tax purposes, adjusted as follows (the "Book Value" of such assets):

i.      The initial Book Value of any asset contributed by a Partner to the Partnership shall be the Asset Value of such asset as of the date of contribution, as determined by the General Partner (or its designee) pursuant to the definition of Asset Value.

ii.      The Book Value of any Partnership asset distributed to a Partner shall be adjusted to equal the Asset Value of such asset on the date of distribution as determined by the General Partner (or its designee) pursuant to the definition of Asset Value.

iii.      At the end of each Accounting Period, the Book Value of any asset owned by the Partnership shall be adjusted to equal the Asset Value of such asset as of the end of such Accounting Period, as determined by the General Partner (or its designee) pursuant to the definition of Asset Value. Such adjustment is intended to constitute a revaluation of an asset of the Partnership within the meaning of Treas. Reg. §1.704-1(b)(2)(iv)(f) and the Capital Accounts of the Partners shall be adjusted accordingly pursuant to Article IV. The General Partner may also cause the Partnership to undertake a revaluation of its assets to Asset Value at any other time, and in the manner, permitted by Treas. Reg. §1.704-1(b)(2)(iv)(f) and Treas. Reg. §1.704-1(b)(2)(ii)(g).

3

iv.     The Book Value of each of the Partnership's assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Sections 734(b) or 743(b) of the Code if the Partnership makes an election under Section 754 of the Code, but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(m).

v.     If the Book Value of an asset subject to cost recovery or depreciation charges has been determined or adjusted pursuant to this definition, such Book Value shall thereafter be adjusted by the cost recovery or depreciation charges taken into account with respect to such asset for purposes of computing allocable items with respect to such asset.

(j)     "Business Day" means any day that the New York Stock Exchange (NYSE) and commercial banks in New York, New York are open for business.

(k)     "Capital Account" has the meaning set forth in Section 3.2(a).

(l)     "Capital Contribution" means, in respect of any Partner and his or her Interests, the amount of cash (and the Book Value of Investments, if permitted by the General Partner to be contributed to the Partnership) contributed to the capital of the Partnership in a Partner capacity with respect to such Interests.

(m)     "Code" means the Internal Revenue Code of 1986, as amended from time to time.

(n)     "Contingency Reserve" has the meaning set forth in Section 7.1(g).

(o)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

(p)     "FATCA" shall have the meaning set forth in Section 9.7.

(q)     "Firm" shall have the meaning set forth in Section 10.12.

(r)     "Fiscal Year" means the Partnership's taxable year, which shall be the taxable year of the Partnership for the purposes of the Code as may be adopted by the General Partner pursuant to Section 1.6, including any period of less than 12 calendar months which is considered a taxable period for purposes of the Code and is necessary to apply the allocation provisions of Article IV.

(s)     "Former Limited Partner" shall mean such person or entity as hereafter from time to time ceases to be a Limited Partner pursuant to the terms of this Agreement.

(t)     "General Partner" means BROAD REACH PARTNERS, LLC, a Delaware limited liability company, and includes any entity that becomes a successor General Partner of the Partnership pursuant to the provisions of the Agreement.

(u)     "Indemnified Persons" has the meaning set forth in Section 2.7.

(v)     "Initial Closing" shall mean the first closing at which a Limited Partner is admitted to the Partnership

(w)     "Interest(s)" mean with respect to any fiscal year (or relevant portion thereof) and with respect to each Partner (or former Partner) the Capital Account(s) balance(s) (as defined in Section 3.2(a)) that such Partner (or former Partner) would have received (or in fact did receive) pursuant to the terms and provisions of Article VI upon withdrawal from the

4

Partnership as of the end of such fiscal year (or relevant portion thereof).

(x)  "Investment Management Agreement" means the Investment Management Agreement dated as of February 15, 2016 between the Partnership and the Manager,  as amended, modified, supplemented or restated from time to time.

(y)  "Investments" has the meaning set forth in Section 1.3.

(z)  "Limited Partner" means any person named as a limited partner of the Partnership and includes any person admitted as an additional limited partner of the Partnership or a substituted limited partner of the Partnership pursuant to the provisions of the Agreement.

(aa)  "Liquidating Person" shall have the meaning set forth in  Section 8.3.

(bb)  "Loss Carryforward" means the accumulated Net Losses taken into account when calculating the Performance Allocation.

(cc)  "Majority-in-Interest of the Limited Partners" shall mean Limited Partners whose Ownership Percentages as of the close of the immediately preceding Accounting Period, aggregate more than fifty percent of the Ownership Percentages of all Limited Partners as of the close of the immediately preceding Accounting Period.

(dd)  "Manager" means Bristol Advisors, LLC, a Delaware limited liability company, and Persons who become a successor investment manager of the Partnership.

(ee)  "Net Asset Value" or "NAV" as that term is applied to the Partnership will be the U.S. dollar amount derived by subtracting (i) the liabilities of the Partnership from (ii) the Asset Value of the Partnership.

(ff)  "Net Profits" and "Net Losses" means the amounts determined as follows:

(i)  "Net Profits" for any Accounting Period shall be the excess of (i) the Net Asset Value of the Partnership on the last day of the Accounting Period, prior to (or otherwise not taking into account or adding back) any distribution or distributions being made with respect to such Period, over (ii) the Net Asset Value of the Partnership on the last day of the immediately preceding Accounting Period (after taking into account any Capital Account Adjustments made with respect to such immediately preceding Accounting Period), with such excess being reduced by any additional Capital Contributions made during such Accounting Period. Net Profits for any Fiscal Year shall be determined in the same manner as set forth in the previous sentence except that the term "Fiscal Year" shall be substituted for "Accounting Period" wherever that term appears.

(ii)     "Net Losses" for any Accounting Period means the excess of (i) the Net Asset Value of the Partnership on the last day of the immediately preceding Accounting Period (after taking into account any Capital Account Adjustments made with respect to such immediately preceding Accounting Period) over (ii) the Net Asset Value of the Partnership on the last day of such Accounting Period, prior to (or otherwise not taking into account or adding back) any distribution or distributions being made with respect to such Accounting Period, with such excess being increased by any additional Capital Contributions made during such Accounting Period. Net Losses for any Fiscal Year shall be determined in the same manner as set forth in the previous sentence except that the term "Fiscal Year" shall be substituted for "Accounting Period" wherever that term appears.

The determination of Net Profits and Net Losses shall take into account the investment advisory fee payable pursuant to Section 3.4 as an item of Partnership expense. Notwithstanding the foregoing, any Partnership items which are specially allocated pursuant to Sections 4.3 and 4.4 hereof shall be excluded from the computation of Net Profits or Net Losses.

The definitions of Net Profits and Net Losses are intended to comply with the provisions of Treas. Reg. §1.704-1(b)(2)(iv) (including, without limitation and through the definition of Book Value, Treas. Reg. §§ 1.704-1(b)(2)(iv)(d), 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g)) and shall be interpreted consistently therewith.

(gg)     "New Issue Account" has the meaning set forth in Section 3.9(a).

(hh)     "New Issue Securities" has the meaning set forth in Section 3.9.

(ii)     "Nonrecourse Deductions" has the meaning set forth in Treas. Reg. §1.704-2(b)(1).

(jj)     "Nonrecourse Liability" has the meaning set forth in Treas. Reg. §1.704-2(b)(3).

(kk)   "Ownership Percentage" with respect to a Partner's Capital Account means the percentage computed by dividing a Partner's Capital Account balance on a given date by the aggregate of all Partners' respective Capital Account balances on that date. A Partner's Ownership Percentage determines his share of the Partnership's Net Asset Value at any given time. The Ownership Percentage of a Partner on the day the Partner becomes a Partner of the Partnership shall be determined by dividing the amount of such Partner's Capital Contribution by the value of the Partnership's Net Asset Value, including unrealized gains and losses and the amount of such Partner's Capital Contribution. As applied only to the Limited Partners, "Ownership Percentage" means the percentage ownership interest of a Limited Partner in the Partnership computed by dividing the Limited Partner's Capital Account balance on a given day by the aggregate of all Limited Partners' respective Capital Account balances on that day.

(ll)   "Partner" means any General Partner or Limited Partner and "Partners" means all General Partners and Limited Partners.

(mm)   "Partner Nonrecourse Debt" has the meaning set forth in Treas. Reg. §1.704-2(b)(4).

(nn) "Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treas. Reg. §1.704-2(i)(3).

(oo) "Partner Nonrecourse Deductions" has the meaning set forth in Treas. Reg. §§1.704-2(i)(1) and 1.704-2(i)(2).

(pp) "Partnership Minimum Gain" has the meaning set forth in Treas. Reg.§§1.704-2(b)(2) and 1.704-2(d).

(qq) "Performance Allocation" shall have the meaning set forth in Section 3.4

(rr ) "Performance Period" means each calendar month.

(ss) "Person" means any natural person, partnership, limited partnership, limited liability company, trust, estate, association, corporation, company, custodian, nominee or any other individual or entity in its own or any representative capacity.

(tt) "Regulatory Allocations" has the meaning set forth in Section 3.6.

(uu) "Restricted Partner" has the meaning set forth in Section 3.9.

(vv) "Subscription Agreement" means the subscription agreement for the Partnership and composes one of the Subscription Documents.

(ww) "Subscription Documents" means the Subscription Agreement together with the Partnership's investor suitability questionnaire, which also composes one of the Subscription Documents.

(xx) "Tax Matters Partner" shall have the meaning set forth in Section 9.5.

(yy) "Treasury Regulations" or "Treas. Reg." mean the regulations promulgated under the Code.

(zz) "Unrestricted Partners" shall have the meaning set forth in Section 3.7(b).

(aaa) "U.S." means the United States of America.

(bbb) "Withdrawal Day" means the last Business Day of any calendar month or such additional day or days as the General Partner may in its sole discretion determine, either in a particular case or generally.

ARTICLE II

MANAGEMENT OF THE PARTNERSHIP

Section 2.1  <u>Management Generally</u>.   The management of the Partnership shall be vested exclusively in the General Partner. The General Partner may delegate its administrative duties hereunder to designated administrators and may delegate its investment management duties hereunder to a designated investment manager or adviser (the "Manager"). Limited Partners shall have no part in the management of the Partnership, and shall have no authority or right to act on behalf of the Partnership in connection with any matter.

Section 2.2      <u>Manager.</u>

a)      <u>Appointment of Manager.</u>  The General Partner hereby appoints the Manager to act as the investment manager of the Partnership in accordance with the terms of the Investment Management Agreement, subject to the following provisions:

   i.   The Manager shall manage and perform such investment management services and other functions of the Partnership as from time to time delegated by the General Partner and take all appropriate actions in connection therewith on behalf of the Partnership, provided that the management and the conduct of the activities of the Partnership shall remain the sole responsibility of the General Partner and the appointment of the Manager shall not relieve the General Partner from its obligations to the Partnership as its general partner hereunder or under the Act.

   ii.   The Manager shall act in conformity with this  Agreement,   the Investment Management Agreement and with the instructions and directions of the General Partner.

   iii.   The Manager shall not assign its duties hereunder to any other Person without the written consent of the General Partner (which consent may be withheld in its sole discretion).

The Engagement by the Partnership of the Manager contemplated hereby is set forth in the Investment Management Agreement, specifying in further detail the rights and duties of the Manager.

b)      <u>Management Fee Generally</u>. The Partnership shall n o t  p a y  a n y management fees to the Manager.

Section 2.3      <u>Authority of the General Partner</u>.  The General Partner shall have the power on behalf and in the name of the Partnership to carry out the business and purpose of the Partnership set forth in Section 1.3, and to perform all acts and enter into and perform all contracts and other undertakings which it may deem necessary or advisable or incidental thereto, including, without limitation, the power to:

(a)      direct the formulation of investment policies and strategies for the Partnership;

(b)     expend the capital and revenues of the Partnership in furtherance of the Partnership's business;

(c)     open, maintain and close, in the name of the Partnership, investment and trading accounts, bank accounts, and to draw checks or other orders for the payment of money;

(d)     make, execute, acknowledge and deliver such agreements, contracts and documents as may be necessary or appropriate to carry out the Partnership's investment program, including, but not limited to, swap agreements, repurchase and reverse repurchase agreements, over-the-counter options, forward contracts, futures contracts and any other derivative instruments of any type or nature whatsoever;

(e)     make, or designate and appoint other persons to make, directly or indirectly, all or any portion of the Partnership's trading and investment decisions, including Affiliates of the General Partner, for the purposes set forth in this Agreement; provided, however, that all such advisory services with respect to permitted transactions shall be performed by appropriately-registered persons under applicable federal and/or state law, as may be required under such applicable federal and/or state law;

(f)     enter into agreements and contracts with third parties, terminate such agreements and institute, defend and settle litigation arising therefrom and give receipts, releases and discharges with respect to all of the foregoing and any matters incident thereto;

(g)     maintain or cause to be maintained adequate records and accounts of all operations and expenditures and furnish the Limited Partners with the reports required hereunder;

(h)     purchase, acquire, hold, invest, reinvest all property of the Partnership, real, personal and mixed, in the name of the Partnership, or in the name of a nominee authorized by the General Partner;

(i)     sell, lease, exchange or otherwise dispose of all or any portion of the property of the Partnership;

(j)     enter into one or more customer agreements with one or more dealers or brokers, including dealers or brokers who are Affiliates of the General Partner or its Affiliates, and subject to applicable federal securities laws, enter into principal and agency cross transactions with one or more brokers. In selecting brokers for the execution of the Partnership's portfolio transactions, the General Partner may consider whatever factors it deems relevant and proper under the circumstances, including the value of any or all of the following provided by the broker or paid for by the broker (either by direct or reimbursement cash payments or by commissions, or any other means) and provided by others: brokerage or research (within the contemplation of Section 28(e) under the Securities Exchange Act of 1934, as amended), other products and services, and, subject to applicable federal securities laws, investor referrals;

(k)     execute for and on behalf of the Partnership any filing, notice, form or other document under any federal or state securities law and to take any additional action as it shall deem necessary or desirable to effectuate the offering of Interests;

(l)     employ consultants, experts, professionals, accountants, administrators, auditors, attorneys, brokers, engineers, custodians, escrow agents, and any other third parties, including Affiliated entities of the General Partner, deemed necessary by the General Partner, and

terminate such employment;

(m)    pay, extend, renew, modify, adjust, submit to arbitration, prosecute, defend or compromise, upon such terms as it may determine and upon such evidence as it may deem sufficient, any obligation, suit, liability, cause of action or claim, including taxes, either in favor of or against the Partnership;

(n)    pay any and all reasonable fees and to make any and all reasonable expenditures which it, in its discretion, deems necessary or appropriate in connection with the organization of the Partnership, the offering and sale of the Interests, the management of the affairs of the Partnership, the investment and maintenance of the assets of the Partnership and the carrying out of its obligations and responsibilities under this Agreement;

(o)    pay any and all reasonable fees and to make any and all reasonable expenditures to an Affiliated entity which it, in its discretion, deems necessary or appropriate in connection with the administration of the Partnership;

(p)    admit an assignee of a Limited Partner's Interests to be a substituted Limited Partner pursuant to and subject to the terms of this Agreement, without the consent of any Limited Partner;

(q)    determine the accounting methods and conventions to be used in the preparation of the tax returns referred to in this Agreement, and make such elections under the tax laws of the U.S., the several states and other relevant jurisdictions as to the treatment of items of income, gain, loss, deduction and credit of the Partnership, or any other method or procedure related to the preparation of such returns;

(r)    make (and if made, to revoke) the elections referred to in Sections 475 or 754 of the Code or other provisions of the Code. Each of the Partners will, upon request, supply the information necessary to properly give effect to such election;

(s)    prior to the termination of the Partnership, form a new limited partnership the investment policies of which are substantially the same as the Partnership;

(t)    pay or authorize the payment of distributions to the Partners;

(u)    prosecute, defend, settle or compromise actions or claims at law or in equity at the Partnership's expense as may be necessary or proper to enforce or protect the Partnership's interests, and shall satisfy any judgment, decree or decision of any court, board or authority having jurisdiction or any settlement of any suit or claim prior to judgment or final decision thereon, first, out of any insurance proceeds available therefor, and then, out of the Partnership's assets, as appropriate;

(v)    vote (or delegate to a third party the authority to vote) all proxies with respect to Investments held by the Partnership;

(w)    upon prior notice to the Limited Partners, but without consent of the Limited Partners, and at the expense of the Partnership, (i) register the Partnership as an investment company pursuant to the 1940 Act, or (ii) cause the Partnership to reorganize into a newly formed investment company (or series thereof) registered under the 1940 Act;

(x)    establish a bond in connection with a contribution made to the

Partnership by an employee benefit plan if such a bond is required by ERISA;

(y)   cause the Partnership to borrow money or enter into credit arrangements on terms deemed appropriate by the General Partner;

(z)   lend and pledge, with or without security, and such Investments, instruments or other Partnership property, including by entering into reverse repurchase agreements; and from time to time without limit as to amount, borrow or raise funds, including by entering into repurchase agreements, and secure the payment of obligations of the Partnership by mortgage upon, or pledge or hypothecation of, all or any part of the Partnership property;

(aa)   obtain insurance coverage that the General Partner may deem appropriate;

(bb)   to perform or cause to be performed, all management and operational functions relating to the business of the Partnership, which the General Partner deems necessary or advisable to carry out the purposes of this Agreement and to exercise on behalf of the Partnership all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Partnership and as permitted under the Act;

(cc)   act as investment manager, or enter into an agreement with a management company, which may be an affiliate of the General Partner, to perform investment functions, including the investment and reinvestment of the Partnership's assets and administrative functions, for a fee;

(dd)   act as investment manager, or enter into an agreement with a management company, which may be an affiliate of the General Partner, to perform investment functions, including the investment and reinvestment of the Partnership's assets and administrative functions, for a fee;

(ee)   procure the services of an administrator, which may be an Affiliate of the General Partner, to render administrative services to the Partnership pursuant to a written agreement;

(ff)   procure the services of a custodian, which may be an Affiliate of the General Partner, to render custodial services to the Partnership pursuant to a written agreement; and

(gg)   to enter into agreements with certain prospective or existing Limited Partners whereby such Limited Partners may be subject to different, and in certain cases more favorable, terms and conditions than those of the limited partnership interests described herein, including, without limitation, fees, redemption terms or access to more frequent or detailed information regarding the Partnership's Investments.

Section 2.4    Reliance by Third Parties.   Persons dealing with the Partnership are entitled to rely conclusively upon a certificate of the General Partner to the effect that it is then acting as the General Partner and upon the power and authority of the General Partner as herein set forth.

Section 2.5   Activities of the General Partner.   The General Partner shall devote so much time to the affairs of the Partnership as, in the sole discretion of the General Partner, the conduct of the Partnership's business shall reasonably require, and the General Partner shall not be obligated to do or perform any act or thing in connection with the business of the Partnership not expressly set forth herein or in any agreements ancillary hereto. The General Partner, the Manager, their members or Affiliates or their respective shareholders, members, partners, officers, directors, employees or agents may act as investment manager, sponsor or general partner for other clients, including collective investment vehicles, and engage directly or indirectly in other business ventures whether or not such business is similar to the business of the Partnership. Neither the Partnership nor any Partner shall have any rights in or to such ventures or the income or profits derived therefrom. The General Partner, its members or Affiliates or their respective shareholders, members, partners, officers, directors, employees or agents may (i) directly or indirectly purchase, sell or hold Investments for the account of persons other than the Partnership, or for their own accounts; (ii) advise and act as investment manager to other accounts that may have investment objectives similar to those of the Partnership and may compete with the Partnership for investment opportunities, provided that where there is a limited supply of an Investment, such Person will act in good faith to use its commercially reasonable efforts to cause investment opportunities to be allocated or to rotate investment opportunities in a manner deemed equitable, but such Person cannot assure, and assumes no responsibility for, equitable allocation of investment opportunities between the Partnership or such other account; and (iii) engage in, or cause or advise other customers to engage in, transactions that may differ from or be identical to the transactions engaged in by the General Partner for the Partnership's account. The General Partner shall not have any obligation to engage in any transaction for the Partnership's account or to recommend any transaction to the Partnership that the General Partner, its members or Affiliates or their respective shareholders, members, partners, officers, directors, employees or agents may engage in for its own account or the account of any other account, except as otherwise required by applicable law. To the extent permitted by applicable law, the General Partner shall be permitted to bunch or aggregate orders for the Partnership's account with orders for other accounts. No Limited Partner shall, by reason of being a Partner in the Partnership, have any right to participate in any manner in the profits or income earned, or derived by or accruing to the General Partner, its members or Affiliates or their respective shareholders, members, partners, officers, directors, employees or agents, from the conduct of any business other than the business of the Partnership or from any transaction in Investments effected by the General Partner, its members or Affiliates or their respective shareholders, members, partners, officers, directors, employees or agents for any account other than that of the Partnership. The General Partner is authorized to establish operating and valuation guidelines, a code of ethics and legal compliance policies that may restrict its activities on behalf of the Partnership or the Partnership's activities and may prevent the Partnership from taking advantage of certain desirable investment opportunities.

Section 2.6   Transactions with Partners and Affiliates.   The General Partner may contract on behalf of the Partnership with one or more banks, trust companies, investment advisers, administrators, custodians, broker-dealers or other persons (which may be a Partner or an Affiliate of a Partner) for the performance of such functions as the General Partner may determine, including, but not limited to, the investment and reinvestment of all or part of the Partnership's assets, the execution of portfolio transactions, the provision of custodial, investment advisory, statistical and research services and any or all administrative functions. Except as

12

otherwise required by law, the fact that the General Partner or one or more of the Limited Partners is directly or indirectly interested in or connected with any company or person with which or with whom the Partnership may have dealings, shall not preclude such dealings or make them void or voidable and the Partnership or any of the Partners shall not have any rights in or to such dealings or any profits derived therefrom.

Section 2.7 <u>Exculpation</u>. To the fullest extent permitted by law, except as provided in Section 2.9 of this Agreement, no Indemnified Person (as defined in Section 2.8 below) shall be liable to any Partner or the Partnership for any act or failure to act in connection with its obligations or responsibilities under this Agreement, unless such act or failure to act resulted from their willful misfeasance, bad faith or gross negligence in the performance of their duties to the Partnership as finally determined by a court of competent jurisdiction. Each Indemnified Person may consult with counsel and accountants regarding Partnership affairs and, to the fullest extent permitted by the law, shall be protected and justified fully in any action or inaction which shall be taken in accordance with the advice or opinion of such counsel or accountants; provided, however, that they shall have been selected with reasonable care. To the fullest extent permitted by law, no Indemnified Person shall have any person liability to the Partnership or any Partner solely by reason of any change in U.S. federal, state or local or non-U.S. income tax laws, or in interpretations thereof, as they apply to the Partnership or the Partners, whether the change occurs through legislative, judicial or administrative action.

Section 2.8 <u>Indemnification</u>. To the fullest extent permitted by law, the Partnership shall indemnify the General Partner, the Manager their Affiliates and their respective shareholders, members, partners, officers, directors, employees, agents and representatives (collectively, "Indemnified Persons") from and against any loss or expense suffered or sustained by them by reason of: the fact they were acting as or on behalf of the General Partner or the Partnership; or any acts or omissions in or arising out of the performance of their duties or services as General Partner or as members, officers, directors, employees or agents of the General Partner, or as an agent, employee, or consultant of the Partnership, except by reason of their willful misfeasance, bad faith or gross negligence in the performance of their duties to the Partnership or by reason of their reckless disregard of their duties to the Partnership, as finally determined by a court of competent jurisdiction.

The Partnership shall, in the sole discretion of the General Partner, advance to any Indemnified Person, reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct; *provided, however*, that where the Indemnified Person has been named as defendant or respondent in a proceeding, the Partnership may only pay, or reimburse in advance of the final disposition of a proceeding, reasonable expenses incurred by the Indemnified Person after: (i) the Partnership receives a written affirmation by the Indemnified Person of its good faith belief that it has met the standard for indemnification described above; and (ii) the Partnership receives a written undertaking on behalf of the Indemnified Person to repay the amount paid or reimbursed if it is ultimately determined that the Indemnified Person has not met that standard, or it is ultimately determined that indemnification of the Indemnified Person in connection with such proceeding is prohibited by the Act or federal securities laws. Any indemnification of or advance expenses paid to a Indemnified Person shall be reported promptly, but no later than six months after the date that the indemnification or advance occurs, in writing to the Limited Partners.

Section 2.9 <u>Related Laws</u>. Federal and state securities laws impose liabilities on persons who act in good faith, and therefore, nothing in this Agreement shall waive or limit any rights that Limited Partners or the Partnership may have against the General Partner under these laws.

Section 2.10     <u>Payment of Certain Costs and Expenses</u>.

(a)  <u>Partnership Expenses.</u> Unless the General Partner or its Affiliates agree to bear them, the Partnership shall bear or reimburse the General Partner or its Affiliates for: (i) the offering expenses of the Partnership; (ii) all expenses incurred in connection with actual and potential investments, including but not limited to, travel, brokerage commissions and other transaction costs, clearing and settlement fees, custodial fees, research and technical service expenses, interest on margin accounts and other indebtedness, all fees and expenses relating to the registration and qualification for sale of such Interests, if any, and all transfer taxes, and legal and accounting fees; (iii) all filing and recording fees; (iv) all federal, state and local taxes payable by the Partnership; (v) all costs, fees and expenses relating to accountings and the preparation and mailing of financial, tax and performance reports to the Partnership, including the allocable share of the costs, fees and expenses relating to internal accounting and tax preparation functions should the General Partner determine not to use third-party providers for such services; (vi) all fees and disbursements of attorneys, accountants, advisers and consultants for work relating to the Partnership; (vii) any other direct fees or expenses of the Partnership; (viii) all interest expense of the Partnership, if any, (ix) insurance premiums, including but not limited to, director & officer or key man insurance; and (x) expenses incurred by the Partnership as a result of complying with future legislative or administrative changes or court decisions that modify current law as may be reasonably determined to be expenses of the Partnership by the General Partner.

(b)  <u>Manager Expenses.</u> The Manager will be responsible for and shall pay, or cause to be paid, its ordinary office overhead expenses incurred in rendering its services to the Partnership, which include rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, payroll taxes, travel expenses and compensation of investment personnel and other personnel.

Section 2.11 <u>Organizational Expenses</u>. Notwithstanding anything   to   the contrary in Section 2.10, the Partnership will bear or will reimburse the General Partner or its Affiliates for organizational expenses. Organizational expenses  may be amortized over sixty months (60) for tax and accounting purposes.

14

## ARTICLE III

## CAPITAL ACCOUNTS OF PARTNERS AND OPERATION THEREOF

Section 3.1    <u>Capital Contributions</u>.    Each Partner has paid or conveyed by way of contribution to the Partnership cash having an aggregate value as set forth in the Partnership's books and records (the "Capital Contribution"). Additional Capital Contributions may be made by Limited Partners only in accordance with the provisions of this Section 3.1. With the prior approval of the General Partner, a Limited Partner may make additional Capital Contributions to the Partnership in cash at such time as the General Partner may permit. Whether Investments will be accepted as a contribution to the Partnership shall be determined in the discretion of the General Partner.

Section 3.2    <u>Capital Accounts</u>.

(a)    A capital account (the "Capital Account") has been established on the books of the Partnership for each Partner in an amount equal to such Partner's Capital Contribution. The Capital Accounts will be adjusted and maintained at all times strictly in accordance with Section 704 of the Code and Treas. Reg. §1.704-1(b)(2)(iv) (including, without limitation, Treas. Reg. §§1.704-1(b)(2)(iv)(d), 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g)). The General Partner is expressly authorized to make appropriate amendments to the allocations of items pursuant to this Section 4 if necessary in order to comply with Section 704 of the Code or Treas. Reg. §1.704-1(b)(2)(iv).

(b)    Each Partner's Capital Account shall be increased by (i) the amount of any cash or the Asset Value of any property contributed (or deemed contributed, including the amount of any distributions reinvested into Interests of the Partnership) by such Partner to the Partnership and (ii) the amount, if any, of Net Profits allocated to such Partner's Capital Account, as well as any items in the nature of income or gain which are specially allocated to such Partner's Capital Account pursuant to this Agreement.

(c)    Each Partner's Capital Account shall be reduced by (i) the amount, if any, of all distributions (or deemed distributions, including any distributions reinvested into Interests of the Partnership) made to such Partner, and (ii) the amount, if any, of all Net Losses allocated to such Partner's Capital Account, and the amount of any items in the nature of expenses or losses which are specially allocated pursuant to this Agreement.

(d)    Unless otherwise determined by the General Partner, no Partner shall be entitled to interest on any Capital Contribution or Capital Account. No Partner shall have the right to demand or receive any return of all or any part of any Capital Contribution or Capital Account, except as expressly set forth in this Agreement.

(e)    If all or any portion of the Interests of a Partner are transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the Partner to the extent it relates to the transferred Interests or portion thereof.

Section 3.3   Ownership Percentages.  A "Ownership Percentage" shall be determined for each Capital Account for each Accounting Period of the Partnership by dividing the balance of such Capital Account by the aggregate Capital Accounts of all Partners as of the beginning of such Accounting Period. The sum of the Ownership Percentages shall equal 100 percent.

Section 3.4     Allocation of Net Profits and Net Losses.

(a)     Immediately after giving effect to the special allocations set forth in Section 3.5 and Section 3.9, Net Profits and Net Losses shall be allocated to the Capital Accounts of the Partners as of the moment immediately following the end of the Accounting Period, or at such other times as the General Partner deems in its sole discretion complies with Section 704 of the Code or Treas. Reg. §1.704-1(b)(2)(iv), in accordance with the Partners' respective Ownership Percentages for such Accounting Period.

(b)     The Net Losses allocated pursuant to Section 3.4(a) shall not exceed the maximum amount of Net Losses that can be so allocated without causing any Partner to have an Adjusted Capital Account Deficit at the end of any Accounting Period. In the event some but not all of the Partners would have Adjusted Capital Account Deficits as a consequence of an allocation of Net Losses pursuant to Section 3.4(a) hereof, the limitation set forth in this Section 3.4(b) shall be applied on a Partner by Partner basis so as to allocate the maximum permissible Net Losses to each Partner under Treas. Reg. §1.704-1(b)(2)(ii)(d).

(c)     Performance Allocation.  As of the end of each Performance Period, Net Profits shall be allocated as follows: First, one hundred percent (100%) to the Limited Partners, pro rata, until such time as the Limited Partners have received eight percent (8%) on an annualized basis.   Thereafter, the General Partner shall receive an allocation of Net Profits, if any ("Performance Allocation"). The Performance Allocation shall equal fifty percent (50%) of the Net Profits allocated to each Limited Partner for such Performance Period, in excess of the Loss Carryforward, if any, for such Limited Partner. "Loss Carryforward" with respect to a Limited Partner means the amount of Net Loss previously allocated to such Limited Partner and carried forward from prior Performance Periods, which have not been recovered by the Limited Partner in full with subsequent allocations of Net Profit to such Limited Partner (from which a Performance Allocation has not been reallocated). The Loss Carryforward is intended to prevent a Performance Allocation from being calculated on what is, in effect, a recoupment of net losses. If a Limited Partner makes a partial withdrawal or receives a distribution, his Loss Carryforward balance, if any, will be reduced in the proportion that the amount withdrawn bears to his Capital Account balance immediately before giving effect to the withdrawal. A Performance Allocation shall also be calculated with respect to profits arising from Partnership asset classes in which not all Limited Partners have an interest, such as new issues.

(d)     In the event of a partial or complete withdrawal from a Limited Partner's Capital Account prior to the end of a Performance Period, the General Partner shall be entitled to a Performance Allocation with respect to the amount withdrawn and the Withdrawal Date shall be deemed to be the end of the Performance Period for purposes of calculating the General Partner's Performance Allocation. Similarly, if the Partnership terminates on a date other than the end of a Performance Period, the final period for computing the Performance Allocation will commence as of the first Business Day of such Performance Period and will end as of the close of business on the termination date.

(e)     Notwithstanding the foregoing, the General Partner may waive or reduce the Performance Allocation with regard to certain Limited Partners that are employees or

16

affiliates of the General Partner, relatives of such persons, and for certain large and/or strategic investors. The amount of any Performance Allocation attributable to any Interests being withdrawn will be allocable to the General Partner following such withdrawal.

Section 3.5.    Special Allocations.  The following special allocations shall be made in the following order:

(a)    Minimum Gain Chargeback. Except as otherwise provided in Treas. Reg. §1.704-2(f), notwithstanding any other provision in this Section 3, if there is a net decrease in Partnership Minimum Gain during any Accounting Period, each Partner shall be specially allocated items of Partnership income and gain for such Accounting Period (and, if necessary, subsequent Accounting Periods) in an amount equal to such Partner's share of the net decrease in Partnership Minimum Gain, determined in accordance with Treas. Reg. §1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Treas. Reg. §§1.704-2(f)(6) and 1.704-2(j)(2). This Section 3.5(a) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. §1.704-2(f) and shall be interpreted consistently therewith.

(b)    Partner Minimum Gain Chargeback. Except as otherwise provided in Treas. Reg. §1.704-2(i)(4), notwithstanding any other provision in this Section 3, if there is a net decrease in Partner Nonrecourse Debt Minimum Gain attributable to a Partner Nonrecourse Debt during any Accounting Period, each Partner who has a share of the Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Treas. Reg. §1.704-2(i)(5), shall be specially allocated items of Partnership income and gain for such Accounting Period (and, if necessary, subsequent Accounting Periods) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt, determined in accordance with Treas. Reg. §1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Partner pursuant thereto. The items to be so allocated shall be determined in accordance with Treas. Reg. §§1.704-2(i)(4) and 1.704-2(j)(2). This Section 3.5(b) is intended to comply with the minimum gain chargeback requirement in Treas. Reg. §1.704-2(i)(4) and shall be interpreted consistently therewith.

(c)    Qualified Income Offset. In the event any Partner unexpectedly receives any adjustments, allocations, or distributions described in Treas. Reg. §1.704-1(b)(2)(ii)(d)(4), §1.704-1(b)(2)(ii)(d)(5) or §1.704-1(b)(2)(ii)(d)(6), items of Partnership income and gain shall be specially allocated to each such Partner in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Partner as quickly as possible, provided that an allocation pursuant to this Section 3.5(c) shall be made only if and to the extent that such Partner would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 3 have been tentatively made as if this Section 3.5(c) were not in the Agreement.

(d)    Nonrecourse Deductions. Nonrecourse Deductions for any Accounting Period shall be allocated in accordance with each Partner's Ownership Percentage.

(e)    Partner Nonrecourse Deductions. Any Partner Nonrecourse Deductions for any Accounting Period shall be specially allocated to the Partner who bears the economic risk of loss with respect to the Partner Nonrecourse Debt to which such Partner Nonrecourse Deductions are attributable in accordance with Treas. Reg. §1.704-2(i)(1).

17

(f)      Section 754 Adjustments. To the extent an adjustment to the adjusted tax basis of any Partnership asset pursuant to Code §734(b) or Code §743(b) is required, pursuant to Treas. Reg. §1.704-1(b)(2)(iv)(m), Code §734(d) or Code §743(d), to be taken into account in determining Capital Accounts the amount of such adjustment to Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss shall be specially allocated to the Partners in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to such Regulation.

Section 3.6.  Curative Allocations.  The allocations set forth in Sections 3.4(b), 3.5(a), 3.5(b), 3.5(c), 3.5(d), 3.5(e), and 3.5(f) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Partners that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Partnership income, gain, loss or deduction pursuant to this Section 3.6. Therefore, notwithstanding any other provision of this Section 3 (other than the Regulatory Allocations), the General Partner may, in its discretion, make such offsetting special allocations of Partnership income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Partner's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Partner would have had if the Regulatory Allocations were not part of the Agreement and all Partnership items were allocated pursuant to Section 3.4 (other than Section 3.4(b)). In exercising its discretion under this Section 3.6, the General Partner may take into account future Regulatory Allocations under Sections 3.5(a) and 3.5(b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 3.5(e) and 3.5(f).

Section 3.7.      Other Allocation Rules.

(a)      Generally, all profits and losses shall be allocated among the Partners as provided in Section 3. If Partners are admitted to the Partnership on different dates during any Fiscal Year, the profits (or losses) allocated among the Partners for each such Fiscal Year shall be allocated in proportion to their respective Capital Accounts from time to time during such Fiscal Year in accordance with Code Section 706, using any convention permitted by law and selected by the General Partner.

(b)      For purposes of determining the Net Profits, Net Losses, or any other items allocable to any period, Net Profits, Net Losses, and any such other items shall be determined on a daily, monthly, or other basis, as determined by the General Partner using any permissible method under Code §706 and the Treasury Regulations thereunder.

(c)      The Partners are aware of the income tax consequences of the allocations made by this Article III and hereby agree to be bound by the provisions of this Article III in reporting their shares of Partnership income and loss for income tax purposes.

Section 3.8. Tax Allocations. For each Accounting Period, items of taxable income, deduction, gain, loss or credit shall be allocated for income tax purposes among the Partners in the same manner as their corresponding book items were allocated  pursuant  to Sections 3.4, 3.5, 3.6 and 3.9 for such Accounting Period, as modified by the following principles:

18

(a)     In the event that the Book Value of Partnership assets differ from their adjusted tax basis upon contribution or revaluation made pursuant to the definition of Book Value, the tax allocations of income, gain, loss and deduction shall be shared among the Partners in a manner that takes into account the variation between such Book Value and adjusted tax basis, pursuant to § 704(c) of the Code or pursuant to the principles thereof. Any elections or other decisions relating to such allocations shall be made by the General Partner in any manner that reasonably reflects the purpose and intention of this Agreement.

(b)     If a Limited Partner redeems all or any portion of its Interests, then, in the General Partner's discretion, ordinary income or loss, or long- or short-term capital gain or loss, recognized by the Partnership in the fiscal year in which such redemption occurs shall be allocated to such Limited Partner solely for U.S. federal income tax purposes up to an amount equal to either of the following amounts: (i) if the Partnership has recognized ordinary income or capital gains (including short-term capital gains) in the fiscal year in which such redemption occurs, the excess of the amount to be distributed to such Limited Partner upon, and as of the time of, such redemption over such Limited Partner's tax basis in its redeemed Interests (or portion thereof, as applicable) as of the time of such redemption (or, if greater, the excess of the amounts previously allocated to such Limited Partner's capital account over the amounts previously allocated to such Limited Partner for U.S. federal income tax purposes), or (ii) if the Partnership has recognized ordinary or capital losses (including short-term capital losses) in the fiscal year in which such redemption occurs, the excess of such Limited Partner's tax basis in its redeemed Interests (or portion thereof) as of the time of such redemption over the amount to be distributed to such Limited Partner upon, and as of the time of, such redemption (or, if greater, the excess of the amounts previously allocated to such Limited Partner for U.S. federal income tax purposes over the amounts previously allocated to such Limited Partner's capital account)

(c)     Allocations pursuant to this Section 3.8 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Net Profits, Net Losses, other allocable items, or distributions pursuant to any other provision of this Agreement.

Section 3.9 New Issues Account. If, at any time, (i) one or more Limited Partners is a "restricted person" (a "Restricted Partner") as such term is defined in Financial Industry Regulatory Authority Inc. (formerly, the NASD, Inc.) Rule 5130 (the "New Issues Rule") and holds in the aggregate more than a 10 percent Ownership Percentage in the Partnership and (ii) the General Partner causes the Partnership to directly or indirectly invest in securities which the General Partner, in its sole discretion, believes may be or become subject to the New Issues Rule ("New Issues Securities"), such investment shall be made in accordance with the following provisions (or such other provisions or procedures as the General Partner, in its sole discretion, deem necessary or advisable):

(a)     any such investment made in a particular Accounting Period shall be made in one or more special accounts established for this purpose (collectively, the "New Issues Account");

(b)     only those Limited Partners who do not fall within the proscription of the New Issues Rule ("Unrestricted Partners") shall have any beneficial interest in the New Issues Account;

(c)     each Unrestricted Partner shall have a beneficial interest in the New Issues Account for any Accounting Period in the proportion which the balance in such Unrestricted Partner's Capital Account as of the beginning of the Accounting Period bears to the

19

sum of the balances of the Capital Accounts of all Unrestricted Partners as of the beginning of such Accounting Period;

(d)     funds required to make a particular investment in New Issues Securities shall be transferred to the New Issues Account from the regular or basic account or accounts of the Partnership;

(e)     New Issues Securities shall be purchased in the New Issues Account, held in the New Issues Account, and, in the sole discretion of the General Partner, either (x) sold from the New Issues Account with the proceeds of the sale to be transferred from the New Issues Account to the regular or basic account or accounts of the Partnership or (y) transferred to the regular or basic account or accounts of the Partnership on such day following the completion of the public distribution of such New Issues Securities as deemed appropriate by the General Partner in its sole discretion at fair market value as of such day of transfer as determined by the General Partner (or its designee) in its sole discretion, with such transfer being treated as a sale for all purposes of this Agreement;

(f)     the determination of the General Partner as to whether a particular Partner falls within the proscription of the New Issues Rule shall be final.

(g)     Notwithstanding anything in this Agreement to the contrary, the General Partner shall interpret (and amend to the extent necessary) this Agreement with respect to a Restricted Partner and the other Limited Partners for all purposes as if such Restricted Partner were not a Limited Partner with respect to the New Issues Securities (including, without limitation, for purposes of allocations and distributions relating to the New Issues Securities), and to any other Security the allocation and distributions for which must be adjusted to reflect actual interests therein, and this Agreement shall be interpreted to include, where appropriate, exclusions and limitations to permit the General Partner to carry out the intent of this Section 3.9(g). A Restricted Partner shall have no right to any distributions or allocations in respect of such New Issues Securities and all economic and other provisions of this Agreement shall be interpreted as if the Partnership were a separate entity with respect to each New Issues Security in which only the Unrestricted Partners with respect to such New Issues Securities have invested.

Section 3.10     Determination of Partnership's Net Asset     Value.     The Partnership's Net Asset Value shall be determined at the end of each Accounting Period at such time as may be determined by the General Partner. The value of a Partner's Interest in the Partnership as of any time shall be equal to the proportionate share of the Net Asset Value of the Partnership represented by such Partner's Capital Account. The determination of the Partnership's Net Asset Value will be made by the General Partner (or its designee). The General Partner (or its designee) may use independent valuation or pricing agents for the purpose of determining valuations of securities. Illiquid investments or securities for which no market prices are available or the General Partner (or its designee) believes such prices are unreliable, may be valued in the good faith judgment of the General Partner (or its designee). The General Partner (or its designee) may value certain securities of the Partnership using the amortized cost method, which involves valuing a security at its cost on the date of purchase and thereafter (absent unusual circumstances) assuming a constant amortization to maturity of any discount or premium, regardless of the impact of fluctuations in general market rates of interest on the value of the instrument. By executing this Agreement (personally or by attorney-in-fact), each Partner agrees to the Partnership's use of the amortized cost method to value certain of the Partnership's securities and other assets.  Determinations of the General Partner (or its designee) are to be final,

conclusive and binding on all Limited Partners. The General Partner may temporarily suspend the calculation of a Partnership's Net Asset Value in the following cases:

(a)     if a stock exchange, market or quotation system, on which a significant portion of the Partnership's assets is traded or is quoted, is closed for periods of time other than normal holidays, or when transactions on such an exchange or market are suspended or subject to restrictions;

(b)     during any breakdown of the means of communication or calculation normally used to determine the value of the Partnership's assets;

(c)     if restrictions on exchange or transfer of Investments prevent transactions from  being carried out on behalf of the Partnership or when purchase or sale transactions cannot be carried out at normal exchange rates;

(d)    if political, economic, military, or monetary events beyond the control, responsibility or action of the Partnership make it impossible to dispose of assets of the Partnership and to determine the value of such assets in a normal and reasonable way; or

(e)     if Limited Partners request redemptions for an amount that is greater than 50% of the total of all Limited Partner's Capital Accounts.

In extraordinary circumstances that could negatively affect the Limited Partners' Interests, or in the case of substantial redemption requests, the General Partner reserves the right not to determine the Partnership's Net Asset Value until it has made the necessary purchases or sales of securities for the Partnership.

## ARTICLE IV

## ADMISSION OF PARTNERS

Section 4.1     Capital Contributions.  Each Person who subscribes for Interests by executing the Subscription Documents, and is approved by the General Partner, will be admitted as a Limited Partner. Completed Subscription Documents and payment must  be received in accordance with the procedures established by the General Partner prior to admission to the Partnership. Payment for Interests may be made by wire transfer or in such other manner as the General Partner may determine. Capital Contributions will be effected  on  the  first Business Day of the calendar month following the General Partner's acceptance of the Subscription Documents and receipt of payment. The General Partner may, in its sole discretion, admit subscribers on days other than the first Business Day of a month. Each Limited Partner agrees to pay for its Capital Contribution in full in accordance with the Subscription Agreement. The General Partner, in its sole discretion, may suspend or close the Partnership to further subscriptions at any time.

Section 4.2 Liability for Failed Contributions.  Each Limited Partner shall be liable to the Partnership for its Capital Contribution(s). If any Limited Partner fails to make payment of such amount when due, the unpaid portion of the Limited Partner's Capital Contribution shall bear interest at the rate established in Section 6621(a)(1) of the Code (or any successor provision) from the date when due until paid. If a payment of a Limited Partner remains due and payable for more than thirty (30) calendar days after the due date, the

Partnership may pursue any remedy available at law or in equity or may cancel the Limited Partner's subscription to become a Limited Partner.

Section 4.3   New Partners.   Subject to Section 4.4 and to the condition that each new Partner (whether a Limited Partner or a General Partner) shall execute (personally or by attorney-in-fact) an appropriate counterpart to this Agreement and the Partnership's Subscription Documents pursuant to which he or she agrees to be bound by the terms and provisions of this Agreement and the Subscription Documents and shall provide such other information and do all other acts as may be requested by the General Partner in its sole discretion, the General Partner may admit one or more new Partners on the first Business Day of a calendar month (or at other times upon the sole discretion of the General Partner). Admission of a new Partner shall not be a cause for dissolution of the Partnership. Admission of employee benefit plans or IRAs may be subject to certain other restrictions established by the General Partner from time to time. The General Partner shall amend the Partnership's books and records to reflect the name, address and capital contribution of any new Limited Partner and other Limited Partner changes.

Section 4.4   Limitation on Admission of Limited Partners.   The General Partner, in its sole discretion, may admit or deny any Person membership in the Partnership, provided that the General Partner may only admit: Partners that are "accredited investors" as defined in Rule 501(a) of Regulation D under the 1933 Act and a "qualified purchaser" under Section 2(a)(51) of the 1940 Act and Rule 2a51-1 thereunder. Notwithstanding the foregoing, the General Partner may admit such other Persons who would not disqualify the Partnership from qualification for the exclusion provided under Section 3(c)(7) of the 1940 Act. The General Partner will make or cause to be made such further inquiry as it deems appropriate with regard to the eligibility of a prospective investor to purchase Interests of the Partnership. The General Partner may reject any subscription for any reason, regardless of whether a prospective investor meets the eligibility standards and the General Partner may in its discretion waive eligibility standards that are not imposed by law.

## ARTICLE V

## RIGHTS AND OBLIGATIONS OF LIMITED PARTNERS

Section 5.1   No Right to Participate In Management.   The Limited Partners will have no participation in or control over the management of the Partnership. No Limited Partner, acting solely in its capacity as a Limited Partner, shall transact any business for the Partnership, and none may bind or obligate the Partnership. The Limited Partners, in their capacity as Limited Partners, shall have no interest in the properties or assets of the General Partner or any equity therein, or in any proceeds of any sales thereof (which sales shall not be restricted in any respect), by virtue of acquiring or owning any Interests.

Section 5.2   Liability of Limited Partners.   The Limited Partners shall not be personally liable for any obligations of the Partnership and shall have no obligation to make contributions to the Partnership in excess of their respective Capital Contributions unless otherwise required under Delaware law.

Section 5.3   Assignment of Interests by Limited Partner.   A Limited Partner may not assign its Interests in the Partnership in whole or in part to any Person, nor may it pledge its Interests in whole or in part, nor shall it be entitled to substitute for itself as a Limited Partner any other Person, without the prior written consent of the General Partner, which consent may be granted or denied in its sole discretion.  Any attempted assignment or substitution not made in

22

accordance with the preceding sentence shall be void. Upon the receipt of the written consent of the General Partner, a Limited Partner may assign its Interests, subject to compliance, at such Limited Partner's expense, with federal and state securities laws, such Limited Partner's Subscription Agreement, this Agreement and any other terms or conditions established by the General Partner. In the sole discretion of the General Partner, the Limited Partner shall furnish the Partnership, at its own expense, with an opinion of counsel in form and substance satisfactory to the General Partner to the effect that the proposed transfer (1) complies with applicable provisions of the federal and state securities laws, ERISA and the Code, (2) does not affect the status of the Partnership under the 1940 Act, 1933 Act or ERISA or for federal income tax purposes, including resulting in the Partnership being deemed to be a "publicly traded partnership" for purposes of Section 7704 of the Code, and (3) complies with such other conditions that may be imposed by the General Partner in its sole discretion, and counsel for the General Partner shall have concurred in such opinion and the General Partner shall have advised the Limited Partner of such concurrence. Any permitted assignment shall be effective as of the end of the Accounting Period in which it is made and no such assignment shall relieve the assignor of such assignor's responsibility for any expenses, obligations or liabilities, whether accruing prior or subsequent to the assignment.

Section 5.4 <u>No Recourse Against Other Limited Partners</u>. Each Limited Partner shall look solely to the assets of the Partnership for the return of such Limited Partner's Capital Contributions, and, if the Partnership property remaining after the payment or discharge of the debts and liabilities of the Partnership is insufficient to return the Capital Contributions of each Limited Partner, a Limited Partner shall have no recourse against any other Limited Partner.

Section 5.5 <u>Cost of Special Services</u>. Any costs incurred in connection with special services requested by a Limited Partner may, at the discretion of the General Partner, be required to be paid by that Limited Partner. Such services would include, for example, those that would benefit the Limited Partner but would not benefit the Partnership, such as a special evaluation or financial accounting for the purposes of estate valuation.

## ARTICLE VI

## REDEMPTION AND DISTRIBUTIONS OF CAPITAL

Section 6.1 <u>Distributions in General</u>.

(a) Unless otherwise determined by the General Partner, distributions from the Partnership shall only be made in accordance with Article VI, Article VII and Article VIII of this Agreement. The General Partner shall have the discretion to waive this distribution restriction in its sole discretion and distribute the Partnership's cashflow and assets to the Partners, with such distributions to be allocated among the Partners based upon each Partner's respective Ownership Percentage.

(b) The General Partner shall, in its sole discretion, determine the amount and timing of all distributions by the Partnership and whether such distributions will be in cash or in kind or partly in cash and partly in kind. Distributions in kind shall be made at valuations determined as provided in the procedures adopted by the General Partner in accordance with Section 3.8. No distributions shall be made if, by doing so, the Partnership or the General Partner would violate any applicable law.

Section 6.2       Taxes.

(a)       The Partnership shall pay taxes and shall withhold taxes from distributions to the Partners, in each case to the extent required by law (as determined by the General Partner in its sole discretion). Except as otherwise provided in this Section 6.2, (i) any amount of taxes paid by the Partnership, (ii) any taxes withheld by the Partnership, and (iii) any withholding or similar taxes imposed on amounts payable to the Partnership shall in each case be treated for purposes of this Agreement as an amount actually distributed to the Partners pursuant to Section 6.1 (Distributions in General) at the time paid or withheld (and the amount of any such tax shall be distributed to and divided among the Partners as the General Partner, in its reasonable discretion, may determine). An amount shall be considered paid or withheld by the Partnership if, and at the time, remitted to a governmental agency without regard to whether the remittance occurs at the same time as the distribution or allocation to which it relates; provided, however, that an amount actually withheld from a specific distribution or designated by the General Partner as withheld with respect to a specific allocation shall be treated as if it were distributed at the time such distribution or allocation occurs.

(b)       To the extent that operation of paragraph (a) above would result in a distribution to a Limited Partner that is prohibited by this Agreement or applicable law, the amount of the deemed distribution instead shall be treated as a loan by the Partnership to the Limited Partner that shall be payable by the Limited Partner upon demand and shall bear interest at a rate equal to the prime rate as in effect at such time, compounded daily.

(c)       If the General Partner determines in its sole discretion that the Partnership lacks sufficient available cash to pay taxes in respect of a Partner, then the General Partner may, in its sole discretion, make a loan or capital contribution to the Partnership to enable the Partnership to pay the taxes. Any such loan shall be full recourse to the Partnership and shall bear interest at a rate equal to the prime rate as in effect at such time, compounded daily. Any loan  (including interest accrued thereon) or capital contribution made to the Partnership by the General  Partner pursuant to this Section 6.2(c) shall be repaid or returned as promptly as is reasonably  practicable. All interest expense in respect of the loan shall be allocated to the Partner on whose  behalf taxes were withheld or paid.

(d)       Each Limited Partner shall indemnify the Partnership and the General Partner and hold each of them harmless from any liability that relates to any taxes, penalties or interest required to be withheld or paid by any taxing authority by the Partnership or the General Partner for or on behalf of the Limited Partner, and such indemnity obligation shall survive the dissolution and termination of the Partnership.

ARTICLE VII

REDEMPTION, WITHDRAWAL, DEATH OR DISABILITY OF A PARTNER

Section 7.1       Optional Redemption of a Limited Partner.

(a)       Subject to the limitations set forth in this Agreement, a Limited Partner may redeem  all or a portion of its Capital Account quarterly and with at least thirty (30) days' prior written notice (or as otherwise agreed to by the General Partner) by  submitting, in accordance with the procedures established by the General Partner, a redemption  request to the General Partner (or its agent) within the time period prescribed by the General  Partner from time  to time.   In its sole  discretion,  the  General Partner may  establish  a  minimum

Capital Account balance requirement for Limited Partners and, if so established, redemptions by Limited Partners shall not be permitted if, after taking into account the requested redemption, a Limited Partner's Capital Account would be less than such minimum Capital Account balance. Subject to the limitations set forth in this Agreement, the Partnership will make payment on your redemption as promptly as possible after the effective date of such redemption in accordance with the procedures established by the General Partner.

(b)     Distribution of redemption proceeds generally shall be made as promptly as reasonably possible after the relevant redemption date, following the General Partner's acceptance of a Limited Partner's request for redemption. Subject to the other provisions of this Agreement, the Partnership will pay at least 95% of the amount of the redemption, with the balance to be paid, without interest or other return from the Partnership's investments (from the applicable redemption date forward), promptly following the later of (i) the completion of the Partnership's audited financial statements for such fiscal year or (ii) the determination by the General Partner of any relevant withholding tax amounts for such year.

(c)     If redemption requests are received for any Redemption Date aggregating more than 25% of the Net Asset Value of the Partnership as of such date, the General Partner may, in its discretion, (i) satisfy all such redemption requests or (ii) reduce all such redemption requests on a pro rata basis in accordance with the Partner's Ownership Percentage so that only 25% (or more, in the discretion of the General Partner) of the Net Asset Value of the Partnership is redeemed as of such date.

(d)     The withdrawal, death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner shall not dissolve the Partnership. The legal representatives of a Limited Partner shall succeed as assignee to the Limited Partner's Interests in the Partnership upon the death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner, but shall not be admitted as a substituted Limited Partner without the consent of the General Partner.

(e)     In the event of the death, disability, incompetency, termination, bankruptcy, insolvency or dissolution of a Limited Partner or the giving of notice of withdrawal by a Limited Partner, the interest of such Limited Partner in the Partnership shall continue subject to all of the risks, liabilities and obligations relating to the Partnership's business to which a Limited Partner is subject until: (i) the end of the Accounting Period in which such event occurred, at which time the Limited Partner (or its legal representatives) shall automatically be deemed to have withdrawn from the Partnership; (ii) the earlier involuntary withdrawal of a Limited Partner from the Partnership by the General Partner pursuant to Section 7.2; or (iii) the earlier termination of the Partnership.

(f)     The Interests of a Limited Partner who is deemed to have withdrawn pursuant to this Section 7.1 shall not be included in calculating the Interests of the Limited Partners required to take any action under this Agreement. In addition, such Limited Partner shall no longer be a limited partner and shall be deemed to hold solely an economic interest, having only the rights attributable to the holder of an economic interest under the Act.

(g)     The right of any Partner or its personal representatives to receive distributions or withdraw all or any portion of the Capital Account of the Partner under this Agreement is subject to the Act and other applicable law. The General Partner may charge an amount equal to actual costs and expenses incurred by the Partnership in connection with such withdrawal.   In addition to the actual costs and expenses incurred in connection with a

withdrawal, the General Partner may withhold an amount, determined in its sole discretion, for Liabilities and contingencies of the Partnership for which such withdrawing Partner may be liable under this Agreement (the " Contingency Reserve"). After the General Partner has determined in its sole discretion that the Liabilities or the contingencies for which the Contingency Reserve was withheld have ceased to exist, any unused portion of the Contingency Reserve shall be returned to the applicable withdrawn Partner as soon as it is reasonably practicable. A Limited Partner's Capital Account balance shall not include any amount charged to such Limited Partner's Capital Account pursuant to this Section 7.1(g).

Section 7.2   <u>Involuntary Redemption/Withdrawal of a Limited Partner</u>.  The General Partner may, in its discretion, terminate all or any part of the interest of any Limited Partner upon at least five (5) calendar days' prior written notice, at any time, for any reason or no reason. The Partner receiving such notice shall be treated for all purposes and in all respects as a Partner who has given notice of withdrawal of all or part of its Capital Account, as the case may be, under Section 7.1.

Section 7.3   <u>Withdrawal by General Partner; Appointment of Successor</u>. The General Partner may withdraw from the Partnership upon prior written notice to the Limited Partners. Upon such withdrawal by the General Partner, the Partnership shall terminate unless, within ninety calendar days after such withdrawal, the remaining Limited Partners unanimously agree in writing to continue the business of the Partnership and to the appointment, effective as of the date of the withdrawal by the General Partner, of a successor General Partner. The successor general partner of the Partnership shall promptly prepare and file or cause to be filed, with the assistance of the General Partner if and to the extent reasonably requested, an amendment to the Certificate, and shall prepare and execute an amendment to this Agreement reflecting the admission of such successor general partner, and the withdrawal or removal of the General Partner as the general partner of the Partnership.

Section 7.4   <u>Removal of General Partner</u>.   The General Partner may not be removed by the Limited Partners as the general partner of the Partnership.

Section 7.5   <u>Successor General Partner.</u>      To the fullest extent permitted by law, a successor general partner shall have all the same rights and privileges of the General Partner set forth herein.

Section 7.6   <u>Suspension of Redemptions; Redemption In-Kind</u>. The General Partner may at any time suspend or delay a Limited Partner's rights of redemption, before or after notice of redemption has been given by any one or more Limited Partners, (i) in the event that it determines that the requested redemptions would have an adverse effect on the non-redeeming Limited Partners or the tax status of the Partnership or would exceed the Partnership's ability to obtain liquidity from the underlying funds in which the Partnership invests or (ii) for any other reason if the General Partner believes it is in the best interests of the Partnership. Redemption proceeds normally will be paid in cash, although the General Partner may in its discretion make the redemption distribution, entirely or partially, in kind.

ARTICLE XIII

DURATION AND TERMINATION OF THE PARTNERSHIP

Section 8.1      <u>Duration</u>.   The Partnership shall continue until the earliest of: (i) a determination by the General Partner that the Partnership should be dissolved; (ii) the withdrawal of the General Partner from the Partnership and subsequent termination of the Partnership pursuant to Section 7.3; (iii) the withdrawal of all Limited Partners  from the

26

Partnership; (iv) the entry of a decree of judicial dissolution under section 17-802 of the Act; and (v) the bankruptcy, dissolution or insolvency of the General Partner except that termination on the bankruptcy, dissolution or insolvency of the General Partner shall not cause the termination of the Partnership if the remaining Limited Partners agree to continue the business of the Partnership pursuant to Section 7.3. Termination because of the bankruptcy, dissolution or insolvency of the General Partner shall be delayed to allow the Liquidating Person (as defined in Section 8.3) to wind up the affairs of the Partnership in an orderly fashion; (vi) any event which causes the Partnership to be taxed as a corporation for federal income tax purposes; or (vii) any event which makes it unlawful for the existence of the Partnership to be continued.

Section 8.2    Termination.  On termination of the business of the Partnership, the General Partner shall within no more than ninety calendar days cause an audit of the Partnership's books to be made and the Partnership's assets, net of expenses, debts and liabilities, to be distributed in cash or in kind to the Partners following the completion of such audit, less reserves for completing the winding up of the Partnership's business and any other potential liability, in the following manner and order:

(a)    to creditors, other than Partners who are creditors, in satisfaction of liabilities of the Partnership (whether by payment or by establishment of reserves);

(b)    to Partners by distributing the remaining Partnership assets to the Partners in proportion to, and to the extent of, their respective positive Capital Account balances, less any reserves retained by the Partnership for completing the winding up of the Partnership's business and any other potential liability.

Section 8.3  Appointment of Liquidating Person.  Upon dissolution or termination of the Partnership because of the bankruptcy or insolvency of the General Partner, the Limited Partners shall appoint a trustee to serve as the Liquidating Person (the "Liquidating Person") of the Partnership with exclusive power and authority to wind up the affairs of the Partnership and commence the orderly liquidation and distribution of Partnership assets in accordance with Section 8.2. If the Partnership dissolves or terminates because of the General Partner's dissolution that is not related to its bankruptcy or insolvency, the General Partner will appoint the Liquidating Person. If the Liquidating Person accepts such appointment and winds up the affairs of the Partnership in accordance with Section 8.2, the Liquidating Person shall be entitled to any fee that the General Partner would have been entitled to receive had the General Partner not ceased to participate. This fee shall be calculated commencing upon the Liquidating Person's date of appointment and ending when substantially all of the Partnership's assets have been liquidated.

ARTICLE IX

BOOKS; REPORTS TO PARTNERS; TAX ELECTIONS

Section 9.1  Books and Records.  The General Partner shall cause the Partnership to maintain true and proper books, records, reports, and accounts in which shall be entered all transactions of the Partnership. The General Partner shall also maintain all schedules and exhibits to this Agreement and shall update such schedules and exhibits promptly upon receipt of new information relating thereto. Copies of such books, records, reports, accounts and schedules shall be located at the principal office of the General Partner and shall be available to any Partner for inspection and copying, upon at least two Business Days notice, during reasonable business hours; provided, however, that confidential communications between the Partnership and its legal counsel may be withheld from a Limited Partner in the General Partner's reasonable discretion. The rights of the Limited Partners to receive information from the General Partner

27

and the Partnership shall be exclusively as set forth in this Agreement and no additional rights shall apply.

Section 9.2    Independent Accountants. The General Partner shall select the Partnership's independent accountants.

Section 9.3    Filing of Tax Returns.  The General Partner shall prepare and file, or cause the preparation and filing of, any required federal, state and local income tax and information returns for each tax year of the Partnership.

Section 9.4    Financial Reports to Partners.

(a)    Within 180 calendar days after the completion of each fiscal year, the General Partner shall cause the Partnership's independent accountants to prepare annual audited financial statements for delivery to the Limited Partners; provided, however, that the General Partner may waive the requirement for the Partnership to produce financial statements which are audited after the end of the Fiscal Year, after providing written notice to the Limited Partners. However, if after such notice a Majority-in-Interest of the Limited Partners notify the General Partner within 10 calendar days that they desire for the financial statements to be audited then the requirement for audited financial statements shall not be waived. The financial statements shall include a statement, prepared in accordance with GAAP (but taking into account the Value of Partnership assets), of: (i) the assets and liabilities of the Partnership; (ii) the Net Profit or Net Loss of the Partnership; and (iii) the Capital Account balance of such Partner. In addition, such accountants shall, within 90 calendar days after the close of each Fiscal Year, supply all other Partnership information reasonably necessary to enable the Partners to prepare their federal income tax returns and (upon request therefor) to comply with other reporting requirements imposed by law. The Partnership shall also deliver monthly capital account statements and may, as deemed appropriate by the General Partner, prepare and distribute periodic unaudited reports of the Partnership's performance.

(b)    The financial reports provided to the Partners under this Section 9.4 shall be in lieu of any rights a Limited Partner may have under the Act to receive information regarding the Partnership or the General Partner. The Partners agree that such financial reports provide just and reasonable information regarding the state of the business and financial condition of the Partnership.

Section 9.4    Tax Reports to Partners and Former Limited Partners.  As soon as practicable after the end of each Fiscal Year, the Partnership shall prepare and mail, or cause its independent tax accountants to prepare and mail, to each Partner and, to the extent necessary, to each Former Limited Partner (or its legal representatives), such information and schedules, including without limitation a report on Internal Revenue Service Schedule K-1, as shall be necessary to enable such Partner or Former Limited Partner (or its legal representatives) to prepare their respective federal, state and local income tax returns in accordance with the laws, rules and regulations then in effect.

Section 9.5    Tax Matters Partner. The General Partner shall at all times constitute, and have full powers and responsibilities as, the "Tax Matters Partner" of the Partnership within the meaning of Section 6231(a)(7) of the Code, and may file a designation of itself as such with the Internal Revenue Service.

Section 9.6    Tax Elections.  The General Partner shall have the power to make, to not make or to revoke any elections now or hereafter required or permitted to be made by the Code (including, without limitation, an election under Section 754 of the Code) or any state or local law.

28

Section 9.7    FACTA.    Notwithstanding any provision of this Agreement to the contrary, each Limited Partner agrees to provide any information or certifications (including without limitation information about such Limited Partner's direct and indirect owners) that may reasonably be requested by the Partnership to allow the Partnership or any member of any "expanded affiliated group" (as defined in Section 1471(e)(2) of the Code) to which the Partnership belongs to (i) enter into, maintain or otherwise comply with the agreement contemplated by Section 1471(b) of the Code; (ii) satisfy any information reporting requirements imposed by FATCA (as defined below); and (iii) satisfy any requirements necessary to avoid withholding taxes under FATCA with respect to any payments to be received or made by the Partnership. Notwithstanding any provision of this Agreement to the contrary, each Limited Partner further agrees that, if such Limited Partner fails to comply with any of the above requirements in a timely manner or if the General Partner determines that such Limited Partner's participation in the Partnership would otherwise have an adverse effect on the Partnership or the Partners as a result of FATCA, then (A) the General Partner, in its sole discretion, may take any action it deems in good faith to be reasonable to minimize any adverse effect on the Partnership and the other Partners as a result of FATCA; and (B) the Limited Partner shall, to the maximum extent permitted by applicable law, indemnify the Partnership and the General Partner for all loss, cost, expenses, damage, claims and demands (including, but not limited to, any withholding tax, penalties or interest suffered by the Partnership) arising as a result of such Limited Partner's failure to comply with the above requirements in a timely manner. As used herein, "FATCA" means the Foreign Account Tax Compliance provisions enacted as part of the U.S. Hiring Incentives to Restore Employment Act and codified in Sections 1471 through 1474 of the Code, all rules, regulations and other guidance issued thereunder, all administrative and judicial interpretations thereof, and any intergovernmental agreement entered into between the United States and a non-United States jurisdiction relating to the foregoing.

ARTICLE X

MISCELLANEOUS

Section 10.1 <u>Binding Effect</u>. This Agreement shall be binding on the executors, administrators, estates, heirs, and legal successors and representatives of the Partners.

Section 10.2 <u>Amendments to Partnership Agreement</u>. The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the written consent of a Majority-in-Interest of the Limited Partners and the written consent of the General Partner, insofar as is consistent with the laws governing this Agreement; provided, however, that without the consent of the Limited Partners the General Partner may amend the Agreement to: (i) reflect a change in the name of the Partnership; (ii) make a change that is necessary or, in the opinion of the General Partner, advisable to qualify the Partnership as a limited partnership or a partnership in which the Limited Partners have limited liability under the laws of any state, or ensure that the Partnership will not be treated as an association taxable as a corporation for federal income tax purposes or otherwise to comply with changes in tax law or regulation; (iii) make a change that does not adversely affect the Limited Partners in any material respect that is necessary or desirable to cure any ambiguity, to correct or supplement any provision in this Agreement, or to make any other provision with respect to matters or questions arising under this Agreement, in each case so long as such change does not adversely affect the Limited Partners in any material respect; (iv) make a change that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any federal or state statute, so long as such change is made in a manner which minimizes any adverse effect on the Limited Partners or that is required or contemplated by this Agreement; (v) make a change in any provision of this Agreement that requires any action to be taken by or on behalf of the General Partner or the Partnership pursuant to the requirements of applicable Delaware law if the provisions of applicable Delaware law are amended, modified or revoked so that the taking of such action is no longer required; (vi) prevent the Partnership from in any manner being deemed an "investment company" subject to the provisions of the 1940 Act, (vii) amend this Agreement for the purpose of authorizing the Partnership to divide the Interests into separate and distinct series as permitted by the Act and to file an amendment to the Partnership's certificate of limited partnership to effectuate such changes; or (viii) make any other amendments which are not adverse to the interests of the Limited Partners. Each Partner, however, must consent to any amendment which would: (x) such Partner's rights of contribution, withdrawal or distribution; (y) adversely affect such Partner's rights as a Limited Partner as provided herein; or (z) amend the provisions of this Agreement relating to amendments. Notwithstanding any provision in this Agreement to the contrary, no amendment to this Agreement shall increase the liability of a Limited Partner without such Partner's consent.

Section 10.3 <u>Choice of Law</u>. Notwithstanding the place where this Agreement may be executed by any of the parties hereto, the parties expressly agree that all the terms and provisions hereof shall be construed under the laws of the State of Delaware (without reference to the conflict of law principles thereof) and, without limitation thereof, that the Act, as amended from time to time, shall govern the partnership aspects of this Agreement.

Section 10.4 <u>Arbitration</u>. **The Partners waive their right to seek remedies in court, including any right to a jury trial.** The Partners agree that in the event of any dispute between the Partners arising out of, relating to or in connection with the Partnership, such dispute

shall be resolved exclusively by arbitration to be conducted only in the county and state of the office of the General Partner at the time of such dispute in accordance with the rules of JAMS applying the laws of the State of Delaware. Disputes shall not be resolved in any other forum or venue. The Partners agree that such arbitration shall be conducted by a retired judge who is experienced in resolving disputes regarding the securities business, that discovery shall not be permitted except as required by the rules of JAMS, that the arbitration award shall not include factual findings or conclusions of law, and that no punitive damages shall be awarded. The Partners understand that any Partner's right to appeal or to seek modification of any ruling or award of the arbitrator is severely limited. Any award rendered by the arbitrator shall be final and binding, and judgment may be entered on it in any court of competent jurisdiction in the county and state of the principal office of the General Partner at the time such award is rendered or as otherwise provided by law.

Section 10.5 <u>Notices</u>. Each notice relating to this Agreement shall be in writing and delivered via postal mail, overnight mail, facsimile or electronic mail. All notices addressed to a Partner shall be addressed to such Partner at the address set forth in the records of the Partnership. Any Partner may designate a new address by written notice to that effect given to the Partnership. Unless otherwise specifically provided in this Agreement, a notice shall be deemed to have been effectively given when mailed by registered or certified mail to the proper address or delivered in person.

Section 10.6 <u>Headings</u>. The titles of the Articles and the headings of the Sections of this Agreement are for convenience of reference only, and are not to be considered in construing the terms and provisions of this Agreement.

Section 10.7 <u>Pronouns</u>. All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identity of the person, persons or entity may require in the context thereof.

Section 10.8 <u>Counterparts</u>. This Agreement may be executed, through the use of separate signature pages or in any number of counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same agreement.

Section 10.9 <u>Severability</u>. If any provision of this Agreement, or the application of such provision to any Partner or circumstance, shall be held invalid, the remainder of this Agreement or the application of such provision to other Partners or circumstances shall not be affected thereby. Any default hereunder by a Limited Partner shall not excuse a default by any other Limited Partner.

Section 10.10 <u>Power of Attorney</u>. Each Limited Partner irrevocably constitutes and appoints the General Partner, with full power of substitution and re-substitution, such Limited Partner's true and lawful attorney-in-fact, for such Limited Partner and in such Limited Partner's name, place and stead, and for such Limited Partner's use and benefit, to sign, execute, deliver, certify, acknowledge, swear to, file, record and publish (a) this Agreement and the Partnership's certificate of limited partnership and any amendment thereto or to this Agreement as provided herein, (b) any other certificates, instruments, agreements and documents necessary to qualify or continue the Partnership as a limited partnership wherein limited partners have limited liability in the states or other jurisdictions where the General Partner deems necessary or desirable, (c) all conveyances, assignments, documents of transfer or other instruments and documents necessary to effect the assignment of a Limited Partner's Interests in the Partnership, the addition, withdrawal or substitution of a Limited Partner, or the dissolution and termination of the

Partnership in accordance with this Agreement, (d) all filings and submissions pursuant to any applicable law, regulation, rule, order, decree or judgment which, in the opinion of the General Partner, may be necessary or advisable in connection with the business of the Partnership; (e) all applications, certificates, certifications, reports or similar instruments or documents required to be submitted by or on behalf of the Partnership to any governmental or administrative agency or body or to any securities or commodities exchange, board of trade, clearing corporation or association or similar institution or to any other self-regulatory organization or trade association, and (f) any business certificate, fictitious name certificate, amendment thereto or other instrument or document of any kind necessary, advisable, incidental or convenient to the business, purposes and objectives of the Partnership, or required by any applicable federal, state or local law. The power of attorney granted herein is coupled with an interest, shall be irrevocable, shall survive the death, disability or incapacity of any Limited Partner, shall be deemed given by each and every assignee and successor of each Limited Partner and may be exercised by the General Partner by listing, or attaching a list of, any or all of the names of the Limited Partners and signing such amendments, certificates, instruments and other documents with the signature of a manger, member, partner, director or officer of the General Partner acting on behalf of the General Partner as attorneys-in-fact for all of the persons whose names are so listed.

Section 10.11 <u>Construction and Interpretation.</u> If any question should arise with respect to the operation of the Partnership, which is not otherwise specifically provided for in this Agreement, or with respect to the interpretation of this Agreement, the General Partner is hereby authorized to make a final determination with respect to any such question and to interpret this Agreement in such a manner as it shall deem fair and equitable, and its determination and interpretations so made shall be final and binding on all parties.

Section 10.12 <u>Advice of Counsel.</u> Each Limited Partner signing this Agreement, personally or by attorney-in-fact, understands, acknowledges and agrees that Andrew E. Hurni, Esq. and his related law firm (the "Firm") drafted this Agreement on behalf of the Partnership at the request of the General Partner and the Partnership, and that prior thereto, and in connection therewith, the Firm advised such Limited Partner that (i) the Firm does not represent such Limited Partner in connection with this Agreement, (ii) a conflict may exist among the Limited Partners with regard to their respective individual interests under this Agreement, and (iii) such Limited Partner should confer with its own counsel with regard to its individual interests. Each Limited Partner further acknowledges that (i) it enters into this Agreement after having had the opportunity to consult with separate counsel, and (ii) they have not relied on the advice of the Firm in entering into this Agreement.

Section 10.13 <u>Confidentiality.</u> Each Limited Partner agrees that it shall not disclose without the prior consent of the General partner (other than to such Limited Partner's employees, auditors or counsel) any information with respect to the Partnership, <u>provided</u> that a Limited Partner may disclose any such information (a) as has become generally available to the public, (b) as may be required or appropriate in any report, statement or testimony submitted to any U.S. municipal, state or national or non-U.S. regulatory body having jurisdiction over such Limited Partner, (c) as may be required or appropriate in response to any summons or subpoena or in connection with any litigation, (d) to the extent necessary in order to comply with any law, order, regulation, ruling or other governmental request applicable to such Limited Partner and (e) to its professional advisers and (f) that constitutes the U.S. federal income tax treatment or tax structure of the Partnership (and any transactions entered into by the Partnership) and all material of any kind (including opinions or other tax analyses) that are provided to such Limited Partner relating to such tax treatment and tax structure, <u>provided</u> that, except as otherwise required by law, Limited Partners (and their respective employees, representatives and other agents) may not

disclose the name of, contact information for, or any other similar identifying information (including the names of any employees, affiliates or investments) regarding the Partnership or the General Partner, its members or Affiliates or their respective shareholders, members, partners, officers, directors, employees or agents, except to their tax advisors or to a regulatory authority as required by law. As used in the proceeding sentence, the term "tax structure" means any fact that may be relevant to understanding the purported or claimed U.S. federal income tax treatment of a transaction. Notwithstanding any other provision of this Agreement, the General Partner shall have the right to keep confidential from the Limited Partners for such period of time as the General Partner determines is reasonable (i) any information that the General Partner reasonably believes to be in the nature of trade secrets and (ii) any other information (A) the disclosure of which the General Partner in good faith believes is not in the best interest of the Partnership or could damage the Partnership or its investments or (B) that the Partnership is required by law or by agreement with a third Person to keep confidential. The General Partner may disclose any information concerning the Partnership or the Limited Partners necessary to comply with applicable laws and regulations, including any anti-money laundering or anti-terrorist laws or regulation, and each Limited Partner shall provide the General partner, promptly upon request, all information that the General Partner reasonably deems necessary to comply with such laws and regulations.

Section 10.14. <u>Compliance with Anti-Money Laundering Requirements.</u> The General Partner shall be authorized, without the consent of any Person, including any other Partner, to take such action as it determines to be necessary or advisable to comply, or to cause the Partnership to comply, with any anti-money laundering or anti-terrorist laws, rules regulations, directives or special measures.

*[Signature page to follow.]*

IN WITNESS WHEREOF, this Limited Partnership Agreement has been duly executed as of February 15, 2016.

| **Limited Partners** | **General Partner** |
|---|---|
| Each Person who has signed, or has had signed on the Person's behalf, a Limited Partner Signature Page, which will constitute a counterpart of this Agreement. | BROAD REACH PARTNERS, LLC<br><br>By:<br>Name:<br>Title: |

BRC022106

**COUNTERPART SIGNATURE PAGE TO**
**THE LIMITED PARTNERSHIP AGREEMENT OF**
**BROAD REACH CAPITAL, LP**

**Dated February 15, 2016**

IN WITNESS WHEREOF, the undersigned has executed this counterpart signature page to the Limited Partnership Agreement (the "Agreement") of Broad Reach Capital, LP. Upon acceptance by the General Partner, the undersigned shall be admitted as a Limited Partner and hereby authorizes this signature page to be attached to a counterpart of such Agreement executed by the General Partner.

[NAME]

By:_____

Name:_____

Title:_____

Preferred address for receiving communications:

_____

_____

_____

Attention:_____

Telephone:_____

Fax:_____

Type of Entity (e.g., individual, corporation, estate, trust, partnership, exempt organization, nominee, custodian):

_____

Federal Tax Identification No.:

_____

35

Copy No. _____

Furnished to: _____

# CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM

## Broad Reach Capital, LP

### (a Delaware Limited Partnership)

## <u>Limited Partnership Interests</u>

## $1,000,000 Minimum Investment

## February 2016

# BROAD REACH CAPITAL, LP

### FOR RESIDENTS OF ALL JURISDICTIONS

THE LIMITED PARTNERSHIP INTERESTS (THE "INTERESTS") OF BROAD REACH CAPITAL, LP (THE "FUND") OFFERED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "1933 ACT"), AND HAVE NOT BEEN REGISTERED WITH OR APPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SECURITIES OR BLUE SKY ADMINISTRATOR OF ANY JURISDICTION OR ANY OTHER REGULATORY AUTHORITY. THE OFFERING MADE BY THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM (THE "MEMORANDUM") IS BEING MADE IN RELIANCE UPON AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE 1933 ACT FOR A SALE OF SECURITIES THAT DOES NOT INVOLVE A PUBLIC OFFERING AND ANALOGOUS EXEMPTIONS UNDER SECURITIES LAWS OF OTHER JURISDICTIONS. NEITHER THE SEC NOR ANY SECURITIES COMMISSION OF ANY JURISDICTION HAS PASSED UPON THE MERITS OF THIS INVESTMENT OR THE ADEQUACY OR ACCURACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS UNLAWFUL.

THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF ANY OFFER TO BUY INTERESTS, NOR SHALL THERE BE ANY SALE OF INTERESTS IN ANY JURISDICTION WHERE SOLICITATION OR SALE WOULD BE PROHIBITED BY LAW PRIOR TO REGISTRATION, QUALIFICATION OR EXEMPTION UNDER THE SECURITIES LAWS OF ANY SUCH JURISDICTION. FURTHER, THE FUND IS NOT REGISTERED AS AN INVESTMENT COMPANY UNDER THE INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "1940 ACT").

AN INVESTOR SHOULD BE ABLE TO BEAR THE COMPLETE LOSS OF HIS, HER OR ITS INVESTMENT IN INTERESTS. THE INTERESTS ARE SUBJECT TO SUBSTANTIAL RESTRICTIONS ON TRANSFERABILITY AND RESALE UNDER THE FUND'S LIMITED PARTNERSHIP AGREEMENT, AS SUCH LIMITED PARTNERSHIP AGREEMENT MAY BE AMENDED FROM TIME TO TIME (THE "PARTNERSHIP AGREEMENT"), AND IN ADDITION, MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT AND SUCH SECURITIES LAWS OF OTHER JURISDICTIONS PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM. INVESTORS WILL HAVE LIMITED REDEMPTION RIGHTS, AND SUCH RIGHTS MAY BE SUSPENDED UNDER THE CIRCUMSTANCES DESCRIBED IN THIS PRIVATE PLACEMENT MEMORANDUM.

IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING INCLUDING THE MERITS AND RISKS INVOLVED. PROSPECTIVE INVESTORS ARE NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM AS LEGAL, INVESTMENT, OR TAX ADVICE. EACH INVESTOR SHOULD CONSULT HIS, HER OR ITS PERSONAL COUNSEL, ACCOUNTANTS AND OTHER ADVISERS AS TO THE LEGAL, TAX, ECONOMIC AND RELATED ASPECTS OF THE INVESTMENT DESCRIBED HEREIN

AND AS TO ITS SUITABILITY FOR SUCH INVESTOR. EACH INVESTOR IS RESPONSIBLE FOR THE FEES OF HIS, HER OR ITS PERSONAL COUNSEL, ACCOUNTANTS AND OTHER ADVISERS.

THIS MEMORANDUM IS INTENDED SOLELY FOR THE USE OF THE PERSON TO WHOM IT HAS BEEN DELIVERED FOR THE PURPOSE OF EVALUATING A POSSIBLE INVESTMENT BY THE RECIPIENT IN THE INTERESTS DESCRIBED HEREIN, AND IS NOT TO BE REPRODUCED OR DISTRIBUTED TO ANY OTHER PERSONS (OTHER THAN PROFESSIONAL ADVISERS OF THE PROSPECTIVE INVESTOR RECEIVING THIS MEMORANDUM).

NOTWITHSTANDING ANYTHING IN THIS MEMORANDUM TO THE CONTRARY, TO COMPLY WITH TREASURY REGULATIONS SECTION 1.6011-4(B)(3)(I), EACH INVESTOR (AND ANY EMPLOYEE, REPRESENTATIVE OR OTHER AGENT OF SUCH INVESTOR) MAY DISCLOSE TO ANY AND ALL PERSONS, WITHOUT LIMITATION OF ANY KIND, THE U.S. FEDERAL INCOME TAX TREATMENT AND TAX STRUCTURE OF THE FUND OR ANY TRANSACTIONS UNDERTAKEN BY THE FUND, IT BEING UNDERSTOOD AND AGREED, FOR THIS PURPOSE, (1) THE NAME OF, OR ANY OTHER IDENTIFYING INFORMATION REGARDING (A) THE FUND OR ANY EXISTING OR FUTURE INVESTOR (OR ANY AFFILIATE THEREOF) IN THE FUND, OR (B) ANY INVESTMENT OR TRANSACTION ENTERED INTO BY THE FUND; (2) ANY PERFORMANCE INFORMATION RELATING TO THE FUND OR ITS INVESTMENTS AND (3) ANY PERFORMANCE OR OTHER INFORMATION RELATING TO PREVIOUS FUND OR INVESTMENTS SPONSORED BY THE GENERAL PARTNER OR ANY OF ITS AFFILIATES, DOES NOT CONSTITUTE SUCH TAX TREATMENT OR TAX STRUCTURE INFORMATION.

NO OFFERING LITERATURE OR ADVERTISING SHALL BE EMPLOYED IN THE OFFERING OF INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN. NO PERSON HAS BEEN AUTHORIZED TO MAKE REPRESENTATIONS OR GIVE ANY INFORMATION NOT CONTAINED IN THIS MEMORANDUM WITH RESPECT TO THE INTERESTS.

NEITHER THE DELIVERY OF THIS MEMORANDUM NOR ANY SALE HEREUNDER SHALL UNDER ANY CIRCUMSTANCES CREATE ANY IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE AFFAIRS OF THE FUND SINCE THE DATE HEREOF OR THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AS OF ANY DATE SUBSEQUENT TO THE DATE HEREOF.

TO ASSIST THE GOVERNMENT'S OPPOSITION TO THE FUNDING OF TERRORISM AND MONEY LAUNDERING ACTIVITIES, FEDERAL LAW REQUIRES ALL FINANCIAL INSTITUTIONS TO OBTAIN, VERIFY, AND RECORD INFORMATION THAT IDENTIFIES EACH INVESTOR. PROSPECTIVE INVESTORS WILL BE REQUIRED TO PROVIDE THEIR NAMES, ADDRESSES, AND OTHER IDENTIFYING INFORMATION, WHICH MAY INCLUDE INFORMATION RELATED TO THEIR BENEFICIAL OWNERS AND CONTROLLING PERSONS.

## DIRECTORY

**Fund:**                   Broad Reach Capital, LP
                            c/o Broad Reach Partners
                            200 Four Falls, Suite 211
                            1001 Conshohocken State Road
                            West Conshohocken, PA  19428

**General Partner:**        Broad Reach Partners, LLC
                            200 Four Falls, Suite 211
                            1001 Conshohocken State Road
                            West Conshohocken, PA  19428

**Investment Advisor:**     Bristol Advisors, LLC
                            200 Four Falls, Suite 211
                            1001 Conshohocken State Road
                            West Conshohocken, PA  19428

**Auditors:**               Sanville & Company
                            1514 Old York Road
                            Abington, PA  19001

**Legal Counsel:**          Andrew E. Hurni, Esq.
                            285 Grand Avenue, Bldg. One
                            Englewood, NJ 07631

**Administrator:**          Nottingham Investment Administration
                            116 South Franklin Street, PO Box 69
                            Rocky Mount, NC 27802

# TABLE OF CONTENTS

SUMMARY OF TERMS ................................................................................................................1

GLOSSARY OF TERMS ............................................................................................................12

THE FUND ................................................................................................................................ 16

INVESTMENT OBJECTIVE AND STRATEGY ......................................................................16

THE GENERAL PARTNER AND THE INVESTMENT MANAGER .................................... 16

MANAGEMENT FEE ...............................................................................................................17

PERFORMANCE ALLOCATION ........................................................................................... 17

INDEMNIFICATION AND EXCULPATION ......................................................................... 18

RISKS .......................................................................................................................................19

CONFLICTS OF INTEREST ....................................................................................................38

BROKERAGE TRANSACTIONS............................................................................................ 40

INVESTOR ELIGIBILITY.......................................................................................................41

ADMISSION OF LIMITED PARTNERS .................................................................................41

MINIMUM SUBSCRIPTION....................................................................................................42

RESTRICTIONS ON TRANSFERABILITY............................................................................43

CONVERSION TO A REGISTERED INVESTMENT COMPANY ........................................ 43

REDEMPTIONS........................................................................................................................ 43

SUSPENSION OF REDEMPTIONS; SUSPENSION OF THE DETERMINATION OF NET
ASSET VALUE ........................................................................................................................45

DISTRIBUTIONS......................................................................................................................46

ALLOCATION OF PROFITS AND LOSSES .......................................................................... 46

ORGANIZATIONAL EXPENSES............................................................................................46

OTHER EXPENSES..................................................................................................................47

VALUATION ........................................................................................................................... 47

ERISA AND TAX-QUALIFIED PLAN CONSIDERATIONS .................................................49

CERTAIN FEDERAL INCOME TAX CONSIDERATIONS ................................................... 51

CERTAIN STATE AND LOCAL TAX CONSIDERATIONS.................................................. 64

PRIVACY ..................................................................................................................................64

ANTI-MONEY LAUNDERING REGULATIONS...................................................................64

ADMINISTRATOR .................................................................................................................. 65

LEGAL COUNSEL ...................................................................................................................66

INDEPENDENT AUDITORS ...................................................................................................66

ADDITIONAL INFORMATION .............................................................................................. 66

EXHIBIT A...............................................................................................................................A-1

## SUMMARY OF TERMS

The following is a summary of certain information set forth more fully elsewhere in this Memorandum and the accompanying Partnership Agreement. This summary should be read in conjunction with such detailed information. Capitalized terms not otherwise defined in this summary are defined under the caption "Glossary of Terms."

| | |
|---|---|
| **THE FUND:** | Broad Reach Capital, LP. (the "Fund") is a Delaware limited partnership established in February 2016. |
| **THE GENERAL PARTNER:** | Broad Reach Partners, LLC, a Delaware limited liability company, serves as the general partner to the Fund. The General Partner has sole and exclusive authority to manage the operations and business of the Fund, although it has delegated its investment authority to the Investment Advisor. |
| **THE INVESTMENT MANAGER:** | Bristol Advisors, LLC, a Delaware limited liability company, serves as the investment manager to the Fund (the "Investment Advisor"). The Investment Advisor is an Affiliate of the General Partner. The Investment Advisor is responsible for making investment decisions regarding the assets of the Fund. |
| **INVESTMENT OBJECTIVE AND STRATEGY:** | The Fund's investment objective is to seek consistent absolute returns primarily through capital appreciation, while also attempting to preserve capital and mitigate risk. The strategy of the Fund is to invest its account with managers ("Managers") that represent a diverse set of assets in order to reduce exposure to any single asset class. These asset classes could include but are not limited to equities, bonds, options, commodities, foreign exchange and energy. It is anticipated that each Manager will trade a sub account of the Fund. **No assurance can be given, however, that the Fund will achieve its objective, and investment results may vary substantially over time and from period to period**. |
| | Although it does not currently anticipate doing so, the Fund may, in the discretion of the Investment Manager, also invest directly in other private funds, trading vehicles, trading strategies, separate accounts, or joint ventures in order to achieve its investment objective. While these Managers will be selected across a spectrum of risk exposures, the key to the Fund's success will be how it combines those Managers and strategies to produce positive returns, low volatility and low correlation to t h e U S equity markets. |

**RISKS:**

The Fund seeks to take risk accordingly.  Investment in the Fund involves significant risk and is suitable only for persons who can bear the economic risk of the loss of their investment, who have limited need for liquidity in their investment and who meet the conditions set forth in this Memorandum.  There can be no assurances that the Fund will achieve its investment objective.  Investment in the Fund carries with it the inherent risks associated with investments in alternative asset classes or strategies either directly or through underlying private or other investment vehicles, derivatives and other financial investments, as well as additional risks including, but not limited to, the risk associated with the use of short sales and the use of potentially substantial leverage.  Each prospective investor should carefully review the Memorandum and the agreement referred to herein before deciding to invest in the Fund.  In addition, conflicts of interest may arise among the Investment Advisor, its affiliates and their other clients and funds. (See "Risks")

**OFFERING:**

The Fund will offer limited partnership interests in the Fund ("Interests") in a private placement to qualified investors.

**COMMENCEMENT OF OPERATIONS:**

The initial offering of Interests is expected to be on or about March 1, 2016.

**MINIMUM SUBSCRIPTION:**

The minimum initial subscription for Interests of the Fund is $1,000,000.  Additional Capital Contributions will be permitted with a minimum $250,000 incremental investment.  The General Partner reserves the right, in its discretion, to make exceptions with respect to the minimum subscription amounts.

**INVESTOR ELIGIBILITY:**

Interests in the Fund will generally be sold only to persons who qualify as both "qualified purchasers," as defined in the 1940 Act a n d  "accredited investors," as defined in Regulation D under the 1933 Act.

**ADMISSION OF LIMITED PARTNERS:**

Each person who subscribes for Interests by executing the Subscription Documents, and is approved by the General Partner, will be admitted as a Limited Partner of the Fund.  Completed Subscription Documents and payment must be received in good form from the prospective investor indicated in the Subscription Documents no later than five (5) Business Days prior to admission to the Fund.  The General Partner reserves the right, in its discretion, to make exceptions with respect to the five (5) Business Day requirement.  No interest will be paid on monies held pending investment in the Fund.

3

No interest is paid on monies held pending investment in the Fund.

Each additional Capital Contribution by an investor shall constitute a (a) reaffirmation of all of the representations, warranties, understandings, acknowledgements and agreements in such investor's Subscription Agreement as if such Subscription Agreement was re-executed on the date of the additional Capital Contribution to the Fund, and (b) certification that all of the information in such investor's suitability questionnaire and Subscription Agreement remains accurate and complete as of the date of the additional Capital Contribution to the Fund.

**ADDITIONAL LIMITED PARTNERSHIP INTERESTS:**

In the future, the Fund, in the General Partner's sole discretion, may establish classes, sub-classes, tranches or series of Interests having different terms than those of the Interests described herein, including, without limitation, higher or lower or no Management Fee or incentive allocation or different or more or less frequent redemption rights.

**SIDE LETTERS**

The Fund may enter into agreements with certain prospective or existing limited partners whereby such limited partners may be subject to terms and conditions that are more advantageous than those set forth in this Memorandum without notice to other limited partners. For example, such terms and conditions may provide for reduced fees; greater liquidity; ownership in management company interests; rights to receive reports from the Fund on a more frequent basis or that include information not provided to other limited partners; and such other rights as may be negotiated by the Fund and such limited partners.

**REDEMPTIONS AND LIMITATIONS ON REDEMPTIONS:**

Each Limited Partner generally may redeem all or a portion of its Interests quarterly on at least 30 days' prior written notice. The General Partner may, in its sole discretion, waive such notice period with respect to any Limited Partner without the consent of any other Limited Partner.

The General Partner may redeem a portion of its interest in the Fund at any time, without any fee or expense and without the permission or consent of any Limited Partner, so long as its remaining Current Percentage (as defined below) is consistent with applicable regulatory requirements including any minimum amount for the General Partner to remain the Fund's "Tax Matters Partner."

The "Current Percentage" of any Partner with respect to any fiscal period means the percentage derived by dividing (a) the balance in such Partner's capital account (including all capital sub-accounts) as of the beginning of such period by (b) the total of all balances in all Partners' capital accounts (including all capital sub-accounts) as of the beginning of such period. Partial redemptions of amounts of less than $25,000 will not be permitted, unless otherwise determined by the General Partner in its sole discretion. Further, partial redemptions of a Limited Partner's Capital Account shall not be permitted if, after taking into account the requested redemption, a Limited Partner's Capital Account would be less than $100,000, unless otherwise determined by the General Partner in its sole discretion.

As promptly as reasonably possible after the relevant redemption date, following the General Partner's acceptance of a Limited Partner's request for redemption of all or any portion of its Interests, the Fund will pay at least 95% of the amount of the redemption, with the balance to be paid, without interest or other return from the Fund's investments (from the applicable redemption date forward), promptly following the later of (i) the completion of the Fund's audited financial statements for such fiscal year or (ii) the determination by the General Partner of any relevant withholding tax amounts for such year, *provided, however, that* if the aggregate amount of redemption requests received from Limited Partners in any given quarter exceeds 25% of the Fund's Net Asset Value, the General Partner reserves the right to limit redemptions in respect of such quarter to 25% of the Fund's Net Asset Value.  In any such instance, redemptions will be allocated to redeeming Limited Partners on a *pro rata* basis, and, with respect to that portion of the amount of any redemption

5

request not paid to a Limited Partner as a result of the limitation on redemptions to 25% of the Partnership's Net Asset Value for such quarter, such redemption request shall be deemed a request by such Limited Partner for redemption of such portion of such amount as of the last day of the immediately succeeding calendar quarter.

**The General Partner may at any time suspend or delay the rights of redemption described earlier, before or after notice of redemption has been given by any one or more Limited Partners, (i) in the event that it determines that the requested redemptions would have an adverse effect on the non-redeeming Limited Partners or the tax status of the Fund or would exceed the Fund's ability to obtain liquidity from the underlying funds in which the Fund invests or (ii) for any other reason if the General Partner believes it is in the best interests of the Fund.**

If a Limited Partner redeems all or any portion of its Interests, then, in the General Partner's discretion, ordinary income or loss, or long- or short-term capital gain or loss, recognized by the Fund in the fiscal year in which such redemption occurs shall be allocated to such Limited Partner solely for U.S. federal income tax purposes up to an amount equal to the following amounts: (i) if the Fund has recognized ordinary income or capital gains (including short-term capital gains) in the fiscal year in which such redemption occurs, the excess of the amount to be distributed to such Limited Partner upon, and as of the time of, such redemption over such Limited Partner's tax basis in its redeemed Interests (or portion thereof, as applicable) as of the time of such redemption (or, if greater, the excess of the amounts previously allocated to such Limited Partner's capital account over the amounts previously allocated to such Limited Partner for U.S. federal income tax purposes), or (ii) if the Fund has recognized ordinary or capital losses (including short-term capital losses) in the fiscal year in which such redemption occurs, the excess of such Limited Partner's tax basis in its redeemed Interests (or portion thereof) as of the time of such redemption over the amount to be distributed to such Limited Partner upon, and as of the time of, such redemption (or, if greater, the excess of the amounts previously allocated to such Limited Partner for U.S. federal income tax purposes over the amounts previously allocated to such Limited Partner's capital account).

Redemption proceeds normally will be paid in cash, although the General Partner may in its discretion make the redemption d stribution, entirely or partially, in kind.

6

**INVOLUNTARY CONVERSIONS:**

The General Partner may, by prior written notice to a Limited Partner, terminate the interest of any Limited Partner in the Fund in part or in its entirety, for reason or no reason in its sole discretion, effective on any Business Day designated by the General Partner in the notice (which shall not be less than five calendar days after delivery of the notice of mandatory redemption).

**SUSPENSION OR POSTPONEMENT OF REDEMPTION AND NAV CALCULATION:**

The General Partner may suspend or restrict the determination of the Fund's Net Asset Value and/or the right of any Limited Partner to redeem its Interests (whether in whole or in part) in its sole discretion under certain circumstances.

**DISTRIBUTIONS:**

The General Partner may make distributions at such times and in such amounts as it deems appropriate or reasonable. Notwithstanding the foregoing, the General Partner currently intends to distribute Net Profits, if any, monthly.

**RESTRICTIONS ON TRANSFERABILITY:**

Interests are not transferable without the prior written consent of the General Partner and may not be transferred or resold except as permitted under the 1933 Act and such securities laws of other jurisdictions pursuant to registration or exemption therefrom.

**ALLOCATION OF PROFITS AND LOSSES:**

Upon acceptance of the subscription of a Limited Partner, the Fund will establish a capital account for the Limited Partner (a "Capital Account"). The Capital Account and income, deduction, gain and loss allocation provisions of the Partnership Agreement generally provide for allocations being made pro rata in accordance with the Ownership Percentages of the Partners. The General Partner may establish separate sub-accounts of a Capital Account of any or all Limited Partners for recordkeeping purposes and/or to comply with FINRA rules regarding New Issues.

For federal income tax purposes, the Fund's items of income, gain, loss and deduction for each taxable year will be allocated among the Partners in such manner as to take account equitably of the variations between the Fund's tax basis in and book value of its assets. If applicable, appreciation and depreciation from New Issues will be allocated only to Limited Partners eligible to participate therein.

**MANAGEMENT FEE:**

The Fund shall not pay the Investment Advisor a monthly management fee.

**PERFORMANCE ALLOCATION:** As of the end of each monthly Performance Period, Net Profits shall be allocated as follows: First, one hundred percent (100%) to the Limited Partners, pro rata, until such time as the Limited Partners have received eight percent (8%) on an annualized basis. Thereafter, the General Partner shall receive an allocation of Net Profits, if any (the "Performance Allocation"). The Performance Allocation shall equal fifty percent (50%) of the Net Profits allocated to each Limited Partner for such Performance Period, in excess of the Loss Carryforward, if any, for such Limited Partner. "Loss Carryforward" with respect to a Limited Partner means the amount of Net Loss previously allocated to such Limited Partner and carried forward from prior Performance Periods, which have not been recovered by the Limited Partner in full with subsequent allocations of Net Profit to such Limited Partner (from which a Performance Allocation has not been reallocated). The Performance Allocation may be lower in certain circumstances in the sole discretion of the General Partner.

**ORGANIZATIONAL EXPENSES:** The General Partner has not received any fee for organizing the Fund. The Fund will bear or will reimburse the General Partner or its Affiliates for organizational expenses. Organizational expenses may be amortized over sixty (60) months for tax and accounting purposes.

**OTHER EXPENSES:**     The Investment Advisor will be responsible for and shall pay, or cause to be paid, its ordinary office overhead expenses incurred in rendering its services to the Fund, which include rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, payroll taxes, travel expenses and compensation of investment personnel and other personnel.

Subject to voluntary waiver or reimbursement by the General Partner or its Affiliates, the Fund will bear or will reimburse the General Partner or its Affiliates for: (i) the offering expenses of the Fund; (ii) all expenses incurred in connection with actual and potential investments, including but not limited to, travel, brokerage commissions, custodial fees, research and technical service expenses, all fees and expenses relating to the registration and qualification for sale of such securities and all transfer taxes, and legal and accounting fees; (iii) all filing and recording fees;(iv) all federal, state and local taxes payable by the Fund; (v) all costs, fees and expenses relating to accountings and the preparation and mailing of financial, tax and performance reports to the Fund, including the allocable share of the costs, fees and expenses relating to internal accounting and tax preparation functions should the General Partner determine not to use third- party providers for such services; (vi) all fees and disbursements of attorneys, accountants and consultants for work relating to the Fund; (vii) any other direct fees or expenses of the Fund; and (viii) all interest expense of the Fund, if any.

**VALUATION:**     The General Partner shall determine the fair value of each asset of the Fund as of the close of business of each "fiscal period" (as defined below). The General Partner, in its sole discretion, shall determine the fair value of each asset of the Fund based on such reasonably available relevant information as it considers material. In general, each underlying fund in which the Fund invests shall be valued at the price provided by, or on behalf of, such underlying fund. Other investments shall be valued by the General Partner in its good faith discretion.

If the General Partner determines that the valuation of any asset or liability does not fairly represent its fair value, the General Partner shall value such asset of liability as it reasonably determines and shall set forth the basis of such valuation in the Fund's records. Each value assigned to a security or other asset or liability of the Fund by the General Partner shall be final and conclusive as to all

9

| | |
|---|---|
| **INVESTMENT REPORTS AND FINANCIAL STATEMENTS:** | Within 180 calendar days after the completion of the year's audit of the Fund's books and records, or as soon as reasonably practicable thereafter, audited financial statements will be mailed to each Limited Partner. The Fund will provide monthly unaudited Capital Account statements and may provide periodic unaudited performance information to each Limited Partner. |
| **ERISA AND OTHER TAX EXEMPT ENTITIES:** | Tax-exempt entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and other tax-exempt entities are generally not permitted to subscribe for Interests.  To the extent that such entities are permitted to invest, the Fund does not intend to permit investments by "benefit plan investors," as defined in the U.S. Department of Labor Plan Asset Regulation, 29 CFR 2510.3-101, as modified by Section 3(42) of ERISA, to equal or exceed 25% of the Net Asset Value of any class of its equity interests.  Investment in the Fund by such tax-exempt entities requires special consideration.  Trustees or administrators of such tax-exempt entities should consult their own legal advisors.  (See "ERISA Considerations.") |
| **INCOME TAX CONSIDERATIONS:** | The Fund expects to be classified as a partnership for U.S. federal tax purposes.  However, the Fund has not, and will not, request any ruling from the Internal Revenue Service as to any U.S. federal income tax consequences relating to the structure or operation of the Fund.  There can be no assurance that any tax position taken by the Fund will not be challenged by the Internal Revenue Service.  Certain federal income tax consequences of an investment in the Fund are described under the heading "Certain Federal Income Tax Considerations" in this Memorandum.

Potential investors should consider carefully the tax consequences of an investment in the Fund.  Potential investors should consult their own tax advisers with respect to the federal, state and local tax consequences resulting from participation as a Limited Partner before purchasing Interests in the Fund. |
| **ADMINISTRATOR:** | Nottingham Investment Administration (the "Administrator") has been retained  by the Fund to perform certain administrative, accounting and  investor services for the Fund.

The Administrator will receive customary fees that will be paid out of the assets of the Fund.  The Administrator will also be reimbursed for out-of-pocket expenses and certain other expenses incurred in providing administrative services to the Fund, as set forth in the agreement between the Fund and the Administrator. |

**LEGAL COUNSEL:**　　　Andrew E. Hurni, Esq. and his law firm, acts as counsel to the Fund in connection with this offering of Interests. Mr. Hurni also acts as counsel to the General Partner, the Investment Advisor and their Affiliates.   In connection with this offering of Interests, and subsequent advice to the Fund, the General Partner, the Investment Advisor and their Affiliates.  Mr. Hurni will not represent investors in the Fund and no independent counsel has been retained to

**INDEPENDENT AUDITORS:**　　　The Fund has retained Sanville & Company to serve as the Fund's auditors.

**ADDITIONAL INFORMATION:**　　　Potential investors who have questions concerning the terms and conditions set forth herein should make inquiries to the General Partner at:

Broad  Reach  Capital,  LP
Broad Reach Partners, LLC
200 Four Falls, Suite 211
1001 Conshohocken State Road
West Conshohocken, PA  19428

## GLOSSARY OF TERMS

Unless the context otherwise requires, the terms defined below will, for the purposes of this Memorandum and the accompanying Partnership Agreement, have the meanings herein specified.

**"1933 Act"** means the Securities Act of 1933, as amended.

**"1934 Act"** means the Securities Exchange Act of 1934, as amended.

**"1940 Act"** means the Investment Company Act of 1940, as amended.

**"Accounting Period"** means the period of time that begins immediately after the end of the prior Accounting Period and ends at the earliest of the following: (i) the close of business on the day immediately preceding the day in which a Limited Partner is admitted to or redeems from the Fund in whole or in part; (ii) the close of business on the day immediately preceding the day in which a Limited Partner makes a contribution to the Fund or receives a distribution from the Fund; or (iii) the close of business on the last day of a calendar month (or, in the case of the last Accounting Period, on the Fund's date of dissolution).  The initial Accounting Period shall begin on the date of the Fund's commencement of operations and each calendar month thereafter.

**"Accredited Investor"** has the meaning ascribed to it in Rule 501 under the 1933 Act, as such Rule may be amended or supplemented from time to time, and as explained in more detail in this Memorandum under "Eligibility of Investors."

**"Administrator"** means Nottingham Investment Administration and includes any entity that becomes an  additional or successor Administrator of the Fund pursuant to the provisions of the Partnership  Agreement.

**"Advisers Act"** means the Investment Advisers Act of 1940, as amended.

**"Affiliate"** means any Person that directly or indirectly controls, is controlled by, or is under common control with, the person in question.

**"Asset Value"** means the value of all of the assets of the Fund, as determined in accordance with the provisions of the Partnership Agreement, as of the date on which such determination is made.

**"Business Day"** means any day that the New York Stock Exchange (NYSE) is open for business.

**"Capital Account"** means, with respect to any Partner, the capital account maintained for such Partner in accordance with the provisions of the Partnership Agreement.

**"Capital Contribution"** means, with respect to any Partner, the aggregate amount of money (or value of securities) contributed to the Fund by such Partner.

**"Code"** means the Internal Revenue Code of 1986, as amended from time to time.

**"Current Percentage"** of any Partner with respect to any fiscal period means the percentage derived by dividing (a) the balance in such Partner's capital account (including all capital sub-accounts) as of the beginning of such period by (b) the total of all balances in all Partners' capital accounts (including all capital sub-accounts) as of the beginning of such period.

**"Delaware Act"** means the Delaware Revised Uniform Limited Partnership Act*, 6 Del.C. §17-101, et seq., as amended.*

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"FINRA"** means the Financial Industry Regulatory Authority Inc. (formerly, the NASD, Inc.).

**"Fiscal Year"** means the period beginning on January 1 of each year and ending on December 31 of such year, unless the General Partner elects another fiscal year.

**"Fund"** means Broad Reach Capital, LP.

**"General Partner"** means Broad Reach Partners, LLC, a Delaware limited liability company.

**"Interest(s)"** means the limited partnership interest reflecting the Partner's ownership interest(s) in the Fund.

**"Investment Advisor"** means Bristol Advisors, LLC and includes any  entity that becomes an additional or successor Investment Advisor of the Fund pursuant to the provisions of  the Partnership Agreement.

**"IRS" or "Service"** means the Internal Revenue Service.

**"Limited Partner"** means any person admitted as a limited partner of the Fund and includes any person admitted as an additional limited partner of the Fund or a substituted limited partner of the Fund pursuant to the provisions of the Fund's Partnership Agreement.

**"Management Fee"** means any annual fee that will be charged to the Fund and paid to the Investment Advisor based on a percentage of the Capital Account balance of each Partner in the Fund, such  fee to be calculated daily and paid monthly in arrears.

**"Memorandum"** means this Confidential Private Placement Memorandum as amended, modified, supplemented or restated from time to time.

**"Net Asset Value" or "NAV"** as that term is applied to the Fund will be the dollar amount derived by subtracting (i) the liabilities of the Fund from (ii) the Asset Value.

**"Net Capital Appreciation"** means the increase (net of allocable management fees and expenses) in the value of a Partner's proportionate share of the Fund's Net Asset Value, including unrealized gains and losses, from the beginning of an Accounting Period to the end of such Accounting Period determined (except for certain reserves that may be established or

abolished for estimated or accrued expenses and for unknown or contingent liabilities) in accordance with U.S. generally accepted accounting principles.

**"Net Capital Depreciation"** means the decrease in the value of a Partner's proportionate share of the Fund's Net Asset Value, including unrealized gains and losses, from the beginning of an Accounting Period to the end of such Accounting Period determined (except for certain reserves that may be established or abolished for estimated or accrued expenses and for unknown or contingent liabilities) in accordance with U.S. generally accepted accounting principles.

**"New Issue"** has the meaning ascribed to it in FINRA Rule 5130, as such Rule may be amended or supplemented from time to time.

**"OFAC"** means the U.S. Department of Treasury's Office of Foreign Assets Control.

**"Ownership Percentage"** means the percentage ownership interest of a Partner in the Fund computed by dividing the Partner's Capital Account balance on a given day by the aggregate of all Partners' respective Capital Account balances on that day. A Partner's Ownership Percentage determines his share of the Fund's Net Asset Value at any given time. The Ownership Percentage of a Partner on the day the Partner becomes a Partner of the Fund shall be determined by dividing the amount of such Partner's Capital Contribution by the value of the Fund's Net Asset Value, including unrealized gains and losses and the amount of such Partner's Capital Contribution. As applied only to the Limited Partners, "Ownership Percentage" means the percentage ownership interest of a Limited Partner in the Fund computed by dividing the Limited Partner's Capital Account balance on a given day by the aggregate of all Limited Partners' respective Capital Account balances on that day.

**"Partner"** means the General Partner or any Limited Partner.

**"Partnership Agreement"** means the limited partnership agreement of the Fund, as amended, modified, supplemented or restated from time to time.

**"Performance Allocation"** means a percentage of the net profits to be allocated to the General Partner pursuant to the limited partnership agreement.

**"Person"** means any natural person, partnership, limited partnership, limited liability company, trust, estate, association, corporation, company, custodian, nominee or any other individual or entity in its own or any representative capacity.

**"Redemption Date"** means the last Business Day of each quarter end where each Limited Partner will have the right to redeem its Interests or such other date on which the General Partner permits a Limited Partner to redeem.

**"SEC"** means the United States Securities and Exchange Commission.

**"Subscription Agreement"** means the subscription agreement attached hereto.

"**Subscription Documents"** means the Subscription Agreement together with the investor suitability questionnaire.

**"Treasury Regulations"** means the income-tax regulations promulgated under the Code, as such regulations may be amended from time to time.

**"UBTI"** means unrelated business taxable income.

**"U.S."** means the United States of America.

## THE FUND

Broad Reach Capital, LP has been established as a Delaware limited partnership.  The Fund was organized under Delaware law in February 2016.  A copy of the Fund's current limited partnership agreement is incorporated herein by reference and will be delivered to each potential investor.  The general partner of the Fund is Broad Reach Partners, LLC, a Delaware limited liability  company, whose principal activity is to serve as general partner of various investment vehicles  for which the Investment Advisor provides advisory services.  The Investment Advisor of the Fund is Bristol Advisors, LLC a Delaware limited liability company.  The General Partner is an Affiliate of the  Investment Advisor.

The Fund's Fiscal Year begins on January 1 and ends on December 31, unless the General Partner elects another Fiscal Year.  The Fund is of perpetual duration.  However, the General Partner may dissolve the Fund at any time subject to the terms of the Partnership Agreement.  In addition, the Fund may dissolve upon the occurrence of other events specified in the Partnership Agreement.

## INVESTMENT OBJECTIVE AND STRATEGY

The Fund's investment objective is to seek consistent absolute returns primarily through capital appreciation, while also attempting to preserve capital and mitigate risk.  The strategy of the Fund is to invest its account with managers ("Managers") that represent a diverse set of assets in order to reduce exposure to any single asset class.  These asset classes could include but are not limited to equities, bonds, options, commodities, foreign exchange and energy.  It is anticipated that each Manager will trade a sub account of the Fund.  **No assurance can be given, however, that the Fund will achieve its objective, and investment results may vary substantially over time and from period to period**.

Although it does not currently anticipate doing so, the Fund may, in the discretion of the Investment Manager, also invest directly in other private funds, trading vehicles, trading strategies, separate accounts, or joint ventures in order to achieve its investment objective.  While these Managers will be selected across a spectrum of risk exposures, the key to the Fund's success will be how it combines those Managers and strategies to produce positive returns, low volatility and low correlation to t h e  U S  equity markets.

**There can be no assurance that the Fund will achieve its objective.**

16

## THE GENERAL PARTNER AND THE INVESTMENT MANAGER

Broad Reach Partners, LLC, the General Partner, is a Delaware limited liability company. The General Partner has sole and exclusive authority to manage the operations and business of the Fund, although it has delegated its investment authority to the Investment Advisor.

Bristol Advisors, LLC, the Investment Advisor, is a Delaware limited liability company. The Investment Advisor has been appointed as the investment manager to the Fund pursuant to an agreement entered into between the Fund and the Investment Advisor (the "Investment Management Agreement"). The Investment Management Agreement will continue and remain in force unless and until terminated by either party giving the other at least 60 days' prior written notice. The Investment Advisor is responsible for the day-to-day investment management of all of the Fund's assets. The Investment Advisor, in its sole discretion, may engage one or more related affiliated entities to manage and monitor the investments of the Fund.

The General Partner, the Investment Advisor and their Affiliates may carry on substantial investment activities for other funds and client accounts (collectively, the "Other Accounts"). As a result, the General Partner, the Investment Advisor, and their Affiliates may have conflicts of interest in allocating their time and activities between the management of the Fund and the management of Other Accounts. The General Partner, the Investment Advisor and their respective staff will devote only so much time to the management of the Fund as in their judgment is necessary and appropriate.

The General Partner, Investment Advisor and certain affiliates are owned and operated by Brenda A. Smith. Ms. Smith's bio is as follows:

Brenda Smith founded CV Brokerage utilizing experience gained while consulting for other broker dealer and financial services firms. She enjoys almost three decades of experience in compliance, accounting and risk management as a Certified Public Accountant and Certified Internal Auditor. Ms. Smith is proficient in software systems and reengineering processes and procedures. Ms. Smith's work has spanned elite global organizations, from Deloitte to one-person start-ups, earning her an international reputation as a worldwide tax expert. She has represented public and private companies including Avon, Applera Bio-Technology, Affinion, Elko and Associates, Entercom, Ernst & Young, Genaera Healthcare, Kreischer Miller, LiquidityPort, M3 Media Group, Inc, Skinny Water International, Telcordia and others in various industries including financial services, manufacturing, healthcare, telecommunications, retail and not-for-profit companies. Ms. Smith received her Bachelor of Science degree in Accounting from Louisiana State University. She is a CPA, CFP and Certified Internal Auditor, while also holding the Series 7, 24, 27, 53, 63 and 79 licenses. She is a member of the American Institute of Certified Public Accountants and the Pennsylvania Institute of Certified Public Accountants. Ms. Smith has developed and taught classes for public and private corporations, national training firms and currently serves as an instructor for Thomson Reuters.

Additional information regarding Ms. Smith's work history, affiliations and disciplinary history can be found on the FINRA broker check website.

## MANAGEMENT FEE

The Fund shall not pay the Investment Advisor a monthly management fee.

## PERFORMANCE ALLOCATION

As of the end of each performance allocation measurement period (at present each month end), the General Partner will be allocated a Performance Allocation as follows: First, one hundred percent (100%) to the Limited Partners, pro rata, until such time as the Limited Partners have received eight percent (8%) on an annualized basis. Thereafter, the General Partner shall receive an allocation of Net Profits, if any ("Performance Allocation"). The Performance Allocation shall equal fifty percent (50%) of the Net Profits allocated to each Limited Partner for such Performance Period, in excess of the Loss Carryforward, if any, for such Limited Partner. "Loss Carryforward" with respect to a Limited Partner means the amount of Net Loss previously allocated to such Limited Partner and carried forward from prior Performance Periods, which have not been recovered by the Limited Partner in full with subsequent allocations of Net Profit to such Limited Partner (from which a Performance Allocation has not been reallocated). The Loss Carryforward is intended to prevent a Performance Allocation from being calculated on what is, in effect, a recoupment of net losses. If a Limited Partner makes a partial withdrawal or receives a distribution, his Loss Carryforward balance, if any, will be reduced in the proportion that the amount withdrawn bears to his Capital Account balance immediately before giving effect to the withdrawal. A Performance Allocation shall also be calculated with respect to profits arising from Partnership asset classes in which not all Limited Partners have an interest, such as new issues. The Performance Allocation may be lower in certain circumstances in the sole discretion of the General Partner.

No Performance Allocation with respect to the Interests will be allocated to the General Partner until the net losses of the Fund (if any) allocated to such Interests since the last performance allocation measurement period for which a Performance Allocation with respect to such Interest was earned (or, if no such Performance Allocation has been earned previously by the General Partner with respect to such Interests, since the date on which the class of Interests was issued by the Fund) have been fully offset against subsequent net profits of the Fund allocated to such Interest.

The first performance allocation measurement period with respect to an Interests will commence on the closing date and will end at the close of business on the first to occur of (a) the Company's first fiscal month end, (b) the effective date of a Limited Partner's redemption of all or a portion of a Capital Account for such portion redeemed or (c) the date when the Partnership shall dissolve. Thereafter, each performance allocation measurement period with respect to such Interests will commence immediately after the end of the immediately preceding performance allocation measurement period with respect to such Interest and end at the close of business on the first to occur of the events specified in (a) – (c) of the preceding sentence. The "period end date" with respect to an Interests is the performance period specified for such Interest in the limited partnership agreement.

If a Limited Partner redeems all or part of its Interests, a Performance Allocation will be determined as of the date of redemption. In addition, if the Fund is liquidated the final performance allocation measurement period will end on the date on which the liquidation of the Fund is completed.

## INDEMNIFICATION AND EXCULPATION

To the fullest extent permitted by law, the Fund shall indemnify the General Partner, the Investment Advisor, their respective members and Affiliates and their respective shareholders, members, partners, officers, directors, employees and agents (collectively, "Indemnified Persons") from  and against any loss or expense suffered or sustained by them by reason of:  (a) the fact they  were acting as or on behalf of the General Partner, the Investment Advisor or the Fund; or (b) any acts or  omissions in or arising out of the performance of their duties or services as General Partner or  Investment Advisor, or as members, officers, directors, employees or agents of the General Partner or the  Investment Advisor, or as an agent, employee, or consultant of the Fund except by reason of their willful  misfeasance, bad faith or gross negligence, as finally determined by a court of competent  jurisdiction or as otherwise provided by applicable federal securities laws.

The Fund shall, in the sole discretion of the General Partner, advance to any Indemnified Person, reasonable attorneys' fees and other costs and expenses incurred in connection with the defense of any action or proceeding which arises out of such conduct; *provided, however*, that where the General Partner has been named as defendant or respondent in a proceeding, the Fund may only pay, or reimburse in advance of the final disposition of a proceeding, reasonable expenses incurred by the General Partner after:  (i) the Fund receives a written affirmation by the General Partner of its good faith belief that it has met the standard for indemnification described above; and (ii) the Fund receives a written undertaking on behalf of the General Partner to repay the amount paid or reimbursed if it is ultimately determined that the General Partner has not met that standard, or it is ultimately determined that indemnification of the General Partner in connection with such proceeding is prohibited by the Delaware Act or federal securities laws.  Any indemnification of or advance expenses paid to a General Partner shall be reported promptly, but no later than six months after the date that the indemnification or advance occurs, in writing to the Limited Partners.

Except as otherwise provided under the federal securities or other applicable federal laws, no Indemnified Person shall be liable to any Partner or the Fund for any good faith act which such person reasonably believed to be in the best interests of the Fund or failure to act on behalf of the Fund, unless such act or failure to act resulted from their willful misfeasance, bad faith or gross negligence in the performance of their duties to the Fund as finally determined by a court of competent jurisdiction or as otherwise provided by applicable federal securities laws.

The provisions and other provisions of the Partnership Agreement and Investment Management Agreement supersede any other standards of liability, fiduciary duty or indemnification under the Delaware Revised Uniform Limited Partnership Act, common law or equity or otherwise; provided, however, nothing herein shall be deemed to exculpate any person from or indemnify any person for any liability or losses in contravention of federal securities law or other applicable federal law. Notwithstanding the foregoing, none of the Indemnified Persons shall be liable for actions of their agents, provided that such agent was selected with reasonable care.

A limited partner who does not take part in management or control of the business of the Fund will not be personally liable for any debt or obligation of the Fund in excess of his or her Capital Contribution.  Under certain circumstances under Delaware law, a limited partner may be required to return for the benefit of creditors, amounts previously distributed to such partner.

**RISKS**

Investment in the Fund involves significant risks. Each prospective Limited Partner should carefully consider the risks inherent in an investment in the Fund engaging in operations of the type described in this Memorandum or permitted under the Partnership Agreement. Persons who invest in Interests must have no need for continuous liquidity of their investment thereafter. Investors must be able to bear the economic risk of diminution of value, or loss of their investment. Some of these risks are further discussed below:

**General Risks**. Investors should be aware that the value of Interests may fall as well as rise. Investment in the Fund involves significant risks. While it is the intention of the Investment Advisor to implement strategies which are designed to minimize potential losses, there can be no assurance that these strategies will be successful. It is possible that an investor may lose a substantial proportion or all of its investment in the Fund. There is unlikely to be a secondary market in the Interests and so Limited Partners may only be able to dispose of their Interests by means of redemption to the Fund. As a result, each investor should carefully consider whether it can afford to bear the risks of investing in the Fund. The following discussion of risks does not purport to be a complete explanation of the risks involved in investing in the Fund.

**Suitability Standards.** Because of the risks involved, investment in the Fund is only suitable for sophisticated investors who are able to bear the loss of substantial portion or even all of the money they invest in the Fund, who understand the high degree of risk involved, believe that the investment is suitable based upon their investment objectives and financial needs and have no need for liquidity of investment. Investors are therefore advised to seek independent professional advice on the implications of investing in the Fund. The Fund will rely on the exemption from the definition of "investment company" set forth in Section 3(c)(7) of the 1940 Act, which generally restricts the ownership of Interests to "qualified purchasers." Interests in the Fund will not be registered with the SEC in reliance on Rule 506(b) of Regulation D under the 1933 Act, which generally restricts the ownership of Interests to "accredited investors." Specifically, investment in the Fund is available only to persons who are both (i) "accredited investors" within the meaning of Rule 501 under the 1933 Act, although up to 35 persons who are not "accredited investors" but are "knowledgeable employees" of the Fund within the meaning of Rule 3c-5 under the 1940 Act, may acquire Interests at the discretion of the General Partner, and (ii) "qualified purchasers" within the meaning of Section 2(a)(51) of the 1940 Act and Rule 2a51-1 thereunder or "knowledge employees" of the Fund within the meaning of Rule 3c-5 under the 1940 Act.

**Redemptions.** Each Limited Partner generally may redeem all or a portion of its Interests quarterly on at least 30 days' prior written notice. The General Partner may, in its sole discretion, waive such notice period with respect to any Limited Partner without the consent of any other Limited Partner.

As promptly as reasonably possible after the start of the calendar quarter subsequent to the relevant redemption date, following the General Partner's acceptance of a Limited Partner's request for redemption of all or any portion of its Interests, the Fund will pay at least 95% of the amount of the redemption, with the balance to be paid, without interest or other return from the Fund's investments (from the applicable redemption date forward), promptly following the later of (i) the completion of the Fund's audited financial statements for such fiscal year or (ii) the determination by the General Partner of any relevant withholding tax amounts for such year,

*provided, however, that* if the aggregate amount of redemption requests received from Limited Partners in any given quarter exceeds 25% of the Fund's Net Asset Value, the General Partner reserves the right to limit redemptions in respect of such quarter to 25% of the Fund's Net Asset Value.  In any such instance, redemptions will be allocated to redeeming Limited Partners on a *pro rata* basis, and, with respect to that portion of the amount of any redemption request not paid to a Limited Partner as a result of the limitation on redemptions to 25% of the Partnership's Net Asset Value for such quarter, such redemption request shall be deemed a request by such Limited  Partner for redemption of such portion of such amount as of the last day of the immediately  succeeding calendar quarter.

**The General Partner may at any time suspend or delay the rights of redemption described  earlier, before or after notice of redemption has been given by any one or more Limited  Partners, (i) in the event that it determines that the requested redemptions would have an  adverse effect on the non-redeeming Limited Partners or the tax status of the Fund or  would exceed the Fund's ability to obtain liquidity from the underlying funds in which the  Fund invests or (ii) for any other reason if the General Partner believes it is in the best  interests of the Fund.**

Redemption proceeds normally will be paid in cash, although the General Partner may in its discretion make the redemption distribution, entirely or partially, in kind

**Limited Operating History.**   The Fund has no operating history upon which prospective investors can evaluate its likely performance.  The past investment performance of the General Partner, Investment Advisor or any of their Affiliates, or entities with which they have been associated is not  an indication of the future results of an investment in the Fund.  The Fund's investment program  should be evaluated on the basis that there can be no assurance that the Investment Advisor's utilization of  the intended approach will prove accurate or that the Fund will achieve its investment objective.

**Lack of Regulatory Oversight.**  The Fund is not registered as an investment company in reliance on Section 3(c)(7) of the 1940 Act, and, accordingly, the provisions of the 1940 Act (which, among other things, require investment companies to have a majority of disinterested directors, require securities held for an investment company by a custodian to be marked to show the ownership of such securities by such investment company, and regulate the relationship between an investment company and its adviser) are not applicable.

**Potential Conflicts of Interest.**  Certain of the Managers may engage in other  forms of related and unrelated activities in addition to advising an underlying private fund. They may also make investments in securities for their own accounts. Such activities could detract from the time  that a Manager devotes to the affairs of an underlying private fund.

**Side Letters and Other Agreements.**  The Fund may enter into agreements with  certain investors, which waive certain terms or allow such  investors to invest on terms different from those specifically described in the offering documents, including without limitation with respect to fees, liquidity, or depth or frequency of  information provided to such investors concerning the Fund. Such agreements may  provide more beneficial terms to investors other than the Fund.

**Multiple Layers of Fees.**  The Fund may bear asset-based fees  and performance-based fees or

allocations. As a result, Investors will bear such fees at multiple levels. Each Investor will bear a proportionate share of the other operating expenses of the Fund as well as a proportionate share of the Manager.

**Availability of Investment Opportunities**. There can be no assurance that the General Partner will be able to identify and complete attractive investments in the future or that it will be able to invest fully its subscriptions.

**Absence of Regulatory Oversight**. The Fund will not be required to register as an investment company under the 1940 Act. Thus, the provisions of the 1940 Act intended to provide various protections to investors will not be applicable.

**Hedging**. The Fund may use a variety of financial instruments, such as derivatives, options, futures, forward contracts, and interest rate swaps, caps and floors, to seek to hedge against declines in the values of their portfolio positions as a result of changes in currency exchange rates, certain changes in the equity markets and market interest rates, and other events. Hedging against a decline in the value of portfolio positions does not eliminate fluctuations in the values of portfolio positions or prevent losses if the values of such positions decline but, rather, establishes other positions designed to gain from those same developments, thus offsetting the decline in the portfolio positions' value.

**High Market Volatility**. The prices of commodities contracts and all derivative instruments can be highly volatile.

**Leverage; Interest Rates; Margin**. The Fund may directly or indirectly borrow funds from brokerage firms and banks. In addition, the Fund may "leverage" their investment return with options, swaps, forwards, and other derivative instruments. While leverage presents opportunities for increasing total returns, it has the effect of potentially increasing losses as well.

**Non-U.S. Investments**. The Fund may, subject to its stated investment objectives, policies, and strategies, make investments (directly or indirectly) in a number of different countries. Such investments may be made in countries or economies that may prove unstable.

**Currencies**. The Fund may, subject to its stated investment objectives, policies, and strategies, invest a portion of its assets in non-U.S. currencies or in instruments denominated in non-U.S. currencies, the prices of which are determined with reference to currencies other than the U.S. dollar. To the extent unhedged, the value of such assets will fluctuate with U.S. dollar exchange rates, as well as the price changes of its investments in the various local markets and currencies.

**Lack of Portfolio Liquidity**. The underlying portfolio companies and other assets in which the Fund invests may, at any given time, consist of significant amounts of securities and other financial instruments or obligations which are very thinly traded, for which no market exists, or which are restricted as to their transferability under U.S. federal or state or non-U.S. securities laws.

**Equity Securities and Equity-Related Instruments**. The Fund may invest long and short in equities and equity-related instruments, which may be subject to various types of risks,

22

including without limitation market risk, liquidity risk, counterparty credit risk, legal risk, and operations risk. In addition, equity-related instruments can involve significant economic leverage and may, in some cases, involve significant risk of loss.

**Merger Arbitrage**. The Fund, with respect to its merger arbitrage investments (if any), generally could incur significant losses when proposed transactions are not consummated.

**Commodity Futures Contracts**. Trading in commodity interests may involve substantial risks. The low margin or premiums normally required in such trading may provide a large amount of leverage, and a relatively small change in the price of a security or contract can produce a disproportionately larger profit or loss.

**Possible Effects of Speculative Position Limits**. The CFTC and the U.S. commodities exchanges have established limits referred to as "speculative position limits" on the maximum net long or short speculative futures positions that any person may hold or control in certain derivatives traded on U.S. commodities exchanges. Such speculative position limits could substantially limit the investments of the Fund.

**Non-U.S. Futures Transactions**. The Fund may invest in non-U.S. commodity futures contracts and in options thereon. Non-U.S. futures transactions involve executing and clearing trades on a non-U.S. exchange. No U.S. organization regulates the activities of a non-U.S. exchange.

**Forward Trading**. Forward contracts and options thereon, unlike futures contracts, are not traded on exchanges and are not standardized; rather, banks and dealers act as principals in these markets, negotiating each transaction on an individual basis. Forward and "cash" trading is substantially unregulated.

**Derivatives Risk Generally**. Derivatives are financial contracts whose value depends on, or is derived from, the value of an underlying asset, reference rate, or index. An underlying private fund may use derivatives for any purpose including without limitation as a substitute for taking a position in the underlying asset or as part of a strategy designed to reduce or increase exposure to other risks, such as interest rate, credit, or currency risk. The Fund's use of derivative instruments involves risks different from, and possibly greater than, the risks associated with investing directly in securities and other traditional investments. Derivatives are subject to a number of risks described elsewhere in the Offering Materials.

**Swap Agreements**. Swap agreements can be individually negotiated and structured to include exposure to a variety of different types of investments or market factors.

**Performance-Based Compensation Arrangements of the Managers**. The Managers of the underlying strategies will typically receive compensation based on the performance of the investments in their respective managed account. Such compensation arrangements may create an incentive for Managers to make investments that are riskier or more speculative than would be the case if such arrangements were not in effect.

**Valuations**. Certain securities in which the Fund invest may not have a readily ascertainable

market price.

**Counterparty Credit Risk.** Many of the markets in which the Fund effect their transactions are "over-the-counter" or "interdealer" markets. The participants in such markets are typically not subject to credit evaluation and regulatory oversight as are members of "exchange-based" markets.

**Potential Significant Impact of the Performance of a Limited Number of Investments**. The Fund will potentially be invested in a small number of underlying investments.

**Small-Capitalization Stocks**. The Fund may directly or indirectly invest in small- to medium-sized companies of a less seasoned nature. Investments in small-capitalization issuers often involve significantly greater risks than the securities of larger, better known companies because they may lack the management experience, financial resources, product diversification, and competitive strengths of larger companies.

**Emerging Markets**. The Fund may invest in assets in emerging markets. Investing in emerging markets involves additional risks and special considerations not typically associated with investing in other more established economies or securities markets.

**Securities Believed to Be Undervalued or Incorrectly Valued**. Securities that underlying Managers believe are fundamentally undervalued or incorrectly valued may not ultimately be valued in the capital markets at prices or within the timeframe which the Managers anticipate.

**Lack of Transparency**. The Fund may not disclose the contents of its Manager's portfolios.

**Short Sales**. The Fund may engage in short selling. Short selling involves selling securities which may or may not be owned and borrowing the same securities for delivery to the purchaser, with an obligation to replace the borrowed securities at a later date.

**Call Options**. The seller (writer) of a call option which is covered (e.g., where the writer holds the underlying security) assumes the risk of a decline in the market price of the underlying security below the purchase price of the underlying security, less the premium received, and gives up the opportunity for gain on the underlying security above the exercise price of the option. The seller of an uncovered call option assumes the risk of a theoretically unlimited increase in the market price of the underlying security above the exercise price of the option. The buyer of a call option assumes the risk of losing its entire investment in the call option.

**Put Options**. The seller (writer) of a put option that is covered (e.g., where the writer has a short position in the underlying security) assumes the risk of an increase in the market price of the underlying security above the sales price (in establishing the short position) of the underlying security, plus the premium received, and gives up the opportunity for gain on the underlying security below the exercise price of the option. The seller of an uncovered put option assumes the risk of a decline in the market price of the underlying security below the exercise price of the option. The buyer of a put option assumes the risk of losing its entire investment in the put option.

**Stock Index Options**. A stock index fluctuates with changes in the market values of the stocks included in the index. The effectiveness of purchasing or writing stock index options for hedging purposes will depend upon the extent to which price movements in the Fund's portfolio correlate with price movements of the stock indices selected.

**Fixed-Income and Convertible Bond Arbitrage**. The success of the investment activities of an underlying Manager involved in fixed-income and convertible bond arbitrage will depend on the Manager's ability to identify and exploit price discrepancies in the market.

**Other Instruments and Future Developments**. An underlying Manager may take advantage of opportunities in the area of swaps, options on various underlying instruments, and certain other customized "synthetic" or derivative instruments, which will be subject to varying degrees of risk. In addition, an underlying private fund may take advantage of opportunities with respect to certain other "synthetic" or derivative instruments which are not presently contemplated or presently available but which may be developed and may be subject to significant degrees of risk.

**Investment in Fixed-Income Securities – Generally**. The value of fixed-income securities in which a Manager invests will change in response to fluctuations in interest rates.

**Risks Associated with Investments in High-Yield Securities**. High-yield securities generally are not exchange-traded, and, as a result, these instruments trade in a smaller secondary market than exchange- traded bonds. High-yield securities that are below investment grade or unrated face ongoing uncertainties and exposure to adverse business, financial, or economic conditions that could lead to the issuer's inability to meet timely interest and principal payments.

**Non-U.S. Investments**. The Fund may invest (directly or indirectly) in a number of different countries. Such investments may be made in countries or economies which may prove unstable and, thus, involve special risks not usually associated with investing in securities of U.S. companies or the U.S. Government.

**Non-U.S. Government Securities**. An underlying Manager's non-U.S. investments may include debt securities issued or guaranteed by non-U.S. governments, their agencies or instrumentalities, or supranational entities. An underlying Manager may invest in debt securities issued by certain "supranational" entities. Investment in sovereign debt of non-U.S. governments can involve a high degree of risk, including additional risks not present in debt obligations of corporate issues and the U.S. government.

**Information**. Many of the non-U.S. securities in which the Fund may invest will not be registered with, nor will the issuers thereof be subject to reporting requirements of, the SEC. Accordingly, there may be less publicly available information about such securities and about the non-U.S. company or government issuing them than is available about a U.S. company or government entity.

**Investing in Distressed Securities**. The fact that certain of the companies in whose securities an underlying private fund may invest are in transition, out of favor, financially leveraged,

troubled, or potentially troubled and may be or have recently been involved in major strategic actions, restructurings, bankruptcy, reorganization, or liquidation means that their securities are likely to be particularly risky investments although they also may offer the potential for correspondingly high returns.

**Mortgage-Backed and Asset-Backed Securities**. Mortgage-backed securities are affected by, among other things, interest rate changes and the possibility of prepayment of the underlying mortgage loans. Mortgage-backed securities are also subject to the risk that underlying borrowers will be unable to meet their obligations. Payment of principal and interest on asset-backed securities is dependent largely on the cash flows generated by the assets backing the securities, and asset-backed securities may not have the benefit of any security interest in the related assets.

**Money Market and Other Liquid Instruments**. One or more underlying Managers may, for defensive purposes or otherwise, invest in money market instruments or money market mutual funds or hold cash or cash equivalents.

**Business, Legal, Tax, and Other Regulatory Risks**. Legal, tax, and regulatory changes, as well as judicial decisions, could adversely affect any of the Fund, the General Partner, one or more underlying Managers and the investment strategies used to implement an underlying private fund's trading program.

**Borrowings for Operations.** The Fund may borrow on a short-term basis to facilitate cash management or to cover operating expenses. If the Fund borrows to finance payment of redemption proceeds, interest on that borrowing will negatively affect Investors who remain in the Fund, by increasing the Fund's expenses and reducing any net investment income. In addition, to the extent that the Fund borrows funds, the rates at which it can borrow may affect the operating results of the Fund.

**Investment Leverage.** The Fund is permitted to borrow money and otherwise leverage its portfolio. The Fund may also use "leverage" by using futures, options, swaps, forwards and other derivative instruments. Although leverage presents opportunities for increasing total investment return, it has the effect of potentially increasing losses as well. Any event that adversely affects the value of an investment, either directly or indirectly, by the Fund would be magnified to the extent that leverage is employed. The cumulative effect of the use of leverage, directly or indirectly, in a market that moves adversely to the investments of the entity employing the leverage would result in a loss that would be greater than if leverage were not employed. Consequently, the Fund will be subject to potentially very significant losses in the event that market disruptions cause the hedged nature of such positions to be disrupted or not to work as intended. In addition, to the extent that the Fund borrows, the rates at which they can borrow may affect the operating results of the Fund. See "Certain Federal Income Tax Considerations" below.

**Investment Risk.** Investments of the sort contemplated for the Fund have risk. All securities investments risk the loss of capital. The Investment Advisor believes that the Fund's investment program and blend of qualitative and quantitative investment techniques may moderate this risk through a careful selection of securities. However, no guarantee or representation is made that the Fund's program will be successful. Past performance is not a guarantee of future

performance. Changes in the general level of the securities market and interest rates may adversely affect the Fund's operating results.

**Equity Securities.** The Fund may purchase equity securities, which represent ownership interests in the issuer, and are commonly called "stocks." Equity securities historically have outperformed most other securities, although their prices can fluctuate widely based on changes in the company's financial condition, market conditions and political, economic or even issuer-specific news. When a stock's price declines, its market value is lowered even though the intrinsic value of the issuer may not have changed. Sometimes factors, such as economic conditions or political events, affect the value of stocks of companies of the same or similar industry or group of industries, and may affect the entire stock market. If stocks held by the Fund reduce or stop paying dividends, the Fund's ability to generate income may be affected.

Common stocks, which are probably the most recognized type of equity security, represent an equity or ownership interest in an issuer and usually entitle the owner to voting rights in the election of the corporation's directors and any other matters submitted to the corporation's shareholders for voting, as well as to receive dividends on such stock. The market value of common stock can fluctuate widely. In the event an issuer is liquidated or declares bankruptcy, the claims of bond owners, other debt holders and owners of preferred stock take precedence over the claims of common stock owners.

Preferred stocks represent an equity or ownership interest in an issuer but do not ordinarily carry voting rights, though they may carry limited voting rights. Preferred stocks normally have preference over the corporation's assets and earnings, however. For example, preferred stocks have preference over common stock in the payment of dividends. Preferred stocks normally pay dividends at a specified rate. However, preferred stock may be purchased where the issuer has omitted, or is in danger of omitting, payment of its dividend. Such investments would be made primarily for their capital appreciation potential. In the event an issuer is liquidated or declares bankruptcy, the claims of bond owners take precedence over the claims of preferred and common stock owners. Certain classes of preferred stock are convertible into shares of common stock of the issuer. By holding convertible preferred stock, the Fund can receive a steady stream of dividends and still have the option to convert the preferred stock to common stock. Preferred stock is subject to many of the same risks as common stock and debt securities.

Convertible securities are typically preferred stocks or bonds that are exchangeable for a specific number of another form of security (usually the issuer's common stock) at a specified price or ratio. A convertible security generally entitles the holder to receive interest paid or accrued on bonds or the dividend paid on preferred stock until the convertible security matures or is redeemed, converted or exchanged. A corporation may issue a convertible security that is subject to redemption after a specified date, and usually under certain circumstances. A holder of a convertible security that is called for redemption would be required to tender it for redemption to the issuer, convert it to the underlying common stock or sell it to a third party. The convertible structure allows the holder of the convertible bond to participate in share price movements in the company's common stock. The actual return on a convertible bond may exceed its stated yield if the company's common stock appreciates in value and the option to convert to common stocks becomes more valuable. Convertible securities typically pay a lower interest rate than nonconvertible bonds of the same quality and maturity because of the conversion feature. Convertible securities are also rated below investment grade ("high yield") or are not rated, and

are subject to credit risk.

Prior to conversion, convertible securities have characteristics and risks similar to nonconvertible debt and equity securities. In addition, convertible securities are often concentrated in economic sectors, which, like the stock market in general, may experience unpredictable declines in value, as well as periods of poor performance, which may last for several years. There may be a small trading market for a particular convertible security at any given time, which may adversely impact market price and the Fund's ability to liquidate a particular security or respond to an economic event, including deterioration of an issuer's creditworthiness.

Convertible preferred stocks are nonvoting equity securities that pay a fixed dividend. These securities have a convertible feature similar to convertible bonds, but do not have a maturity date. Due to their fixed income features, convertible securities provide higher income potential than the issuer's common stock, but typically are more sensitive to interest rate changes than the underlying common stock. In the event of a company's liquidation, bondholders have claims on company assets senior to those of shareholders; preferred shareholders have claims senior to those of common shareholders.

Convertible securities typically trade at prices above their conversion value, which is the current market value of the common stock received upon conversion, because of their higher yield potential than the underlying common stock. The difference between the conversion value and the price of a convertible security will vary depending on the value of the underlying common stock and interest rates. When the underlying value of the common stocks declines, the price of the issuer's convertible securities will tend not to fall as much because the convertible security's income potential will act as a price support. While the value of a convertible security also tends to rise when the underlying common stock value rises, it will not rise as much because their conversion value is more narrow. The value of convertible securities also is affected by changes in interest rates. For example, when interest rates fall, the value of convertible securities may rise because of their fixed income component.

Warrants are types of securities usually issued with bonds and preferred stock that entitle the holder to purchase a proportionate amount of common stock at a specified price for a specific period of time. The prices of warrants do not necessarily move parallel to the prices of the underlying common stock. Warrants have no voting rights, receive no dividends and have no rights with respect to the assets of the issuer. If a warrant is not exercised within the specified time period, it will become worthless and the Fund will lose the purchase price it paid for the warrant and the right to purchase the underlying security.

**Real Estate Investment Trusts (REITs).** The Fund's investments in REITs will be subject to the risks associated with the direct ownership of real estate. Risks commonly associated with the direct ownership of real estate include fluctuations in the value of underlying properties, defaults by borrowers or tenants, changes in interest rates and risks related to general or local economic conditions. In addition to the risks associated with investing in securities of real estate companies, REITs are subject to certain additional risks. Equity REITs may be affected by changes in the value of the underlying properties owned by the trusts, and mortgage REITs may be affected by the quality of any credit extended. Further, REITs are dependent upon specialized management skills and may have their investments in relatively few properties, or in a small geographic area or a single property type. REITs are also subject to heavy cash flow

28

dependency,  defaults by borrowers and self-liquidation. In addition, REITs could possibly fail to qualify for  tax free pass-through of income under the Internal Revenue Code, or to maintain their  exemptions from registration under the Investment Company Act of 1940. The failure of a company to qualify as a REIT under federal tax law may have adverse consequences to the Fund.  The above factors may also adversely affect a borrower's or a lessee's ability to meet its obligations to the REIT. In the event of a default by a borrower or lessee, the REIT may experience delays in enforcing its rights as a mortgagee or lessor and may incur substantial costs associated with protecting its investments. In addition, REITs have their own expenses, and the Fund will bear a proportionate share of those expenses.

**ETF and ETN Risk**. ETFs or ETNs that are based on a specific index may not be able to replicate and maintain exactly the composition and relative weighting of securities in the applicable index. ETFs or ETNs also incur certain expenses not incurred by their applicable index. Additionally, certain securities comprising the index tracked by an ETF or ETN may, at times, be temporarily unavailable, which may impede an ETF's or ETN's ability to track its index.

ETFs and some levered ETFs can, at times, be relatively illiquid and, thus, they may be hard to purchase or sell at a fair price. In addition, levered ETFs are subject to the risk of a breakdown in the swaps, futures and options markets they use.  A levered ETF's or ETN's use of leverage is subject to the same risks as the Fund's use of leverage. While leverage allows for greater potential return, the potential for loss is also greater. Finally, additional losses may be incurred if an investment made with borrowed money loses value because, in addition to the money lost on the investment, the loan still needs to be repaid.  Unlike regular bonds, there are no periodic interest payments for ETNs, and principal is not protected. As is the case with ETFs, an investor could lose some of or the entire amount invested in ETNs.

The market values of ETF or ETN shares may differ from their net asset value (NAV). This difference in price may be due to the fact that the supply and demand in the market for ETF or ETN shares at any point in time are not always identical to the supply and demand in the market for the underlying securities that the ETF or ETN holds. There may be times when an ETF or ETN share trades at a premium or discount to its NAV.

**Volatility.**  All issuers are affected to some degree by economic trends or developments.  Smaller and medium capitalization companies, however, may be more vulnerable to such developments and, therefore, such companies may be particularly affected by negative economic events. Therefore, securities of smaller or medium capitalization companies may be more volatile than securities of larger companies.

**Derivatives.** The Fund may invest in, or enter into, derivatives or derivatives transactions. Derivatives are financial instruments that derive their performance, at least in part, from the performance of an underlying asset, index or interest rate. Derivatives entered into by the Fund can be volatile and involve various types and degrees of risk, depending upon the characteristics of a particular derivative and the portfolio of the Fund as a whole. Derivatives permit the Investment Advisor to increase or decrease the level of risk of an investment portfolio, or change the character of the risk, to which an investment portfolio is exposed in much the same way as the  Investment Advisor can increase or decrease the level of risk, or change the character of the risk, of an  investment portfolio by making investments in specific securities.

Derivatives may entail  investment exposures that are greater than their cost would suggest, meaning that a small  investment in derivatives could have a large potential effect on performance of the Fund. The use  of derivatives may include swaps, options and futures designed to replicate the performance of  an index or to adjust market or risk exposure.

If the Fund invests in derivatives at inopportune times or incorrectly judges market conditions, the investments may lower the return of the Fund or result in a loss. The Fund also could experience losses if derivatives are poorly correlated with its other investments, or if the Fund is unable to liquidate the position because of an illiquid secondary market. The market for many derivatives is, or suddenly can become, illiquid. Changes in liquidity may result in significant, rapid and unpredictable changes in the prices for derivatives.

**Commodity Exchange Act.** The use by the Fund of derivatives that are subject to regulation by the Commodity Futures Trading Commission ("CFTC") may cause the Fund to be deemed a "commodity pool", which could result in the Fund, the General Partner and the Investment Advisor being  required to comply with certain rules of the CFTC.  In light of this potential, the General Partner  may claim an exemption from registration as a commodity pool operator with the CFTC in  connection with the Fund if such exemption is available.  The Investment Advisor may claim an exemption  from registration as a commodity trading adviser with the CFTC in connection with the Fund, if  such exemption is available.  Depending on the Fund's level of investment in commodity  interests, the Fund, the General Partner or the Investment Advisor may become subject to registration with  the CFTC, which could result in higher operating expenses for the Fund due to increase legal and  regulatory compliance costs.

**Options and Futures.**   The Fund may utilize options and futures contracts and so-called "synthetic" options or other derivatives written by broker-dealers or other permissible financial intermediaries. Options transactions may be effected on securities exchanges or in the over-the-counter market. When options are purchased over-the-counter, the Fund's portfolio bears the risk that the counterparty that wrote the option will be unable or unwilling to perform its obligations under the option contract. Options may also be illiquid and, in such cases, the Fund may have difficulty closing out its position. Over-the-counter options also may include options on baskets of specific securities.

The Fund may purchase call and put options on specific securities and may write and sell covered or uncovered call and put options for hedging purposes in pursuing their investment objectives. A put option gives the purchaser of the option the right to sell, and obligates the writer to buy, the underlying security at a stated exercise price, typically at any time prior to the expiration of the option. A call option gives the purchaser of the option the right to buy, and obligates the writer to sell, the underlying security at a stated exercise price, typically at any time prior to the expiration of the option. A covered call option is a call option with respect to which the seller of the option owns the underlying security. The sale of such an option exposes the seller during the term of the option to possible loss of opportunity to realize appreciation in the market price of the underlying security or to possible continued holding of a security that might otherwise have been sold to protect against depreciation in the market price of the security. A

covered put option is a put option with respect to which cash or liquid securities have been placed in a segregated account on the books of or with a custodian to fulfill the obligation undertaken. The sale of such an option exposes the seller during the term of the option to a decline in price of the underlying security while depriving the seller of the opportunity to invest the segregated assets.

The Fund may close out a position when writing options by purchasing an option on the same security with the same exercise price and expiration date as the option that it has previously written on the security. In such a case, the Fund will realize a profit or loss if the amount paid to purchase an option is less or more than the amount received from the sale of the option.

The Fund may enter into futures contracts in U.S. markets or on exchanges located outside the United States. Non-U.S. markets may offer advantages such as trading opportunities or arbitrage possibilities not available in the United States. Non-U.S. markets, however, may have greater risk potential than U.S. markets. For example, some non-U.S. exchanges are principal markets so that no common clearing facility exists and an investor may look only to the broker for performance of the contract. In addition, any profits realized could be eliminated by adverse changes in the exchange rate, or the Fund could incur losses as a result of those changes. Transactions on non-U.S. exchanges may include both commodities that are traded on U.S. exchanges and those that are not. Unlike trading on U.S. commodity exchanges, trading on non-U.S. commodity exchanges is not regulated by the CFTC.

Engaging in transactions in futures contracts involves risk of loss to the Fund that could adversely affect the value of the Fund's net assets. No assurance can be given that a liquid market will exist for any particular futures contract at any particular time. Many futures exchanges and boards of trade limit the amount of fluctuation permitted in futures contract prices during a single trading day. Once the daily limit has been reached in a particular contract, no trades may be made that day at a price beyond that limit or trading may be suspended for specified periods during the trading day. Futures contract prices could move to the limit for several consecutive trading days with little or no trading, preventing prompt liquidation of futures positions and potentially subjecting the Fund to substantial losses. Successful use of futures also is subject to the Investment Advisor's ability to predict correctly movements in the direction of the relevant market, and, to the extent the transaction is entered into for hedging purposes, to determine the appropriate correlation between the transaction being hedged and the price movements of the futures contract.

**Swaps.** The Fund may enter into interest rate, index, currency rate, credit default, total return or other swap agreements. These transactions are entered into in an attempt to obtain a particular return when it is considered desirable to do so, possibly at a lower cost than if the Fund had invested directly in the asset that yielded the desired return. Swap agreements are two-party contracts entered into primarily by institutional investors for periods ranging from a few weeks to more than a year. In a standard swap transaction, two parties agree to exchange the returns (or differentials in rates of return) earned or realized on particular predetermined investments or instruments, which may be adjusted for an interest factor. The gross returns to be exchanged or "swapped" between the parties are generally calculated with respect to a "notional amount" (i.e., the return on or increase in value of a particular dollar amount invested at a particular interest rate, in a particular foreign currency, or in a "basket" of securities representing a particular index).

**Interest Rate Swaps.**  The Fund may enter into interest rate swaps.  Forms of swap agreements include interest rate caps, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates exceed a specified rate or "cap"; interest rate floors, under which, in return for a premium, one party agrees to make payments to the other to the extent interest rates fall below a specified level or "floor"; and interest rate collars, under which a party sells a cap and purchases a floor or vice versa in an attempt to protect itself against interest rate movements exceeding given minimum or maximum levels.

**Currency Swaps.**  The Fund may enter into currency swaps for both hedging and non-hedging purposes.  Currency swaps involve the exchange of rights to make or receive payments in specified foreign currencies.  Since currency swaps are individually negotiated, the Fund would expect to achieve an acceptable degree of correlation between its portfolio investments and its currency swap positions.  Currency swaps usually involve the delivery of the entire principal value of one designated currency in exchange for another designated currency.  Therefore, the entire principal value of a currency swap is subject to the risk that the other party to the swap will default on its contractual delivery obligations.  The use of currency swaps is a highly specialized activity which involves special investment techniques and risks.  If the Investment Advisor is  incorrect in its forecasts of market values and currency exchange rates, the Fund's performance  will be adversely affected.  If there is a default by the other party to such a transaction, the Fund  will have contractual remedies pursuant to the agreements related to the transaction.

**Total Return Swaps.**  The Fund may invest in total return swaps with appropriate counterparties.  In a total return swap, one party pays a rate of interest in exchange for the total rate of return on another investment.  For example, if the Fund wished to invest in a senior loan, it could instead enter into a total return swap and receive the total return of the senior loan, less the "funding cost," which would be a floating interest rate payment to the counterparty.

Certain swap agreements into which the Fund enters may require the calculation of the obligations of the parties to the agreements on a "net basis."  Consequently, the Fund's current obligations (or rights) under such swap agreements generally will be equal only to the net amount to be paid or received under the agreement based on the relative values of the positions held by each party to the agreement (the "net amount").  The risk of loss with respect to swaps is limited to the net amount of interest payments that the Fund is contractually obligated to make.  If the other party to a swap defaults, the Fund's risk of loss consists of the net amount of payments that the Fund contractually is entitled to receive.

**Credit Default Swaps.**  The Fund may enter into credit default swaps, as a buyer or a seller. A credit default swap is designed to transfer the credit exposure of a fixed income security between parties.  The buyer in a credit default contract is obligated to pay the seller a periodic stream of payments over the term of the contract provided no event of default with respect to the referenced instrument has occurred. If an event of default occurs with respect to the referenced instrument, the seller must pay the buyer the full notional value ("par value") of the referenced instrument in exchange for the referenced instrument.  If the Fund is a buyer and no event of default occurs, the Fund will have made a stream of payments to the seller without having benefited from the default protection it purchased.  However, if an event of default occurs, the Fund, as buyer, will receive the full notional value of the referenced instrument that may have

little or no value following default.  As a seller, the Fund receives a fixed rate of income throughout the term of the contract, provided there is no default.  If an event of default occurs, the Fund would be obligated to pay the notional value of the referenced instrument in return for the receipt of the referenced instrument.  The value of the referenced instrument received by the Fund, coupled with the periodic payments previously received may be less than the full notional value it pays to the buyer, resulting in a loss of value to the Fund.  Credit default swaps involve different risks than if the Fund invests in the referenced instrument directly.

**Short Sales.**  A short sale involves the sale of a financial instrument that the Fund does not own in the expectation of purchasing the same financial instrument (or a financial instrument exchangeable therefor) at a later date at a lower price.  To make delivery to the buyer, the Fund often must borrow the financial instrument, and the Fund is obligated to return the financial instrument to the lender, which is accomplished by a later purchase of the financial instrument by the Fund.  When the Fund makes a short sale of a financial instrument on a U.S. exchange, it must leave the proceeds thereof with the broker and it must also deposit with the broker an amount of cash or U.S. Government or other securities sufficient under current margin r e g u l a t i o n s  to collateralize its obligation to replace the borrowed securities that have been sold.  If  short sales are effected on a foreign exchange, such transactions will be governed by local law.  A  short sale involves the risk of a theoretically unlimited increase in the market price of the  financial instrument.  The extent to which the Fund engages in short sales depends upon its  investment strategy and perception of market direction.

**Bonds and Other Fixed Income Securities.**   The Fund may invest in bonds and other fixed income securities, both U.S. and non-U.S., and may take short positions in these securities. The Fund will invest in these securities when they offer opportunities for capital appreciation (or capital depreciation in the case of short positions) and may also invest in these securities for temporary defensive purposes and to maintain liquidity. Fixed income securities include, among other securities: bonds, notes, and debentures issued by U.S. and non-U.S. corporations; debt securities issued or guaranteed by the U.S. Government or one of its agencies or instrumentalities ("U.S. Government securities") or by a non-U.S. government; municipal securities; and mortgage-backed and asset backed securities. These securities may pay fixed, variable, or floating rates of interest and may include zero coupon obligations. Fixed income securities are subject to the risk of the issuer's inability to meet principal and interest payments on its obligations (i.e., credit risk) and are subject to price volatility resulting from, among other things, interest rate sensitivity, market perception of the creditworthiness of the issuer, and general market liquidity (i.e., market risk).

The Fund may invest in both investment grade and non-investment grade (commonly referred to  as junk bonds) debt securities. Non-investment grade debt securities in the lowest rating categories may involve a substantial risk of default or may be in default. Adverse changes in economic conditions or developments regarding the individual issuer are more likely to cause price volatility and weaken the capacity of the issuers of non-investment grade debt securities to make principal and interest payments than issuers of higher grade debt securities. An economic downturn affecting an issuer of non-investment grade debt securities may result in an increased incidence of default. In addition, the market for lower grade debt securities may be thinner and less active than for higher grade debt securities.

33

**Depositary Receipts**. American Depositary Receipts (ADRs) as well as other "hybrid" forms of ADRs, including European Depositary Receipts (EDRs) and Global Depositary Receipts (GDRs), are certificates evidencing ownership of shares of a foreign issuer.  Depositary receipts may be sponsored or unsponsored.   These certificates are issued by depository banks and generally trade on an established market in the United States or elsewhere.  The underlying shares are held in trust by a custodian bank or similar financial institution in the issuer's home country.  The depository bank may not have physical custody of the underlying securities at all times and may charge fees for various services, including forwarding dividends and interest and corporate actions.  ADRs are alternatives to directly purchasing the underlying foreign securities in their national markets and currencies.  However, ADRs continue to be subject to many of the risks associated with investing directly in foreign securities.

Although the two types of depositary receipt facilities (unsponsored or sponsored) are similar, there are differences regarding a holder's rights and obligations and the practices of market participants. A depository may establish an unsponsored facility without participation by (or acquiescence of) the underlying issuer; typically, however, the depository requests a letter of non-objection from the underlying issuer prior to establishing the facility.  Holders of unsponsored depositary receipts generally bear all the costs of the facility.  The depository usually charges fees upon the deposit and withdrawal of the underlying securities, the conversion of dividends into U.S. dollars or other currency, the disposition of non-cash distributions, and the performance of other services. The depository of an unsponsored facility frequently is under no obligation to distribute shareholder communications received from the underlying issuer or to pass through voting rights to depositary receipt holders with respect to the underlying securities.

Sponsored depositary receipt facilities are created in generally the same manner as unsponsored facilities, except that sponsored depositary receipts are established jointly by a depository and the underlying issuer through a deposit agreement.  The deposit agreement sets out the rights and responsibilities of the underlying issuer, the depository, and the depositary receipt holders.  With sponsored facilities, the underlying issuer typically bears some of the costs of the depositary receipts (such as dividend payment fees of the depository), although most sponsored depositary receipts holders may bear costs such as deposit and withdrawal fees.  Depositories of most sponsored depositary receipts agree to distribute notices of shareholder meetings, voting instructions, and other shareholder communications and information to the depositary receipt holders at the underlying issuer's request.

Investments in the securities of foreign issuers may subject the Fund to investment risks that differ in some respects from those related to investments in securities of U.S. issuers.  Such risks include future adverse political and economic developments, possible imposition of withholding taxes on income, possible seizure, nationalization or expropriation of foreign deposits, possible establishment of exchange controls or taxation at the source or greater fluctuation in value due to changes in exchange rates.  Foreign issuers of securities often engage in business practices different from those of domestic issuers of similar securities, and there may be less information

publicly available about foreign issuers.  In addition, foreign issuers are, generally speaking, subject to less government supervision and regulation and different accounting treatment than are those in the United States.

**Participation Notes**.  The Fund may invest in Participation Notes (also known as Participation Certificates and Equity Certificates). These give the holder rights without ownership to securities listed on local stock exchanges which have been acquired by the issuer of the Participation Notes, generally a major international investment bank. They are usually listed in Luxembourg or the Cayman Islands. Dividends from the underlying securities are passed through to the holder of the Participation Notes and bonus issues or stock dividends are dealt with by the issue of additional Participation Notes. The holder is at counterparty risk from the issuer of the Participation Notes, and the issuer may make additional charges.  Participation Notes continue to be subject to the risks associated with holding the underlying securities directly.

**Small to Mid Cap Companies**.  The Fund may invest its assets in the securities of small to mid-cap companies.  While the Investment Advisor believes they often provide significant potential for  appreciation, those securities involve higher risks in some respects than do investments in stocks  of larger companies.  For example, prices of small to mid-cap company securities are often more  volatile than prices of large-capitalization stocks and the risk of bankruptcy or insolvency of  many smaller companies (with the attendant losses to investors) is higher than for larger, "blue-  chip" companies.  In addition, due to thin trading in some small to mid-cap company securities,  an investment in those stocks may be illiquid.

**Non-U.S. Investments**.  It is expected that the Fund may invest in securities of non-U.S. companies and foreign countries.  Investing in these securities involves certain considerations not  usually associated with investing in securities of U.S. companies or the U.S. government, including political and economic considerations, such as greater risks of expropriation and nationalization, confiscatory taxation, the potential difficulty of repatriating funds, general social, political and economic instability and adverse diplomatic developments; the possibility of imposition of withholding or other taxes on dividends, interest, capital gain or other income (see "Certain Federal Income Tax Considerations"); the small size of the securities markets in such countries and the low volume of trading, resulting in potential lack of liquidity and in price volatility; fluctuations in the rate of exchange between currencies and costs associated with currency conversion; and certain government policies that may restrict the Fund's investment opportunities.  In addition, accounting and financial reporting standards that prevail in foreign countries generally are not equivalent to United States standards and, consequently, less information is available to investors in companies located in such countries than is available to investors in companies located in the United States.  Moreover, an issuer of securities may be domiciled or may operate in a country other than the country in whose currency the instrument is denominated, thereby increasing the possibility of an adverse impact from currency changes.
The values and relative yields of investments in the securities markets of different countries, and their associated risks, are expected to change independently of each other.  There is also less regulation, generally, of the securities markets in foreign countries than there is in the United States.  In addition, unfavorable changes in foreign currency exchange rates may adversely affect the U.S. dollar values of securities denominated in foreign currencies or traded in non-U.S. markets.  The Investment Advisor may, but is not required to, hedge against such risk, and there is no  assurance that any attempted hedge will be successful.

ERISA and Other U.S. Tax-Exempt Investors.  Investment in the Fund by entities subject to the U.S. Employee Retirement Income Security Act of 1974, as amended ("ERISA") and other tax-exempt entities requires special consideration.  Trustees, administrators or other fiduciaries of such entities are urged to carefully review the matters discussed in this Memorandum. See "Certain Federal Income Tax Considerations" below.

**Discretionary Management.**  Pursuant to the Investment Management Agreement, the Investment Advisor  has sole discretion over the day-to-day management of the Fund's assets; including determining the types of investments the Fund will make and the securities transactions the Fund will engage  in.  Such discretion will be exercised without the consent of the Limited Partners.  Persons who  purchase Interests will not have advance knowledge of or the opportunity to evaluate the  securities in which the Fund will invest.  There can be no assurance that the Fund will be  successful in investing in securities that will meet all of the Fund's objectives.

**Side Letters.**        Certain investors may pay lower fees, have preferential redemption rights, ownership in management companies or have  other unique arrangements with respect to the Fund.  For example, investors providing large or  initial investments in the Fund, investors with multiple business relationships with the Investment Advisor  or its affiliates, and/or employees or affiliates of the Investment Advisor or its affiliate may have  arrangements with respect to their investment in the Fund in which the terms governing their  investments are not the same as the terms described herein.  Such arrangements, sometimes  known as "side letters," are entered into only when they are consistent with the Fund's Limited  Partnership Agreement, and the Investment Advisor determines that it can continue to meet its duties to all  Fund investors.

**Valuation.**  The Partnership Agreement gives to the General Partner (or its designee) the right to determine the Net Asset Value of the Fund, and the Limited Partners do not have the right to an independent determination thereof.

**Lack of Diversification.**  If the Investment Advisor believes it to be in the best interest of the Fund in light  of the Fund's investment objective, a substantial portion of the Fund's portfolio could consist of  securities of companies doing business in one industry, product field or geographic region.  The  assets of the Fund may be inadequate to achieve sufficient diversification of the Fund's  investments.  Diversification does not guarantee against a loss.

**Payment of Fees.**  The Fund intends to pay the Management Fees, administration fees and all of its operating expenses (such as brokerage commissions and legal and accounting fees) out of its cash dividends, interest and trading profits.  There can be no assurance that the operations of the Fund will be profitable, that the Fund will be able to avoid losses or that cash from dividends, interest and trading profits will be sufficient to pay the Fund's expenses.  Further, the Fund will have no source of funds from which to pay distributions to the Limited Partners other than income and gain received on its investments and the return of capital.  Accordingly, to the extent that the Management Fees, administration fees and all of its operating expenses exceed such dividends, interest and trading profits, the Fund will be required to pay expenses out of principal amounts invested by Partners.

**Tax Liabilities.**  The Investment Advisor will not necessarily seek to minimize the tax consequences of  trading in the Fund's portfolio and it should be expected that the Fund will incur short term  capital gains. Gain or loss on the sale or exchange of the Fund's assets will be passed through to  the Limited Partners of the Fund even if all cash proceeds from the sale or exchange are retained  by the Fund and reinvested.  In addition, although cash dividends and interest in excess of the  operating expenses may, in the absolute discretion of the General Partner, be distributed to  Limited Partners, the General Partner intends to retain and reinvest such amounts in the Fund.

Finally, the Fund may incur phantom income tax from its investment strategy. Accordingly, the Limited Partners will likely incur tax liabilities without commensurate disbursements of cash to meet such liabilities.

**Lack of Investment Opportunities.**  The assets of the Fund may exceed the availability of investment opportunities deemed appropriate by the Investment Advisor in light of market conditions, the  objectives of the Fund or the ability and resources of the Investment Advisor to manage a portfolio beyond  a given size.  If an inordinately large portion of the assets of the Fund is held in cash or similarly  liquid form, the performance of the Fund may be adversely affected.

**General Partner's Right to Redeem.**  The General Partner may redeem a portion of its interest in the Fund at any time, without any fee or expense and without the permission or consent of any Limited Partner, so long as its remaining Current Percentage is consistent with applicable regulatory requirements including any minimum amount for the General Partner to remain the Fund's "Tax Matters Partner."

**Risk Associated with Variation of Portfolio Value.**  The Partnership Agreement provides that the General Partner may admit new Limited Partners to the Fund at the beginning of each calendar month or at such other times as the General Partner may permit in its sole discretion.  If new Limited Partners are admitted to the Fund at a time when the existing Limited Partners' Capital Accounts have been reduced due to Fund losses, the new Limited Partners will be entitled  to a larger share of the future profits and losses of the Fund than would be the case if they had  been admitted to the Fund (and had made the same capital contribution) prior to that reduction.

In such event, if the value of the Fund's portfolio were to increase after the admission of such new Limited Partners, a larger portion of the gain attributable to such increase would be allocated  to the new Limited Partners.

**Liability of Limited Partners for Return of Capital.**  Limited Partners are not required to contribute capital to the Fund for any debts of the Fund beyond the purchase price of their respective Interests.  A Limited Partner will be liable to the extent of any distributions he receives, however, if, after such distribution, the remaining assets of the Fund are not sufficient to  pay its then outstanding liabilities, exclusive of liabilities to Limited Partners on account of their  capital contributions and liabilities, if any, to the General Partner, and to the extent that the Delaware Act may require a Limited Partner who receives a return of any part of his contribution to return such distributions to the Fund to discharge the Fund's liabilities to creditors who extended credit to the Fund during the period such contribution was held by the Fund.

**Potential Conflicts of Interest/Management or Advice of other Fund or Accounts.**  The Investment Advisor and its affiliates may manage or advise other investment funds or customer accounts that invest in the Fund or in assets that may also be purchased or sold by the Fund. Because of different objectives or other factors, an asset may be purchased for one or more funds (including the Fund) or accounts managed by the Investment Advisor or one of its affiliates at the same time that the asset may be sold for another fund (including the Fund) or account managed by the Investment Advisor or one of its affiliates.  If the Investment Advisor decides that one or more of such funds (including the Fund) or accounts would be best served by selling a certain type of asset at the same time that one or more of such funds (including the Fund) or accounts would be best served by purchasing the same type of asset, transactions in such assets will be made for the respective funds and accounts in a manner determined by the Investment Advisor to be equitable to all. Further, the Investment Advisor may decide that a customer account or other fund that it advises may be best served by selling its investment in the Fund.  Circumstances may exist in which the purchase or sale of assets for one or more funds or accounts advised by the Investment Advisor or its affiliates or the sale by customers or the Investment Advisor of their investments in the Fund will have an adverse effect on other funds (including the Fund) or accounts advised by the Investment Advisor.

## CONFLICTS OF INTEREST

The General Partner, the Investment Advisor, their respective Affiliates and the Fund will be subject to  actual and potential conflicts of interest.  The General Partner, the Investment Advisor or any of their  officers, directors, partners, managing member(s), members or employees will devote only so  much of their time to the Fund's affairs as deemed necessary or appropriate and are not  prohibited from engaging in any other existing or future business activities.

The General Partner, the Investment Advisor and/or their Affiliates may in the future act as investment  manager of, or adviser to, one or more other registered or unregistered investment companies,  partnerships, corporations, pension or profit-sharing plans, trusts or other entities, or individuals  that have investments which may be substantially similar to the investments of the Fund, or that  employ investment strategies similar to those employed by the Fund.  The advice and investment  recommendations that the General Partner, the Investment Advisor and/or their Affiliates gives to these  other accounts and the securities that the General Partner, the Investment Advisor and/or their Affiliates  buys or sells for these other accounts may differ from the advice and recommendations that the  Investment Advisor gives to the Fund, and the securities bought or sold for the Fund, even if these other  accounts employ substantially the same investment strategies as the Fund.  The General Partner,  the Investment Advisor and/or their Affiliates cannot guarantee that trades for these other accounts will not  be different from or opposite to or entered ahead of trades entered into by or for the Fund.  The  performance of the Fund's investments could be adversely affected by the manner in which the  General Partner, the Investment Advisor and/or their Affiliates enters particular orders for all such accounts.

A potential conflict of interest may arise as a result of the Investment Advisor's management of the Fund  and the Investment Advisor's management of other accounts which, in theory, may allow the Investment Advisor to  allocate investment opportunities in a way that favors the other accounts over the Fund.  This  conflict of interest may be exacerbated to the extent that the Investment Advisor receives, or expects to  receive, greater compensation from its management

of the other accounts than the Fund.  Notwithstanding this theoretical conflict of interest, it is the Investment Advisor's intention to manage each  account based on its investment objectives and related restrictions and the Investment Advisor will adopt  policies and procedures reasonably designed to allocate investment opportunities on a fair and  equitable basis over time and in a manner consistent with each account's investment objectives  and related restrictions, as such conflicts arise.  For example, while the Investment Advisor may buy for another account securities that differ in identity or quantity from securities bought for the Fund,  such an approach might not be suitable for the Fund given its investment objectives and related restrictions.

The Investment Advisor, may, directly or through affiliates, sponsors, administers, manages, or advises certain  other private investment funds.

The Fund and one or more of these other accounts may be prepared to purchase, or may desire to sell, the same security at approximately the same time.  Because of market fluctuations, the prices obtained on such transactions may vary.  In such a case, some accounts would receive the benefit of the more favorable prices while others would not.  In order to more equitably allocate the effects of such market fluctuations, for certain transactions, the Investment Advisor will endeavor to use  an "averaging" or "batching" procedure.  In some cases, it is possible that batching the Fund's  orders with those of other accounts may affect adversely the price paid or received by the Fund  or the size of the position purchased or sold by the Fund, although in many cases, this practice of  batching orders may result in brokerage cost savings and block transactions effected at more  favorable prices.  Any orders placed for execution on an aggregated basis are subject to the  Investment Advisor's order aggregation and allocation policy and procedures.  This policy and these  procedures are designed to meet the legal standards applicable to the Investment Advisor under applicable  federal and state securities laws and its obligations as a fiduciary to each client.

The General Partner, the Investment Advisor, their Affiliates, and any of their respective officers, directors,  partners, managing member(s), members or employees, may invest for their own account in  various investment opportunities, including in investment partnerships, private investment  companies or other investment vehicles.  Such trading and investment activities may be similar  to or different from trading and investment activities of the Fund.  The Investment Advisor is not prohibited  from taking positions on behalf of the Fund in companies in which its partners, officers, or  directors may have invested or may invest in the future, *provided* the investment of Fund assets  is made in good faith in the reasonable belief that the Fund will benefit thereby, and the  investment is believed to be consistent with the Fund's investment objectives.  The Investment Advisor will  not be under any liability for any act or failure to act with respect to its investment advice except  in the absence of good faith.

From time to time, the General Partner, the Investment Advisor or their Affiliates may come into possession  of material, non-public information concerning an entity in which the Fund has invested or  proposes to invest, and applicable law may limit the ability of the Investment Advisor to buy or sell  securities of such entity on behalf of the Fund while such information remains non-public and  material.

Further, the Partnership Agreement gives to the General Partner (or its designee) the right to determine the value of the Fund's assets.  Because the Investment Advisor is compensated based on the  value of the Fund's assets, information provided by the General Partner, which is an Affiliate of  the Investment Advisor, regarding such valuation may present a potential conflict of interest.

## BROKERAGE TRANSACTIONS

The Investment Advisor will be responsible for the placement of the portfolio transactions of the Fund and  the negotiation of any commissions (including dealer spreads) paid on such transactions.  In  placing portfolio transactions, the Investment Advisor will seek to obtain the best net results for the Fund,  taking into account the following factors, among others: the ability to effect prompt and reliable  executions at favorable prices (including the applicable dealer spread or commission, if any); the  operational efficiency with which transactions are effected, taking into account the size of order  and difficulty of execution; the financial strength, integrity and stability of the broker or dealer,  the firm's risk in positioning a block of securities, the quality, comprehensiveness and frequency  of available research services considered to be of value; and the competitiveness of commission  rates in comparison with other brokers satisfying the Investment Advisor's other selection criteria.  The Investment Advisor is under common control with a FINRA broker dealer, CV Brokerage, Inc.  CV Brokerage, Inc. may execute orders on behalf of the Fund provided such services are evaluated utilizing the same criteria the Investment Manager employs for the selection of all brokers.

The Investment Advisor may allocate out of all commission business generated by the Fund and accounts  under its respective management, brokerage business to brokers or dealers who provide brokerage and research services.  These services include, among others, advice, either directly or through publications or writings, as to the value of securities, the advisability of investing in, purchasing or selling securities, and the availability of securities or purchasers or sellers of securities; furnishing of analyses and reports concerning issuers, securities or industries; providing information on economic factors and trends; assisting in determining portfolio strategy; providing computer software and hardware used in security analyses; and providing portfolio performance evaluation and technical market analyses.  Such services are used by the Investment Advisor in connection with its investment decision-making process with respect to the Fund and  accounts managed by it, and may not be used, or used exclusively, with respect to the Fund or  account generating the brokerage.

As provided under the Securities Exchange Act of 1934, as amended, higher commissions are permitted to be paid to broker/dealers who provide brokerage and research services than to broker/dealers who do not provide such services if such higher commissions are deemed reasonable in relation to the value of the brokerage and research services provided.  Although transactions are directed to broker/dealers who provide such brokerage and research services may result in higher commissions, the Investment Advisor believes that such commissions are reasonable in  relation to the value of the brokerage and research services provided.  In some instances, services  may be provided to the Investment Advisor which constitute in some part brokerage and research services  used by the Investment Advisor in connection with its investment decision-making process and constitute in  some part services used by the Investment Advisor in connection with administrative or other functions not  related to their investment decision-making process.   In such cases, the Investment Advisor will make a  good faith

allocation of brokerage and research services and will pay out of its own resources for services used by the Investment Advisor in connection with administrative or other functions not related to its investment decision-making process. Securities transactions for the Fund may be effected in foreign markets which may not allow negotiation of commissions or where it is customary to pay fixed rates.

The Investment Advisor may place a combined order for two or more accounts engaged in the purchase or sale of the same security if the judgment is made that joint execution is in the best interest of each participant and will result in best execution. Transactions involving commingled orders are allocated in a manner deemed equitable to each account. When a combined order is executed in a series of transactions at different prices, each account participating in the order may be allocated an average price obtained from the executing broker. It is believed that the ability of the accounts to participate in volume transactions will generally be beneficial to the accounts and the Fund. Although it is recognized that, in some cases, the joint execution of orders could adversely affect the price or volume of the security that a particular account may obtain, it is the opinion of the Investment Advisor that the advantages of combined orders outweighs the possible disadvantages of separate transactions.

### INVESTOR ELIGIBILITY

The Fund is designed primarily for investors with substantial financial resources. An investment in the Fund is believed to be particularly suitable for investors who have the perspective and financial ability to assume the investment risks involved with an investment in the Fund.

The Fund will rely on the exemption from the definition of "investment company" set forth in Section 3(c)(7) of the 1940 Act, which generally restricts the ownership of Interests to "qualified purchasers." Interests in the Fund will not be registered with the SEC in reliance on Rule 506(b) of Regulation D under the 1933 Act, which generally restricts the ownership of Interests to "accredited investors." As a result, the General Partner must have reasonable grounds to believe that each investor, other than certain "knowledgeable employees" of the Fund within the meaning of Rule 3c-5 under the 1940 Act, is both an "accredited investor" under Rule 501(a) of Regulation D under the 1933 Act and a "qualified purchaser" under Section 2(a) (51) of the 1940 Act and Rule 2a51-1 thereunder. For purposes of the above, the criteria for qualifying as an "accredited investor" and a "qualified purchaser" are provided in Exhibit A. Additionally, the General Partner must believe, based on reasonable grounds, that each purchaser, alone or together with his purchaser representative, has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and economic risks of investment in the Interests. The satisfaction of such standards by a prospective investor does not necessarily mean that an investment in the Fund is a suitable investment for such person. The General Partner has the absolute right to revoke any offer made hereunder and to refuse to sell Interests to any prospective purchaser, whether or not such purchaser satisfies the conditions described in this section.

The General Partner will require certain written information concerning the prospective purchaser's income, net worth and experience in financial and business matters.

## ADMISSION OF LIMITED PARTNERS

Persons interested in subscribing for Interests will be furnished with Subscription Documents  that should be completed and returned to: Broad Reach Capital, LP, c/o Broad Reach Partners, LLC, 200 Four Falls, Suite 211, 1001 Conshohocken State Road, West Conshohocken, PA  19428.

Each person who subscribes for Interests by executing the Subscription Documents, and is approved by the General Partner, will be admitted as a Limited Partner of the Fund.  Completed Subscription Documents and payment must be received in good form from the prospective investor indicated in the Subscription Documents no later than five Business Days prior to admission to the Fund, unless waived by the General Partner.  Payment for Interests may be made by wire transfer or in such other  manner as the General Partner may determine. Subscribers who purchase Interests generally will  be admitted on the first Business Day of the calendar month following the General Partner's  acceptance of the Subscription Documents.  In order to be admitted on the first Business Day of  the calendar month, a subscriber's payment for Interests must be received, and available for use,  by the General Partner (or its designee) at least five (5) Business Days prior to the first Business  Day of such calendar month, unless waived by the General Partner.  No interest will be paid on monies held pending investment in the  Fund. The General Partner reserves the right to accept or reject any subscription for Interests by  a prospective investor, or any additional Capital Contribution by a Limited Partner, in whole or  in part, in its sole discretion.

The execution of the Subscription Agreement by a prospective investor constitutes a binding offer to purchase Interests and an agreement to hold such investor's offer open until the subscription is accepted or rejected by the General Partner.  The execution of the Subscription Agreement and its acceptance by the General Partner together constitute an agreement by such prospective investor to be bound by the terms of the Subscription Agreement and the Partnership Agreement.  By execution of the Partnership Agreement (personally or by attorney-in-fact), each Limited Partner appoints the General Partner as its attorney-in-fact to make, execute, sign, acknowledge and file:  (1) a certificate or amended certificate of limited partnership under the laws of the State of Delaware; (2) all instruments which the General Partner deems appropriate to reflect any amendment, change or modification of the Fund in accordance with the terms of the Partnership Agreement; (3) all such other instruments, documents and certificates which may from time to time be required by the laws of the State of Delaware, the United States of America or other jurisdictions; (4) all applications, certificates, certifications, reports or similar instruments or documents required to be submitted by or on behalf of the Fund to any governmental or administrative agency or body or to any securities or commodities exchange, board of trade, clearing corporation or association or similar institution or to any other self-regulatory organization or trade association; (5) any business certificate, fictitious name certificate, amendment thereto or other instrument or document of any kind necessary, advisable, incidental or convenient to the business, purposes and objectives of the Fund, or required by any applicable federal, state or local law; and (6) all papers which may be deemed necessary or desirable by the General Partner to effect the dissolution and liquidation of the Fund.

## MINIMUM SUBSCRIPTION

The minimum initial Capital Contribution of a Limited Partner to purchase Interests of the Fund

is $1,000,000, subject to the discretion of the General Partner to make exceptions.  Additional Capital Contributions for Interests of the Fund will be permitted with a minimum of $250,000 incremental investment, subject to the discretion of the General Partner to make exceptions.

## RESTRICTIONS ON TRANSFERABILITY

The Interests have not been registered or qualified under the 1933 Act or any securities laws of any jurisdiction and are being offered and sold in reliance upon one or more exemptions from such registration requirements.  Pursuant to such exemptions, no investor may resell or dispose of his Interests unless it is registered and qualified under all applicable securities laws or, in the opinion of counsel acceptable to the General Partner, an exemption from such requirements is available and permitted by the Partnership Agreement.  In addition, no Interests or parts thereof may be transferred by an investor in the absence of the General Partner's prior written consent.

Such exemptions are not available if any purchaser acquires Interests with a view to the resale or other disposition thereof.  Each prospective purchaser, when executing the Subscription Agreement and/or the Partnership Agreement, will be required to acknowledge that the purchase of the Interests is for investment, for its own account and without any view to the resale or other disposition thereof.

The Partnership Agreement imposes substantial restrictions, including the approval of the General Partner in its sole discretion, on the transfer by a Limited Partner of his or her Interests in the Fund by way of assignment of rights, either with or without substitution of the assignee as a Limited Partner.  The death, incompetency, bankruptcy, dissolution, or other cessation to exist as a legal entity of a Limited Partner will not, in and of itself, dissolve the Fund.  Because of the limitation on the number of holders that may own Interests, or for any other reason in its sole discretion, the General Partner could deny a transfer of a Limited Partner's interest by a legal representative or successor of a Limited Partner for the purpose of settling its estate or administering its property.  Any transfer or assignment of Interests made or attempted to be made in contravention of the restrictions contained in the relevant Partnership Agreement is void and of no effect.

## CONVERSION TO A REGISTERED INVESTMENT COMPANY

The Fund is not making and does not presently propose to make a public offering of its securities; however, the General Partner, in its sole discretion, may decide to offer the Fund securities to the public in the future.  In connection with such proposal, the Fund will register as an investment company under the 1940 Act.  Alternatively, the General Partner may, without the approval of the Limited Partners, cause the Fund to reorganize into a newly formed investment company (or series thereof) registered under the 1940 Act.

## REDEMPTIONS

Each Limited  Partner generally may redeem all or a portion of its Interests quarterly on at least 30 days' prior written notice.  The General Partner may, in its sole discretion,  waive such notice period with respect to any Limited Partner without the consent of any other  Limited Partner.

The General Partner may redeem a portion of its interest in the Fund at any time, without any fee or expense and without the permission or consent of any Limited Partner, so long as its remaining Current Percentage (as defined below) is consistent with applicable regulatory requirements including any minimum amount for the General Partner to remain the Fund's "Tax Matters Partner."

The "Current Percentage" of any Partner with respect to any fiscal period means the percentage derived by dividing (a) the balance in such Partner's capital account (including all capital sub-accounts) as of the beginning of such period by (b) the total of all balances in all Partners' capital accounts (including all capital sub-accounts) as of the beginning of such period.  Partial redemptions of amounts of less than $25,000 will not be permitted, unless otherwise determined by the General Partner in its sole discretion.  Further, partial redemptions of a Limited Partner's Capital Account shall not be permitted if, after taking into account the requested redemption, a Limited Partner's Capital Account would be less than $100,000, unless otherwise determined  by the General Partner in its sole discretion.

As promptly as reasonably possible after the start of the calendar quarter subsequent to the relevant redemption date, following the General Partner's acceptance of a Limited Partner's request for redemption of all or any portion of its Interests, the Fund will pay at least 95% of the amount of the redemption, with the balance to be paid, without interest or other return from the Fund's investments (from the applicable redemption date forward), promptly following the later of (i) the completion of the Fund's audited financial statements for such fiscal year or (ii) the determination by the General Partner of any relevant withholding tax amounts for such year, *provided, however, that* if the aggregate amount of redemption requests received from Limited Partners in any given quarter exceeds 25% of the Fund's Net Asset Value, the General Partner reserves the right to limit redemptions in respect of such quarter to 25% of the Fund's Net Asset Value.  In any such instance, redemptions will be allocated to redeeming Limited Partners on a *pro rata* basis, and, with respect to that portion of the amount of any redemption request not paid to a Limited Partner as a result of the limitation on redemptions to 25% of the Partnership's Net Asset Value for such quarter, such redemption request shall be deemed a request by such Limited Partner for redemption of such portion of such amount as of the last day of the immediately succeeding calendar quarter.

**The General Partner may at any time suspend or delay the rights of redemption described earlier, before or after notice of redemption has been given by any one or more Limited Partners, (i) in the event that it determines that the requested redemptions would have an adverse effect on the non-redeeming Limited Partners or the tax status of the Fund or would exceed the Fund's ability to obtain liquidity from the underlying funds in which the Fund invests or (ii) for any other reason if the General Partner believes it is in the best interests of the Fund.**

If a Limited Partner redeems all or any portion of its Interests, then, in the General Partner's discretion, ordinary income or loss, or long- or short-term capital gain or loss, recognized by the Fund in the fiscal year in which such redemption occurs shall be allocated to such Limited Partner solely for U.S. federal income tax purposes up to an amount equal to either of the following amounts:  (i) if the Fund has recognized ordinary income or capital gains (including short-term capital gains) in the fiscal year in which such redemption occurs, the excess of the

amount to be distributed to such Limited Partner upon, and as of the time of, such redemption over such Limited Partner's tax basis in its redeemed Interests (or portion thereof, as applicable) as of the time of such redemption (or, if greater, the excess of the amounts previously allocated to such Limited Partner's capital account over the amounts previously allocated to such Limited Partner for U.S. federal income tax purposes), or (ii) if the Fund has recognized ordinary or capital losses (including short-term capital losses) in the fiscal year in which such redemption occurs, the excess of such Limited Partner's tax basis in its redeemed Interests (or portion thereof) as of the time of such redemption over the amount to be distributed to such Limited Partner upon, and as of the time of, such redemption (or, if greater, the excess of the amounts previously allocated to such Limited Partner for U.S. federal income tax purposes over the amounts previously allocated to such Limited Partner's capital account).

Redemption proceeds normally will be paid in cash, although the General Partner may in its discretion make the redemption distribution, entirely or partially, in kind.

The General Partner may establish reserves for estimated accrued expenses, liabilities and contingencies that could reduce the amount of a distribution upon redemption.

## SUSPENSION OF REDEMPTIONS; SUSPENSION OF THE DETERMINATION OF NET ASSET VALUE

The General Partner may suspend redemption rights, in whole or in part, or suspend the determination of Net Asset Value (i) during any period in which any stock exchange on which a substantial portion of the Fund's investments are quoted is closed, other than for ordinary holidays and weekends, or during periods in which dealings in such stock exchange are restricted or suspended; (ii) during any period in which, in the opinion of the General Partner or the Investment Advisor, disposal of a substantial portion of investments by the Fund would not be reasonable or practical; (iii) during any breakdown in the means of communication normally employed in determining the price or value of any Fund investment or current prices in any securities market, or when for any other reason the prices or values of any investments owned by the Fund cannot be reasonably or promptly ascertained; (iv) during any period in which the transfer of funds involved in the realization or acquisition of any investments by the Fund cannot be effected at normal rates of exchange; (v) when there exists in the opinion of the General Partner or the Investment Advisor a state of affairs where disposal of the Fund's assets would not be reasonably practicable or would be seriously prejudicial to the non-redeeming investor; and (vi) for any period during which the redemption of Interests would cause a breach or default under any covenant in any agreement entered into by the Fund for borrowing for cash management purposes.

The General Partner may suspend the payment of redemption proceeds of any investor if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering or other laws and regulations applicable to the Fund, the Investment Advisor, or any of the Fund's service providers.

Any suspension of redemptions or the determination of Net Asset Value, as the case may be, will take effect at such time as the General Partner will declare and, thereafter, there will be no redemptions or determination of Net Asset Value, as the case may be, until the General Partner declares any such suspension to be at an end.

All investors will be notified in writing by the Administrator of any suspension of redemptions or determination of Net Asset Value, or of any reinstatement following a suspension thereof, within ten days of such suspension or reinstatement.

## DISTRIBUTIONS

The General Partner may make  distributions at such times and in such amounts as it deems necessary, appropriate or reasonable, in its sole and absolute discretion.  Notwithstanding the foregoing, the General Partner currently intends to distribute Net Profits, if any, monthly.

## ALLOCATION OF PROFITS AND LOSSES

It is generally intended that items of  income, deduction, gain and loss for federal income tax purposes will be allocated among the  Partners based upon each Partner's respective Ownership Percentage.  The General Partner may  establish separate sub-accounts of a Capital Account of any or all Limited Partners solely for  record-keeping purposes and to comply with FINRA rules regarding New Issues and other  similar rules.  If applicable, appreciation and depreciation from New Issues and other FINRA  restricted investments will be allocated only to Limited Partners eligible to participate therein.

Each investor should carefully review the Partnership Agreement in its entirety to understand how such Fund will allocate items of income, gain, loss and deduction.  An individual Capital Account will be established and maintained for each Partner.  As of the commencement of each Accounting Period, an opening Capital Account will be established for each Partner, which for the Accounting Period in which such Partner was admitted to the Fund will be an amount equal to its initial Capital Contribution, and for each Accounting Period thereafter will equal the closing Capital Account of such Partner for the immediately preceding Accounting Period.  At the conclusion of each Accounting Period, closing Capital Accounts will be determined for the Partners by adjusting their opening Capital Accounts for any Net Capital Appreciation or Net Capital Depreciation allocated to such Partner for such Accounting Period as well as for any contributions, redemptions or other allocations made during such Accounting Period.   All matters concerning allocations among the Partners and accounting procedures not expressly provided by the Partnership Agreement are to be determined by the General Partner.

## ORGANIZATIONAL EXPENSES

The General Partner has not received any fee for organizing the Fund. The Fund will bear, directly or by reimbursing, the General Partner or its Affiliates for its organizational expenses.  Organizational expenses may be amortized over sixty (60)  months for tax and accounting purposes.

## OTHER EXPENSES

The Investment Advisor will be responsible for and shall pay, or cause to be paid, its ordinary office overhead expenses incurred in rendering its services to the Fund, which include rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures, payroll taxes, travel expenses and compensation of investment personnel and other personnel.

Subject to voluntary waiver or reimbursement by the General Partner or its Affiliates, the Fund will bear or will reimburse the General Partner or its Affiliates for:  (i) the offering expenses of the Fund; (ii) all expenses incurred in connection with actual and potential investments,

including but not limited to, travel, brokerage commissions and other transaction costs, clearing and settlement fees, custodial fees, research and technical service expenses, all fees and expenses relating to the registration and qualification for sale of such securities and all transfer taxes, and legal and accounting fees; (iii) all filing and recording fees; (iv) all federal, state and local taxes payable by the Fund; (v) all costs, fees and expenses relating to accountings and the preparation and mailing of financial, tax and performance reports to the Fund, including the allocable share of the costs, fees and expenses relating to internal accounting and tax preparation functions should the General Partner determine not to use third-party providers for such services; (vi) all fees and disbursements of attorneys, accountants, advisers and consultants for work relating to the Fund; (vii) any other direct fees or expenses of the Fund; (viii) premiums for directors' and officers' liability insurance (if any); (ix) Management Fees, if any; (x) fees and expenses of the Administrator; (xi) expenses related to the maintenance of the Fund's registered office, corporate licensing, and other similar expenses related to the Fund; (xii) litigation and other extraordinary expenses of the Fund and (xiii) all interest expense of the Fund, if any.

There may also be expenses incurred by the Fund as a result of complying with future legislative or administrative changes or court decisions that affect the Fund's operations.

## **VALUATION**

The Net Asset Value of the Fund equals the aggregate value of the underlying funds plus any cash or other assets as of the close of business on the applicable valuation date less all accrued expenses (including accrued Management Fees and Performance Allocation, if any) and liabilities of the Fund (including any borrowings) and any contingencies for which reserves are reasonably determined to be required.

Under normal conditions, the Fund's Net Asset Value is calculated by the Administrator in accordance with the Partnership Agreement and U.S. GAAP, as of the close of business on the applicable valuation date, as described below.

The Net Asset Value per Interest of each series is calculated separately in respect of each series by dividing the Net Asset Value of the series by the total number of Interests of such series outstanding. The initial Net Asset Value of each series equals the aggregate issue price of the Interests of such series.

Thereafter, the Net Asset Value is (i) increased or decreased on each valuation date by any increase or decrease in the Net Asset Value of such series for the period ending on such date based on the proportion which the Net Asset Value of such series as of the immediately preceding valuation date represents of the Net Asset Value of the Fund on such immediately preceding valuation date (in each case, after taking into account subscriptions for Interests of such series occurring on or after such preceding valuation date), and (ii) decreased by the amount of the proceeds of any redemption of Interests of such series; provided that any change to the Net Asset Value of the Fund attributable to the Performance Allocation attributable to any series is allocated to that series.

The Net Asset Value of the Fund on any date is determined, in large part, on information regarding the Fund's assets provided by the underlying funds. The value of an underlying fund is recorded at its value as determined in good faith by the Administrator in accordance with U.S.

GAAP and the Administrator may rely upon the direction of the General Partner or the Investment Advisor, on values provided by such underlying fund and as otherwise described below.

In calculating the Net Asset Value of the Fund, the Administrator will use the value of each underlying fund as most recently reported to the Administrator by the underlying fund's Manager, administrator or other valuation agent. If actual values are not available, the Administrator may use estimated values for underlying funds as reported by the underlying fund's Manager, administrator or other valuation agent or if no estimate is provided or if the Investment Advisor determines that the value or estimated value of the underlying fund as determined in accordance with the foregoing policies does not represent the appropriate value, the Investment Advisor may value such investment positions at fair value as it reasonably determines.

The Investment Advisor may establish reserves and/or holdbacks for estimated accrued expenses, liabilities and contingencies (even if such reserves or holdbacks are not otherwise in accordance with U.S. GAAP). The Investment Advisor, the Fund and the Administrator will be absolutely protected in relying on the valuations furnished by third parties, provided that such reliance is consistent with the applicable standard of care.

The Administrator is expressly authorized to compute the Net Asset Value based on estimates and unaudited financial information. Furthermore, the Fund is not obligated to restate Net Asset Value determinations previously made in order to reflect the difference between estimated and final Net Asset Values, but rather may, but has no obligation to, reflect such difference entirely in the accounting period in which the amount of such difference is determined. In the event that estimated value supplied by an underlying fund's Manager, administrator or other valuation agent, or the estimates used by the Investment Advisor, later prove to be materially incorrect, the Investment Advisor may: (i) after consultation with the General Partner, instruct the Administrator to adjust the number of Interests held by a Limited Partner and, where practicable, the redemption proceeds payable or to be paid to a Limited Partner who has elected to redeem and (ii) adjust the Investment Advisor's fees by rebating to the Fund a portion of such fees.

The General Partner may, but has no obligation to, delay the determination of Net Asset Value as of any valuation date — and the associated effective dates for purchases and redemptions of Interests, as applicable — if the Investment Advisor determines that, as of such valuation date, a material portion of the Fund's investment assets cannot be valued. In such event, the Fund will give notice as soon as reasonably practicable of any such postponement to the Limited Partners.

All values assigned to the Fund's assets are subject to the ultimate supervision of the General Partner, and are final, binding and conclusive on the Limited Partners. Expenses of the Fund, including the fees payable to the Administrator, are accrued monthly and taken into account for the purpose of determining Net Asset Value.

## ERISA AND TAX-QUALIFIED PLAN CONSIDERATIONS

**Prudence and Diversification.**   Before authorizing an investment in Interests of the Fund, fiduciaries of a pension, profit sharing or other employee benefit plans subject to the fiduciary duty provisions under Title I of ERISA (each, an "ERISA Plan") should consider (i) whether the investment in such Interests satisfies the prudence and diversification requirements of Section 404 of ERISA, (ii) whether such fiduciaries have authority to acquire such Interests under the appropriate plan investment policies and governing instruments and under Title I of ERISA and (iii) whether the investment will result in unrelated business taxable income to the plan (see "Certain Federal Income Tax Considerations").   Fiduciaries of an individual retirement account ("IRA"), a Keogh plan or other plan within the meaning of Section 4975(e)(1) of the Code that is not otherwise subject to Title I of ERISA (each, a "Tax-Qualified Plan" and, together with ERISA Plans, each a "Plan") should consider that a Tax-Qualified Plan may only make investments that are authorized by the appropriate governing instrument.

**Prohibited Transactions**.   Any fiduciary of an ERISA Plan, a Tax-Qualified Plan or any entity the assets of which constitute assets of any ERISA Plan or Tax-Qualified Plan (collectively "Plans") should also consider whether the investment is a non-exempt prohibited transaction under Section 406 of ERISA and/or Section 4975 of the Code.   Generally, prohibited transactions are certain transactions involving "plan assets" with persons who are "parties in interest" as defined under ERISA or "disqualified persons" as defined under the Code with respect to any such Plan.   These prohibited transaction provisions are complex and may prohibit a purchase of Interests.

**Plan Assets**.   ERISA generally requires that the assets of ERISA Plans be held in trust and that the trustees, a named fiduciary or a duly authorized investment manager (within the meaning of Section 3(38) of ERISA) have exclusive authority and discretion to manage and control the assets of the plan.   ERISA imposes certain fiduciary responsibility rules on persons who are fiduciaries of ERISA Plans.   Such rules include the prohibited transaction provisions, which restrict the manner in which fiduciaries may deal with the assets of an ERISA Plan.   The Code applies similar prohibited transaction provisions to Tax-Qualified Plans.

In 1986, the Department of Labor ("DOL") issued a final regulation defining "plan assets" under ERISA (the "Final Regulation").   The Final Regulation was subsequently modified by the Pension Protection Act of 2006 ("PPA").   The Final Regulation, as amended, generally provides that when a Plan acquires an equity interest in an entity that is neither a "publicly-offered security" nor a security issued by an investment company registered under the 1940 Act, the assets of the Plan include both the equity interest and an undivided interest in each of the underlying assets of the entity, unless it is established either that the entity is an "operating company" or that equity participation in the entity by "benefit plan investors" is not "significant" (the "25% Exception"), in each case as defined in the Final Regulation, as amended.   The enactment of the PPA limits the definition of "benefit plan investor", which was previously broadly defined, to include only ERISA Plans, Tax-Qualified Plans and entities deemed, under the Final Regulation as modified by the PPA, to hold assets of either an ERISA Plan or Tax-Qualified Plan.

The Fund currently intends to meet the 25% Exception.   Under the 25% Exception, the assets of the Fund will not be deemed to be assets of a Plan investing in the Fund if less than 25% of each

49

class of equity interests in the Fund is held in the aggregate by benefit plan investors. For purposes of the 25% rule, the interest of any person (other than a benefit plan investor) who has discretionary authority or control with respect to the assets of the Fund, or who provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliates of such a person, are disregarded. In order to insure that the assets will not be considered "plan assets," the Fund intends to limit the equity participation of benefit plan investors to less than 25% in the aggregate of the value of each class of equity interest (excluding the holdings of the General Partner and its Affiliates). However, the Fund reserves the right to either permit benefit plan investors to acquire 25% or more of any class of the Fund's Interests or to redeem Interests owned by benefit plan investors in order to maintain the 25% Exception.

In any event, if the 25% threshold is reached and the assets of the Fund are deemed to be assets of a Plan investing in the Fund, the Investment Advisor would be deemed to have authority and discretion to manage and control assets of all investing Plans, with the following consequences: (a) the prudence and diversification standards, prohibited transaction rules, bonding requirements and other provisions of Part 4 of Title I of ERISA applicable to investments by any ERISA Plans and their fiduciaries would extend to the actions of the Investment Advisor with respect to the Fund, including investments by the Fund, which may adversely affect the Investment Advisor's management of the Fund,
(b) certain transactions that the Fund has entered into or might seek to enter into might constitute non-exempt "prohibited transactions" under ERISA or the Code, subject to a requirement that such transactions may be rescinded and result in potential penalties or excise tax liability and other fiduciary liability of the Fund, (c) financial information concerning the Fund would be required to be reported annually to the IRS and DOL and (d) co-fiduciary responsibility would arise between the fiduciaries of any investing ERISA Plan and the Investment Advisor, because the Investment Advisor would be deemed to be a "plan fiduciary" to such ERISA Plans.

**Decision to Invest in Interests.** Certain prospective Plan investors may currently maintain relationships (*i.e.*, investment management, investment advisory or other services) with the General Partner (or an Affiliate thereof). Each such affiliated person may be deemed to be a party in interest (or disqualified person) and/or a fiduciary with respect to such prospective Plan investor. Generally, ERISA prohibits (and the Code penalizes) the use of Plan assets for the benefit of a party in interest (or disqualified person) and also prohibits (or penalizes) a Plan fiduciary for using its position to cause a Plan to make an investment from which the fiduciary or a third party in which the fiduciary has an interest would receive a fee or other consideration. Accordingly, fiduciaries of Plans will be required to represent that the decision to invest in the Fund was made by a fiduciary independent of such affiliated persons, that such fiduciaries are duly authorized to make such investment decisions and that they have not relied upon any individualized advice or recommendation of such affiliated persons as a primary basis for the decision to invest in the Fund.

It is the responsibility of any fiduciary or other person with investment responsibilities over the assets of a Plan considering an investment in Interests of the Fund to see that the above factors have been carefully considered before making an investment. Moreover, because the provisions of ERISA and the related provisions of the Code are highly technical and subject to extensive and varying administrative and judicial interpretation and review, Plans considering an investment in the Fund should consult with their own counsel and advisors regarding the impact of ERISA and the related provisions of the Code.

In addition to the above limitations, the Investment Advisor, in its sole discretion, may limit or exclude any investments by a Plan where the participants of such plan have the ability to self-direct investments.

## CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

**CIRCULAR 230 NOTICE. THE FOLLOWING NOTICE IS BASED ON U.S. TREASURY REGULATIONS GOVERNING PRACTICE BEFORE THE U.S. INTERNAL REVENUE SERVICE: (1) ANY U.S. FEDERAL TAX ADVICE CONTAINED HEREIN IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED BY ANY TAXPAYER, FOR THE PURPOSE OF AVOIDING U.S. FEDERAL TAX PENALTIES THAT MAY BE IMPOSED ON THE TAXPAYER; (2) ANY SUCH ADVICE IS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED HEREIN; AND (3) EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

General.  The following is a summary of the federal income tax principles applicable to the Fund, based on the Code, the Regulations and published rulings and court decisions currently in effect.  All of these authorities are subject to change (possibly retroactive) by legislative or administrative action.  Furthermore, particularly in view of the complexities of the income tax laws applicable to partnerships and securities transactions, and since no attempt is made herein either to mention all of the tax considerations which should be taken into account in evaluating a potential investment in the Fund or to provide a complete explanation of those issues which are summarized, a person considering investing in the Fund should consult his or her own tax advisor in order to understand fully the federal, local and foreign income tax consequences of such investment in his particular situation.  The Fund has not sought a ruling from the Internal Revenue Service or similar state or local authority with respect to any of the tax issues affecting the Fund, nor have they obtained an opinion of counsel with respect to any federal, state or local tax issues.

Except as specifically indicated, the following general discussion assumes that each investing Limited Partner is an individual who is a U.S. citizen or resident that is not tax-exempt and that each investing Limited Partner holds its Interests as capital assets and is the initial holder of such Interests.  Except as specifically indicated, the following discussion does not deal with the consequences of the ownership of Interests in the Fund by special classes of holders such as banks, thrifts, insurance companies, governmental entities, dealers, traders in securities that elect to mark their securities portfolios to market and other investors that do not own their Interests as capital assets.  No representation is made as to the tax consequences of the operation of the Fund. Furthermore, given the Fund's investments in underlying funds, the tax treatment of each investing Limited Partner from its investment in the Fund will be dependent on the underlying funds' investment activity and decisions over which the Fund has no influence.  Accordingly, it is not possible to predict with any degree of certainty the tax consequences to an investing Limited Partner from its investment in the Fund.

Tax Classification as a Partnership.  Under current law, a limited partnership with two or more partners established under state law will be classified as a partnership unless it affirmatively elects to be classified as an association taxable as a corporation by notifying the IRS.  The Fund does not intend to elect to be classified as an association taxable as a corporation.  Furthermore,

the General Partner of the Fund believes that the Fund will be taxable as a partnership for Federal income tax purposes and not as an association taxable as a corporation or a "publicly-traded partnership," and, therefore, as an entity will not be subject to any Federal income tax. This belief is based in part upon the expectation that at least 90% of the gross income of the Fund will be passive in nature and that the Fund will not register under the 1940 Act. However, given the Fund's investment strategy and investments in underlying funds there can be no assurance that the Fund will be able to always comply with the 90% passive income expectation and no ruling from the IRS with respect to partnership status has been or will be sought.  In the absence of such a ruling, there can be no assurance that the IRS will not successfully contend that the Fund should be treated as an association taxable as a corporation.

If the Fund should at any time be classified as an association taxable as a corporation, the investing Limited Partners would not be treated as partners for tax purposes, income or loss of the Fund would not be passed through to the Limited Partners and the Fund would be subject to tax on its income at the rates applicable to corporations.  In addition, all or a portion of distributions made by the Fund to its Limited Partners could be taxable to them as dividends (to the extent of current or accumulated earnings and profits) or capital gains, while none of those distributions would be deductible by the Fund in computing its taxable income.  Any such recharacterization would reduce the after-tax return to a Limited Partner from its investment in the Fund.

The discussion in the following paragraphs assumes the Fund will be treated as a partnership for Federal income tax purposes.

<u>Taxation of Fund Operations - General</u>.  As a partnership, the Fund itself will not be subject to federal income tax. The Fund will file an annual partnership information return, which will report the results of its operations.  Each Partner of the Fund will be required to report separately on his or her own income tax return his distributive share of the Fund's net long-term capital gain or loss, net short-term capital gain or loss, net ordinary income (including dividends and interest received) or deduction, and various other categories of income, gain, loss, deduction and credit.  However, various loss limitations may prohibit Limited Partners from including distributive shares of Fund losses on their individual tax returns.

Each Partner's distributive share of Fund items of income, deduction, gain, loss or credit will be determined in accordance with the allocation provisions of the Fund's Partnership Agreement. All matters concerning the allocation of profits, gains and losses among the Limited Partners, including taxes thereon, and accounting procedures, not expressly provided for by the terms of the Partnership Agreement will be determined by the General Partner, whose determination will be final and conclusive as to all of the Limited Partners.

The Fund believes that its allocations of Fund tax items among the various Partners will be upheld under the provisions of the Code and Treasury Regulations dealing with tax allocations by partnerships.  However, if it were determined that an allocation made by the Fund with respect to a particular item did not have "substantial economic effect" (within the meaning of the Code and Treasury Regulations) and was not in accordance with the Partners' interests in the Fund, taking into account all the facts and circumstances, that item could be allocated, for tax purposes, in a different manner.  In some circumstances, this could result in a Partner recognizing a greater or smaller amount of loss, deduction, gain or income than he would have

recognized under the allocation made by the Fund or in such Partner recognizing an amount of loss, deduction, gain or income at a different time than he would have recognized such amount under the allocation made by the Fund.

Under the authority granted by the Partnership Agreement, the General Partner of the Fund may (in the absence of a Section 754 election, which due to such an election's associated administrative and financial burdens is not expected to be made) elect in its sole discretion to specially allocate taxable income or loss to a withdrawing Limited Partner in order to equalize, to the extent possible, the value of the withdrawing Limited Partner's capital account with the income tax basis of his interest in the Fund. Absent such a special allocation, unrealized gains (or losses) that have economically accrued to the benefit (or detriment) of the withdrawing Limited Partner might be taxed to the remaining Partners. While this special allocation would provide a result, which would be more equitable and more reflective of economic reality, there can be no assurance that the IRS would accept such an allocation.

A Partner in the Fund will be subject to tax on his or her distributive share of the Fund's taxable income or loss regardless of whether he has received or will receive any distribution of cash from the Fund. Since the Fund does not intend to make distributions of cash prior to dissolution, except for limited redemption rights, Limited Partners will likely be allocated taxable income during the life of the Fund without receiving corresponding cash distributions.

<u>Taxation of Partnership Operations - Securities Transactions</u>. The taxation of securities transactions (including transactions in commodities) is extremely complex and no attempt is made herein to fully describe the various tax rules that apply to such transactions or to explain in complete detail those rules which are mentioned. However, some general points may be noted.

Preferential tax treatment is accorded the net long term capital gains of individual taxpayers. Net long term capital gains are currently taxed at a stated maximum rate of 20% (for most assets held for more than twelve months) in lieu of a stated maximum rate of 39.6% for ordinary income. However, because the receipt of additional income (whether capital gain or ordinary income) may result in the loss of the use of itemized deductions and the deduction for personal exemptions, the true effective marginal rate of taxation may be somewhat higher than the stated maximum rate. The capital losses of a noncorporate taxpayer will offset capital gains and any excess of capital losses over capital gains will offset ordinary income to the extent of $3,000 per year, with the unused capital losses being carried forward to other years, subject to certain limitations.

For corporate taxpayers, all net capital gains, whether long-term or short-term, are taxed at the corporation's regular tax rate. For such taxpayers, capital losses may only offset capital gains, but unused capital losses may be carried backwards and forwards to other years, subject to certain limitations.

If considered advantageous, the Fund may elect pursuant to Code Section 475 to mark to market securities positions that are held by the Fund in connection with acting as a trader in securities. Such an election would apply to the taxable year for which made and all subsequent taxable years unless revoked with the consent of the Internal Revenue service. Securities covered by such election would be treated as if sold for their fair market value at the close of the taxable year (if not disposed of earlier). Any gain or loss resulting from actual and deemed sales of

such securities would then be treated as ordinary income or loss. Gain or loss recognized as a result of a Section 475 election might affect the amount, as well as the character (i.e., as ordinary rather than capital) of income that a Limited Partner is required to recognize in a particular year. Since for federal income tax purposes capital losses generally may be deducted only against capital gains, a Partner may be unable to deduct capital losses realized from other investments and transactions in a taxable year against his share of the Fund's income.

The Fund may recognize ordinary income from a variety of different sources. The Fund will recognize ordinary income from dividends and accruals of interest on securities. Furthermore, the Fund may hold debt obligations with "original issue discount." In such case, the Fund would be required to include constructive interest payments in taxable income on a current ratable basis even though receipt of such amounts may occur in a subsequent year. Similar rules may also apply to certain types of preferred stock held by the Fund. The Fund may also acquire debt obligations with "market discount." Upon disposition of such an obligation, the Fund generally would be required to treat gain realized as interest income to the extent of the market discount which accrued during the period the debt obligation was held by the Fund. Income or loss from transactions involving certain derivative instruments, such as swap transactions, will also generally constitute ordinary income or loss. In addition, amounts, if any, payable by the Fund in connection with equity swaps, interest rate swaps, caps, floors and collars could be considered "miscellaneous itemized deductions" which, for a noncorporate Partner, may be subject to restrictions on their deductibility. See the discussion below under the heading "Deductibility of Certain Fund Expenses by Individual Partners." Finally, capital assets of the Fund held for a year or less will generate short term capital gain or loss upon sale. Short term capital gain is generally taxable at ordinary income rates.

*Section 1256 Contracts.* In the case of "section 1256 contracts," the Code generally applies a mark-to-market system of taxing unrealized gains and losses on such contracts and otherwise provides for special rules of taxation. A section 1256 contract includes certain futures contracts (including certain stock index futures), certain foreign currency contracts, and certain options contracts (including certain options on stock index futures). Under these rules, section 1256 contracts held by the Fund at the end of each taxable year would generally be treated for federal income tax purposes as if they were sold for their fair market value on the last Business Day of such taxable year. The net gain or loss, if any, resulting from such deemed sales, together with any gain or loss resulting from actual sales of section 1256 contracts, must be taken into account by the Fund in computing its taxable income for such year. This is true even though the Fund would not actually have received any proceeds from such deemed sales. If a section 1256 contract held at the end of a taxable year were sold in the following year, the amount of any gain or loss realized on such sale would be adjusted to reflect the gain or loss previously taken into account under the mark-to-market rules. Capital gains and losses from section 1256 contracts are characterized as short-term capital gains or losses to the extent of 40% thereof and as long-term capital gains or losses to the extent of 60% thereof.

*Short Sales.* Gain or loss from a short sale of property is generally considered a capital gain or capital loss to the extent the property used to close the short sale constitutes a capital asset in the taxpayer's hands. Except with respect to certain situations where the property used to close a short sale has a long-term holding period on the date of the short sale, special rules would generally treat the gains on short sales as short-term capital gains. In addition, the holding period of "substantially identical property" held by the taxpayer may be considered to begin only upon


closing of the short sale. Moreover, a loss on a short sale will be treated as a long-term capital loss if, on the date of the short sale, substantially identical property has been held by the taxpayer for more than the long-term holding period. The acquisition of certain options to sell securities would be treated for tax purposes as short sales.

*Constructive Sales.* Under an exception to the general rule that gain is taxed only when realized (i.e., a transaction is closed by an actual sale or disposition), the Fund will recognize gain (but not loss) on any "constructive sale" of any "appreciated financial position" – even though the proceeds of the transaction may not be received until a subsequent taxable year. Appreciated financial positions subject to the constructive sale rules include any position with respect to any stock, debt instrument (other than certain "straight debt") or partnership interest if gain would result on the sale, assignment or other termination of that position at its fair market value.

Subject to certain exceptions, a constructive sale would occur if the Fund were to enter into any one of the following transactions: (i) a short sale with respect to the same (or substantially identical) property, (ii) an offsetting notional principal contract with respect to the same (or substantially identical) property, (iii) a futures or forward contract with respect to the same (or substantially identical) property; or (iv) transactions to be enumerated in Treasury Regulations having substantially the same effect as those transactions. Alternatively, if the Fund's appreciated financial position is one of the above transactions, a constructive sale generally would occur if the Fund were to acquire the same (or substantially identical) property that is the subject of the appreciated financial position.

*Wash Sales.* The Fund may in certain circumstances be negatively impacted by certain special rules of the Code and Regulations relating to "wash sales." In general, the "wash sale" rules prevent the recognition of loss by a taxpayer from the disposition of stock or securities at a loss in a case in which identical or substantially identical stock or securities (or an option to acquire such property) is or has been acquired within a prescribed period. Thus, the wash sale rules could prevent the current utilization for tax purposes of a loss realized by the Fund from the sale of a security if within 30 days before or 30 days after the sale, the Fund were to acquire substantially identical securities or enter into a contract or option to acquire such securities.

*Derivative Transactions.* Income or loss from transactions involving derivative instruments, such as swap transactions, entered into by the Fund also may constitute ordinary income or loss. Moreover, gain recognized from certain "conversion transactions" will be treated as ordinary income. Generally, a conversion transaction is one of several enumerated transactions where substantially all of the taxpayer's return is attributable to the time value of the net investment in the transaction. The enumerated transactions are (i) the holding of any property (whether or not actively traded) and entering into a contract to sell such property (or substantially identical property) at a price determined in accordance with such contract, but only if such property was acquired and such contract was entered into on a substantially contemporaneous basis, (ii) certain straddles, (iii) generally any other transaction that is marketed or sold on the basis that it would have the economic characteristics of a loan but the interest-like return would be taxed as capital gain or (iv) any other transaction to be specified in Regulations.

<u>Basis Limitation on the Deduction of Losses</u>. Any Net Loss for a year allocated by the Fund to a Partner for tax purposes may be deducted by that Partner only to the extent of the "adjusted tax basis" of his Interests and then only to the extent that various loss limitation rules of the Code do not apply to the loss (such as the at-risk and passive activity rules discussed below). Generally, a

Limited Partner's basis for Interests in the Fund will initially equal the sum of the Limited Partner's initial cash contribution to that Fund and the adjusted tax basis of any property contributed to that Fund.  A Limited Partner's basis will be increased by (i) any subsequent Capital Contributions the Partner makes to the Fund and (ii) the Limited Partner's distributive share of Fund income for tax purposes.  A Limited Partner's adjusted tax basis for his Interests in the Fund will be decreased (but not below zero) by (i) distributions to such Limited Partner from the Fund and (ii) his distributive share of Fund losses and deductions for tax purposes.  Losses in excess of a Limited Partner's adjusted tax basis may be carried over to succeeding taxable years, subject to certain limitations.

At-Risk Limitations of Section 465 of the Code.  The "at-risk" rules of Section 465 of the Code could have an adverse impact on a Limited Partner in connection with the deductibility of losses from the Fund.  Under Section 465, an individual partner in a partnership may deduct losses from business and investment activities only to the extent of the aggregate amount the partner has "at risk" in the activity conducted by the partnership at the close of the partner's taxable year.  In general, a partner's amount at risk is initially equal to the amount of personal funds and the adjusted basis of unencumbered property which is contributed to the partnership.  A partner's amount at risk is generally increased by the partner's distributive share of partnership income (including tax-exempt income) and decreased by distributions and the partner's distributive share of partnership losses.  In general, amounts borrowed for use by the partnership increase a partner's amount at risk only to the extent the partner is personally liable for repayment of the borrowed amount or has pledged property not used by the partnership as security for a partnership loan. Prospective investors should consult their own tax advisors concerning the application of the at-risk rules to their personal circumstances.

Passive Activity Limitations of Section 469 of the Code.  Section 469 of the Code imposes certain restrictions on the ability of non-corporate taxpayers, as well as certain closely held subchapter C corporations and personal service corporations, to deduct losses and credits from passive activities.  In general, passive activities are trade or business activities in which a taxpayer does not materially participate.  Code section 469 generally provides that losses and credits from a passive activity may be used only to offset income from other passive activities, but not portfolio income from investments (generally defined as all income other than income derived in the ordinary course of a trade or business).  Potential investors are advised to consult their own tax advisors concerning the issues discussed in this subsection.

Limitations on Deductibility of Interest.  For noncorporate taxpayers, section 163(d) of the Code limits the deduction for "investment interest" (i.e., interest expense (including certain short sale expense) allocable to investment property).  Investment interest is not deductible to the extent that it exceeds the taxpayer's net "investment income" (generally, the excess of (i) the ordinary income derived from investments and the net gain attributable to the disposition of property held for investment over (ii) the deductions, other than for interest, which are directly connected with the production of investment income).  However, net long-term capital gains are excluded from the category of net investment income, except to the extent a taxpayer elects to reduce his net capital gain eligible for the maximum rate generally applicable to net long-term capital gains.  A Partner who cannot deduct investment interest currently as a result of the application of section 163(d) would be entitled to carry forward such deductions to future years, subject to the same limitation.

Whether or not the Fund's activities are deemed to constitute the conduct of a trade or business, it is likely that the investment interest limitations would apply to the deductibility by a Limited Partner of his share of the interest expenses attributable to the Fund's operations as well as to any interest paid by him on money borrowed to finance his investment in the Fund.  It would also appear that the excess of a Limited Partner's share of Fund income over that Limited Partner's share of Fund expenses would constitute net investment income.  However, the above characterization of income and expenses would not apply to the extent that the Fund's activities are deemed to be passive activities.

In addition to the limitation on the deduction of investment interest expense, depending upon a given investor's particular situation, if the investor owns tax-exempt obligations, interest paid on funds borrowed for purposes of making an investment in the Fund may be considered to be incurred to enable the investor to continue to carry tax exempt obligations, and therefore could be subject to the limitations of the Code which disallow any deduction for interest on indebtedness incurred or continued to purchase or carry tax-exempt obligations.

"Phantom Income" From Certain Foreign Investments.  Pursuant to various "anti-deferral" provisions of the Code (the "Subpart F," "passive foreign investment company" and "foreign personal holding company" provisions), investments (if any) by the Fund in certain foreign corporations may cause a Limited Partner to (i) recognize taxable income prior to the Fund's receipt of distributable proceeds, (ii) pay an interest charge on receipts that are deemed as having been deferred or (iii) recognize ordinary income that, but for the "anti-deferral" provisions, would have been treated as long-term or short-term capital gain.

Deductibility of Certain Fund Expenses by Individual Partners.  The expenses of an individual taxpayer paid or incurred for the production of income, but not attributable to a trade or business, ("Section 212 Expenses") are deductible for any taxable year only to the extent that such expenses, along with certain other "miscellaneous itemized deductions," exceed 2% of the taxpayer's adjusted gross income for that taxable year.  Further, an individual's Section 212 Expenses will not be deductible for alternative minimum tax purposes.  The 2% floor on the deductibility of Section 212 Expenses and the nondeductibility of such expenses for alternative minimum tax purposes also apply, in modified form, to estates and trusts.  Code Section 68 reduces certain itemized deductions by 3% of the amount by which the individual's adjusted gross income exceeds a specified amount (which is adjusted annually for inflation) except that no more than 80% of the individual's otherwise allowable itemized deductions which are subject to this rule will be disallowed.

A securities partnership may be classified as an "investor," "trader," or a "dealer" for federal income tax purposes.  As discussed above under the heading "Taxation of Fund Operations-Securities Transactions," the gains and losses recognized by an investor or a trader on the sale of securities are capital gains and losses (unlike the gains or losses of dealers, which are in whole or in part characterized as ordinary).  However, unlike the expenses of an investor, the expenses of a trader are treated as expenses incurred in connection with the operation of a trade or business and not as Section 212 Expenses.  Accordingly, the expenses of a securities partnership classified as a trader, including any management fees, should not be subject to the itemized deduction limitations set forth above.

The determination of whether a securities partnership is an investor, trader, or a dealer for tax

purposes is a fact sensitive inquiry that turns on (1) the partnership's investment intent, (2) the nature and source of the income derived from the partnership activity, and (3) the frequency, extent, and regularity of the partnership's securities transactions.  While no clear bright lines exist in evaluating these factors, a few general conclusions can be drawn from the body of judicial and regulatory decisions which have applied them.  A trader buys and sells securities with reasonable frequency in an effort to catch short swings in the market movements and thus profit on a short-term basis.  Conversely, an investor purchases securities to be held for capital appreciation and income usually without regard to short-term developments that would influence the price of the securities on the daily market.  A dealer is differentiated from a trader in that a dealer has customers and expects to profit from finding buyers who will pay more for securities than the dealer's cost, this excess representing remuneration for the dealer's services as a middle-man.

The consequences of the itemized deduction limitations will vary depending upon the personal tax situation of each taxpayer and the Fund's position as to whether it is classified as a dealer or investor for tax purposes, and each Limited Partner is advised to consult his own tax advisor with respect to the application of these limitations to that Limited Partner, including the possibility that these limitations may significantly reduce the Partner's after tax return form an investment in the Fund.

Contribution, Distributions and Dispositions of Interests.  No gain or loss will be recognized by the Fund or a Partner upon the acquisition of an Interest in the Fund for cash.  However, if appreciated property is contributed to the Fund, and if the Fund is deemed to be an "investment company" within the meaning of section 721(b) of the Code, gain would be recognized to the contributing Partner unless the contribution by the Partner constituted a "diversified portfolio" of assets.  Prospective investors should consult their own tax advisors concerning this issue.  Even if no gain were required to be recognized by a Partner on the contribution of appreciated property to the Fund, on a subsequent recognition of that appreciation by the Fund on a taxable disposition of the property, the amount of such appreciation generally would be taxed to the contributing Partner for income tax purposes.  The amount of such gain could also be taxed to the contributing Partner if the appreciated property were subsequently distributed by the Fund to a Partner other than the contributing Partner, or if other property were distributed by the Fund to the contributing Partner.

A Partner will not recognize a loss on the contribution of built-in loss property to the Fund.  Built-in loss property is property whose fair market value exceeds its adjusted basis at the time of the contribution.  Section 704(c)(1)(C) provides that the amount of the built-in loss is taken into account only in determining the amount of items allocated to the contributing Partner.  In determining the amount of items allocated to non-contributing Partners, the basis of the contributed property is treated as equal to its fair market value.  Therefore, if the contributing Partner transfers his Interests to another person, the transferee will not benefit from the built-in loss on the contributed property.

The Fund revalues the "book" value of its assets periodically for Capital Account purposes, at the same time and in the same manner in which its assets are marked-to-market for financial statement presentation purposes.  Such revaluations will create disparities between the "tax capital" and "book capital" accounts of the Partners of the Fund at the time of the revaluation and will have the effect of allocating unrealized appreciation and depreciation in the revalued

58

assets to such Partners for book (but not tax) purposes at the time of the revaluation. The Partners would be specially allocated such appreciation and depreciation for tax purposes on the taxable disposition of the revalued property by the Fund (or on a distribution of the revalued property to certain Partners). Prospective investors should consult their own tax advisors concerning this issue.

Gain (but not loss) will be recognized by a Partner to the extent the Fund distributes an amount of money (or in certain circumstances, marketable securities) which exceeds the Partner's adjusted basis for his or her Interests immediately before the distribution after taking into account all allocations, including in the case of a withdrawing Partner, any allocations (including special allocations for tax purposes) for the Accounting Period in which the withdrawal occurs. This gain would have the same character as would gain realized by a Partner upon a sale or exchange of an Interest.  A loss, if any, would be recognized by a Partner only upon a distribution in liquidation of his or her Interests.  Certain special rules would apply if the Fund were to distribute property rather than cash.

If a Partner sells his or her Interests in the Fund, then, with certain exceptions, any resulting gain or loss will be treated as capital gain or capital loss and, to the extent the Partner has a long-term holding period in his or her Interests, the capital gain or loss will be treated as long-term.  The sale or exchange within a twelve-month period of 50% or more of the total interest in Fund capital and profits may result, for federal income tax purposes, in a termination of the Fund, a constructive contribution of all of the Fund's assets and liabilities to a new partnership followed by a constructive distribution of interests in the new partnership to the Partners.  Such a termination would close the taxable year of the Fund so that each Partner's distributive share for that short year would be included in its taxable year during which the termination takes place and could have certain other adverse tax consequences.

Fund items of taxable income and loss for a year which a Partner sells all (or any portion) of his or her Interests in the Fund will be allocated between the Partner reducing his or her interest in the Fund and the other Partners as permitted by the Code.

Basis Adjustment Election.  Pursuant to the terms of each Partnership Agreement, the General Partner is authorized, but not required, to cause the Fund to elect under Section 754 of the Code to have the basis of its assets adjusted in the event of a distribution of money or property to a Partner or in the event of a transfer of an Interest in the Fund by sale or exchange or as a result of the death of a Partner.  If made, such election could be revoked only with the consent of the IRS. Until revoked, the election would apply to all such transactions during the year for which made and for subsequent taxable years.  Due to the complexity and costs involved in making such an election, it is unlikely that the General Partner would make such an election.

Pursuant to Section 743(a), the basis of the Fund's assets is required to be adjusted if there is a transfer of an Interest of the Fund by sale or exchange or on the death of a Partner, if the Fund has a substantial built-in loss immediately after such transfer.  A substantial built-in loss exists when the basis in Fund assets exceeds by more than $250,000 the fair market value of such property. Pursuant to Section 734(a), the basis of Fund assets is also required to be adjusted in the event of a distribution of property to a Partner if there is a substantial basis reduction.  A substantial basis reduction exists if the sum of (A) the loss recognized to the distributor Partner plus (B) the excess of the basis of the distributed property in the hands of the distributee Partner

over the basis of the property to the Fund immediately prior to the distribution exceeds (C) $250,000.

Foreign and Other Special Investors.  The following discussion summarizes certain significant U.S. federal income tax consequences to a Limited Partner that is not a "United States person" within the meaning of the Code (a "Non-U.S. Investor") and that, in addition, is not (i) a partnership or other tax-transparent entity, (ii) an individual present in the United States for 183 days or more in a taxable year who meets certain other conditions, or (iii) subject to rules applicable to certain expatriates or former long-term residents of the United States.

The Fund generally does not expect to be treated as engaged in a U.S. trade or business for U.S. tax purposes. If the Fund is not engaged in a U.S. trade or business, a Non-U.S. Investor will not be required to file U.S. federal income tax returns because of its investment in the Fund, and generally will not be subject to U.S. tax (or to U.S. withholding by the Fund) on its distributive share of any income or capital gain from its investments in the Fund, other than U.S. withholding tax on its distributive share of (i) dividends, if any, from the Fund's U.S. equity investments, if any, (ii) interest, if any, received by the Fund from U.S. sources, except for interest derived from certain portfolio debt and other instruments, and (iii) gain, if any, from the sale of any "United States real property interest" ("USRPI"). The rate of withholding is generally 30% on dividends or non-portfolio debt interest, and up to 39.6% on gain from the sale of a USRPI, unless the Non-U.S. Investor is entitled to the benefits of an applicable tax treaty.

If the Fund were treated as engaged in a U.S. trade or business for tax purposes (including as a result of an investment in tax-transparent entities that are so treated), a Non-U.S. Investor could be subject to U.S. federal income tax at graduated rates (up to 39.6%) on its entire distributive share of Fund income effectively connected with that trade or business (including interest, dividends, and gains) and would be obligated to file United States income tax returns.  In such case, the Fund would be required to withhold such tax during the year on an estimated basis and pay any difference between the estimated payments and the withholding tax due on the Fund's actual income with its annual partnership tax return. If the Fund is engaged in a U.S. trade or business, such withholding is required, whether or not the Fund distributes any of its income.  In addition, a Non-U.S. Investor that is a foreign corporation may, in certain circumstances, be subject to a branch profits tax of 30% on such investor's share of adjusted effectively connected earnings and profits.]

Any foreign person or entity, or any other person or entity subject to special tax treatment, who or which is considering acquiring an interest in the Fund should consult his or its own tax advisers with respect to the federal, state and local tax consequences of an investment in the Fund, and in the case of a foreign person or entity, the consequences of an investment in the Fund under the laws of any jurisdictions in which such person or entity is subject to tax.

Returns and Tax Information.  The Fund annually furnishes to the Limited Partners sufficient information from its information return for the Limited Partners to prepare their own federal and state income tax returns.   The Fund's information returns are prepared by independent accountants selected by the General Partner.

Audit of Tax Returns. While the Fund was not established to allow investors to avail themselves of losses or deductions it may generate, the IRS still may audit the Fund's information returns.

Any such audit may precipitate audits of the income tax returns of Limited Partners. If the IRS successfully asserts a position to adjust any item of income, gain, deduction or loss reported on the Fund information return, corresponding adjustments would be made to the income tax returns of Limited Partners. Any such audit might also result in IRS adjustments to items of non-Fund income or loss. If a tax deficiency is determined, the taxpayer is liable for interest on such deficiency from the due date of the return.

Procedures. The Code provides that the tax treatment of items of partnership income, gain, loss, deduction and credit is to be determined at the partnership level in a unified partnership proceeding rather than in separate proceedings with the limited partners. Generally each partner will be required to treat Fund items on such Partner's return consistently with the treatment given such items by the Fund. These rules provide for the appointment of a "tax matters partner," which, in the case of the Fund, is the General Partner. The tax matters partner is treated by the IRS as the Fund's primary representative and has the power to bind the Fund and its Limited Partners in certain circumstances. While the tax matters partner must keep each Limited Partner informed of all administrative and judicial partnership proceedings, and while all Limited Partners are entitled to participate in administrative and judicial proceedings, the tax matters partner generally has the authority to extend the three-year statute of limitations for assessment of a deficiency with respect to Fund tax items on behalf of all Limited Partners and has the authority to bind Limited Partners who are not "notice partners" or members of a "notice group" to a settlement agreement unless such Limited Partners file statements revoking such authority. With respect to investment companies with fewer than 100 partners, all members are notice partners. Notice members are not bound by a settlement entered into by the tax matters partner with the IRS. As a practical matter, the General Partner, as tax matters partner, will exercise substantial control over the conduct and outcome of any audit proceeding involving the Fund. The expenses of any such audit proceeding, including a judicial proceeding, will be borne by the Fund. These expenses could be substantial, regardless of the outcome of the proceeding.

Reportable Transactions. Certain transactions ("Reportable Transactions") are subject to a special tax return disclosure requirement. If an investment in the Fund or any transaction of the Fund is a Reportable Transaction, then the Fund, and in certain cases, the Partners, would be required to file a disclosure on Form 8886 with its tax return. The General Partner does not believe that an investment in the Fund is a Reportable Transaction, but cannot predict whether any transaction of the Fund will be deemed to be a Reportable Transaction. Furthermore, although it anticipates that no underlying fund will engage in a Reportable Transaction, it cannot be sure of such expectation.

Reportable Transactions include transactions which result in the Fund or any of its Partners claiming a loss (including a capital loss and a worthless securities loss), if such loss exceeds certain thresholds, and if an exemption does not apply. The threshold applicable to the Fund for a loss transaction is a loss of at least $2,000,000 or more in the year of the transaction or at least $4,000,000 in a combination of taxable years. If the loss is a Reportable Transaction for the Fund, the Fund will be required to file Form 8886. In addition, a Partner may also be required to file Form 8886 if the Partner's share of such loss exceeds such thresholds. Further, a Partner that incurs a loss on the sale or transfer of the Partner's interest in the Fund (in excess of the thresholds described above) likely will be required to file Form 8886 with his, her or its tax return.

Certain partnerships and material advisors are subject to a requirement to maintain a list identifying each person who was sold an interest in such partnership; material advisors may also be required to file a statement with the IRS disclosing information regarding such partnership. The General Partner does not expect that the list maintenance requirements and disclosure requirements will apply to the Fund, but the General Partner may determine in the future that such list maintenance and disclosure requirements are applicable to the Fund.  Investors are advised that their names, addresses, taxpayer identification numbers, and other information required under regulations may be included on such list and provided to the IRS upon request.

The penalties for non-compliance with the list maintenance requirements or with the requirement to disclose Reportable Transactions on Form 8886 are severe.

<u>Medicare Contribution Tax on Unearned Income</u>.  For taxable years beginning after December 31, 2012, a 3.8% Medicare tax will generally be imposed on the net investment income of individuals, estates and trusts that are U.S. Persons. "Net investment income" includes, among other things, (1) gross income from dividends other than dividends derived from the conduct of a non-passive trade or business and (2) net gain attributable to the disposition of property other than property held in a non-passive trade or business. A significant portion of the income that the Fund derives likely will constitute net investment income.

<u>Foreign Account Tax Compliance</u>.  Sections 1471 – 1474 of the Code (referred to as "FATCA") imposes a 30% withholding tax respect to certain U.S. source income, including US source dividends, interest, and gross proceeds from the sale of securities that can produce dividends and interest (such amounts are referred to as "Withholdable Payments").  A non-U.S. Limited Partner's share of the Withholdable Payments received by the Fund will be subject to this 30% withholding tax unless such Limited Partner provides the Fund with information, representations and waivers of non-U.S. law as may be required for the Fund to comply with the provisions of FATCA.  In particular, withholding may apply unless a non-U.S. Limited Partner certifies to the Fund (and provides other supporting information to the Fund) that it is (i) a "foreign financial institution" that has either entered into an agreement with the IRS under which it will agree to identify its direct or indirect U.S. owners and report certain information concerning such U.S. owners to the IRS, or alternatively, is exempt from the requirement to enter into an agreement as a result of an applicable intergovernmental agreement between such Partner's home jurisdiction and the United States for the implementation of FATCA, (ii) treated as a "non-financial foreign entity" and certifies that it either does not have any substantial U.S. owners or furnishes identifying information regarding each of its substantial U.S. owners, or (iii) otherwise exempt from these rules.

Pursuant to recent IRS guidance, FATCA withholding will be effective with respect to certain payments of U.S. source income, including U.S. source dividends and interest, made after June 30, 2014 (and after December 31, 2016 with respect to payments of gross proceeds from the sale of securities giving rise to U.S. source dividends and interest). Underlying funds in which the Fund invests may also be required to satisfy certain requirements relating to FATCA in order to avoid being subject to the 30% FATCA withholding tax, but there can be no assurance that such underlying funds will satisfy such requirements to avoid withholding under FATCA. Each prospective investor should consult with its own tax adviser as to the potential impact of the legislation in its own tax situation

Possible Legislative Tax Changes.  The foregoing summary of federal income tax law reflects provisions of recent legislation.  Because, however, Regulations and other official interpretations have not been issued with respect to a number of such provisions, their meaning is uncertain.  In addition, legislation has been or may be proposed in Congress that might have a substantial and adverse effect on Limited Partners.  Investors should consult with their own professional advisers as to all current and possible future proposals with respect to federal, state and local tax legislation and the effect, if any, that such legislation may have on an investment in Interests.

The federal income tax aspects of the Fund summarized above are general in nature and are not intended to be a complete explanation of the federal income tax results of investing in the Fund.  Each prospective Limited Partner should consult with such prospective Limited Partner's own tax adviser for detailed information.

The foregoing summary does not address tax considerations that may be applicable to certain Limited Partner under the laws of jurisdictions other than the US.  The Fund has no present plans to apply for any certifications or registrations, or to take any other actions under the laws of any jurisdictions that would afford the relief to local investors therein from the normal tax regime otherwise applicable to an investment in the Interests.  It is the responsibility of all Limited Partners to inform themselves as to any income or other tax consequences arising in the jurisdictions in which they are resident or domiciled for tax purposes, as well as any foreign exchange or other fiscal or legal restrictions relevant to their particular circumstances in connection with the acquisition, holding, or disposition of the Interests.  The value of the Fund's investments may also be affected by repatriation and exchange control regulations.

## CERTAIN STATE AND LOCAL TAX CONSIDERATIONS

As a result of their ownership of Interests, Limited Partners may be subject to state and local taxes imposed by their states of residence.  As in the case of federal income taxes, state and local taxes are subject to change.  In addition, the computation of the amount of state and local income that is subject to tax could differ materially from the computation for federal income tax purposes.  For example, interest that is deductible for federal income tax purposes would not be deductible for state and local purposes.  It is important for each investor to discuss his or her obligation to file returns and pay tax in the jurisdictions in which the Fund will operate with his or her individual tax adviser.

## PRIVACY

The Fund does not disclose any nonpublic personal information about its investors or former investors to anyone, except to the General Partner, the Investment Advisor, the Administrator and the  Fund's attorneys, accountants, service providers and auditors or as otherwise required by  applicable law.  However, in order to service Fund accounts and effect transactions, non-public   personal information may be provided to other third parties.  The General Partner requires all  third party service providers and financial institutions with which it has contractual arrangements  to protect the confidentiality of investor information and to use the information only for purposes  related to the operation and management of the Fund.

## ANTI-MONEY LAUNDERING REGULATIONS

As part of the Fund's responsibility for the prevention of money laundering, the General Partner, the Investment Advisor, the Administrator and each of their Affiliates may require a detailed verification of a Limited Partner's identity, any beneficial owner underlying the account and the source of the  payment.

The General Partner reserves the right to request such information as is necessary to verify the identity of a Limited Partner and the underlying beneficial owners of a Limited Partner's Interests in the Fund.  In the event of delay or failure by the Limited Partner to produce any information required for verification purposes, the General Partner may refuse to accept a subscription or may cause the redemption of any such Limited Partner from the Fund.  The General Partner, by written notice to a Limited Partner, may suspend the payment of redemption proceeds of such Limited Partner if the General Partner reasonably deems it necessary to do so to comply with anti-money laundering regulations applicable to the Fund, the General Partner or any of the Fund's service providers, including the Investment Advisor and the Administrator.

Each Limited Partner will be required to make such representations to the Fund as the Fund, the General Partner, the Investment Advisor, or the Administrator will require in connection with such anti-  money laundering obligations, including without limitation, representations to the Fund that such  Limited Partner is not a prohibited country, territory, individual or entity listed on the OFAC  website and that it is not directly or indirectly affiliated with, any country, territory, individual or  entity named on an OFAC list or prohibited by any OFAC trade or economic sanctions  programs.  Such Limited Partner will also represent to the Fund that amounts contributed by it to  the Fund were not directly or indirectly derived from activities that may contravene federal, state  or international laws and regulations, including anti-money laundering laws and regulations.

If, as a result of any information or other matter which comes to their attention, the Fund, the General Partner, the Investment Advisor, or the Administrator know or suspect that a Limited Partner or an  underlying beneficial owner is engaged in money laundering or payments from such Limited  Partner or an underlying beneficial owner are derived from illicit activity, such entity may be  required to or deem it to be advisable or in the best interest of the Fund to report such  information or other related matter to appropriate law enforcement or other governmental or  regulatory authorities and such report shall not be treated as a breach of any restriction upon the  disclosure of information imposed by law or otherwise.

## ADMINISTRATOR

Nottingham Investment Administration (the "Administrator") serves as the Fund's administrator. The Administrator provides certain administrative,  accounting and investor services to the Fund.  Pursuant to the terms of an Administration  Agreement between the Fund and the Administrator, the Administrator is responsible, under the  ultimate supervision of the General Partner, for providing all administrative services required in  connection with the Fund's operations, including: (a) managing the purchase and redemption  process; (b) computing the Net Asset Value of the Fund; (c) maintaining the register of investors  and entering on such all issues, transfers, and redemption of Interests in the Fund; and (d)  performing such additional administrative duties relating to the administration of the Fund as  may subsequently be agreed

upon in writing between the Fund and the Administrator.

The Administrator will receive customary fees that will be paid out of the assets of the Fund. The Administrator will also be reimbursed for out-of-pocket expenses and certain other expenses incurred in providing administrative services to the Fund, as set forth in the Administration Agreement.  The Administration Agreement also provides that the Administrator shall not be liable to the Fund for, and shall be indemnified by the Fund against, any acts or omissions in the performance of its services in the absence of willful misfeasance, bad faith, reckless disregard of its obligations and duties or breach of its contractual obligations.

## LEGAL COUNSEL

Andrew E. Hurni, Esq. acts as  counsel to the Fund in connection with this offering of Interests. Mr. Hurni  also acts as counsel to the General Partner, the Investment Advisor and their Affiliates.  In connection with  this offering of Interests, and subsequent advice to the Fund, the General Partner, the Investment Advisor  and their Affiliates, Mr. Hurni will not be representing investors in the  Fund. No independent counsel has been retained to represent investors in the Fund.

## INDEPENDENT AUDITORS

The Fund has selected Sanville & Company to serve as independent auditors.  The  General Partner, however, may in the future select other auditors to serve the Fund and prepare  an annual audit.

## ADDITIONAL INFORMATION

Each prospective investor is invited to discuss with, ask questions of, and receive answers from, the General Partner concerning the terms and conditions of this offering of Interests of the Fund, and to obtain any additional information, to the extent the Fund possess such information or can acquire it without unreasonable effort or expense, necessary to verify the information contained herein.

Potential investors who have questions concerning the terms and conditions set forth herein should make inquiries to the General Partner at:

Broad Reach Capital, LP
200 Four Falls, Suite 211
1001 Conshohocken State Road
West Conshohocken, PA  19428

# **EXHIBIT A**

## **Definition of Accredited Investor**

• An employee benefit plan within the meaning of Employee Retirement Income Security Act of 1974, as amended ("ERISA") or a plan established and maintained by a state or its political subdivisions or any agency or instrumentality of a state or its political subdivisions for the benefit of its employees, in each case with total assets in excess of $5,000,000.

• An employee benefit plan within the meaning of ERISA if the investment decision is made by a Plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment adviser.

• An employee benefit plan which is completely self-directed and whose investment decisions are made by a person who is an "Accredited Investor" under Regulation D.

• A trust with total assets in excess of $5,000,000, not formed for the specific purpose of making this investment, the investments of which are directed by a person with knowledge and expertise in financial and business matters, as described in Rule 506(b)(2)(ii) of Regulation D.

• An individual who has, or an Individual Retirement Account (IRA), a Keogh Plan covering only self-employed individual or a self-directed account of a one member retirement plan whose beneficial owner has, net worth, or joint net worth, with that person's spouse at the time of his purchase in excess of $1,000,000.

• An individual who has, or an IRA, a Keogh Plan covering only self-employed individuals, or a self-directed account of a one member retirement plan whose beneficial owner had, an income in excess of $200,000 in each of the two most recent years or joint income with that person's spouse in excess of $300,000 in each of those years and who reasonably expects an income in excess of the same income level in the current year.

• A corporation, Massachusetts or similar business trust, a partnership, a limited liability company or similar organization not formed for the specific purpose of making this investment, with total assets in excess of $5,000,000.

• An entity in which all of the equity owners are Accredited Investors under Rule 501 of Regulation D under the Securities Act of 1933 ("Regulation D").

• A bank, savings and loan association, broker, dealer, insurance company, investment company, business development company, licensed small business investment company or private business development company (as such terms are defined under applicable sections of the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, the Investment Advisers Act of 1940 or the Small Business Investment Act of 1958).

• An organization described in Section 501(c)(3) of the Internal Revenue Code, not formed for the specific purpose of making this investment, with total assets in excess of $5,000,000.

• An executive officer or director of the General Partner or an IRA for their benefit.

## <u>Definition of Qualified Purchaser</u>

\*    A natural person (including any person who holds a joint, community property or other similar shared ownership interest in the Partnership with that person's qualified purchaser spouse) who owns not less than $5,000,000 in "investments."

\*    A company, partnership or trust that owns not less than $5,000,000 in "investments" and that is owned directly or indirectly by or for two or more natural persons who are related as siblings or spouse (including former spouses), or direct lineal descendants by birth or adoption, spouses of such persons (including former spouses), the estates of such persons, or foundations, charitable organizations or trusts established by or for the benefit of such persons (a "Family Company").

\*    A trust that is not covered by the immediately preceding paragraph and that was not formed for the specific purpose of acquiring the securities offered, as to which the trustee or other person authorized to make decisions with respect to the trust, and each settlor or other person who has contributed assets to the trust, is a person described in the first, second or fourth paragraphs of this section.

\*    A person or entity, acting for its own account or the accounts of other qualified purchasers, who in the aggregate owns and invests on a discretionary basis not less than $25,000,000 in "investments".

\*    A qualified institutional buyer as defined in paragraph (a) of Rule 144A under the Securities Act, acting for its own account; provided that (i) a dealer described in paragraph (a)(1)(ii) of Rule 144A shall own and invest on a discretionary basis at least $25 million in securities of issuers that are not affiliated persons of the dealer; and (ii) a plan referred to in paragraph (a)(1)(D) or (a)(1)(E) of Rule 144A, or a trust fund referred to in paragraph (a)(1)(F) of Rule 144A that holds the assets of such a plan, and whose investments are participant-directed will not be eligible to acquire the Interests, unless each participant in such plan or trust is a qualified purchaser under sub-paragraph (a) above and also an "accredited investor" (as defined in Rule 501(a) of Regulation D under the Securities Act).

\*    A company, limited liability company, partnership or trust, each beneficial owner of the securities of which it is a qualified purchaser.

Ex. A-2